UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MESCALERO APACHE TRIBE,
PUEBLO OF ISLETA,
PUEBLO OF POJOAQUE,
and PUEBLO OF SANDIA,

      Plaintiffs,

v.                          No. _____

KALSHI, INC. and KALSHIEX, LLC,

      Defendants

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND CIVIL PENALTIES**

1.     The Mescalero Apache Tribe, Pueblo of Isleta, Pueblo of Pojoaque, and Pueblo of

Sandia (together, the "Tribes") bring this action to enjoin Kalshi, Inc. and KalshiEx, LLC

(together, "Kalshi") from—and for all the Tribes besides Pueblo of Sandia, to impose civil

penalties for—operating Class III gaming activities on the Tribes' respective Indian lands in

violation of their respective tribal-state gaming compacts and their respective federally approved

gaming ordinances as made enforceable under the Indian Gaming Regulatory Act ("IGRA").

## I.     JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action under 28 U.S.C. § 1331, as this action

arises under federal common law and IGRA, which provides in 25 U.S.C. § 2710(d)(1) that

> Class III gaming activities shall be lawful on Indian lands only if such activities
> are . . . authorized by an ordinance or resolution that . . . is adopted by the governing
> body of the Indian tribe having jurisdiction over such lands . . . and . . . approved
> by the Chairman [of the National Indian Gaming Commission ("NIGC") and] . . .
> conducted in conformance with a Tribal-State compact . . . that is in effect.

3.     This Court also has jurisdiction directly under IGRA, which provides in 25 U.S.C.

§ 2710(d)(7)(A) that "United States district courts shall have jurisdiction over . . . any cause of

1

action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . that is in effect." That applies here since the Tribes' compacts only authorize the Tribes to conduct gaming on their Indian lands.

4.      This Court also has jurisdiction under 28 U.S.C. § 1362 because this civil action is brought by four federally recognized Indian tribes and the matter in controversy arises under federal law. *See* 91 Fed. Reg. 4102, 4104 (Jan. 22, 2026).

5.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) as all the Tribes' Indian lands where Kalshi is conducting unauthorized Class III gaming are located in New Mexico, so a substantial part of events or omissions giving rise to the claims occurs in this judicial district.

## II.    PARTIES

6.      Plaintiff Mescalero Apache Tribe ("Mescalero") is a federally recognized Indian tribe which occupies and governs the Mescalero Apache Reservation ("Mescalero Reservation") established by the Executive Order of May 29, 1873, consisting of over 719 square miles located near Ruidoso, in south central New Mexico.

7.      Plaintiff Pueblo of Isleta ("Isleta") is a federally recognized Indian tribe which occupies and governs its Indian lands consisting of over 300,000 acres located about 15 miles south of Albuquerque, New Mexico.

8.      Plaintiff Pueblo of Pojoaque ("Pojoaque") is a federally recognized Indian tribe whose land grant dates to 1731 and which occupies and governs its Indian lands covering about 12,000 acres located mostly north of Santa Fe, New Mexico.

9.      Plaintiff Pueblo of Sandia ("Sandia") is a federally recognized Indian tribe established in the 1300s, which occupies and governs its Indian lands covering about 22,877 acres located just north of Albuquerque, New Mexico.

10.     Defendant Kalshi, Inc. is a Delaware corporation having its principal place of business at 594 Broadway, Suite 407, New York, New York, 10012. On information and belief, Kalshi, Inc. is the parent company of Plaintiff KalshiEx, LLC.

11.     Defendant KalshiEX, LLC is a Delaware limited liability company having its principal place of business at 594 Broadway, Suite 407, New York, New York 10012, and is, upon information and belief, a wholly-owned subsidiary of Kalshi, Inc.

### III.     TRIBAL AUTHORITY AND IGRA

**A.     IGRA Confirms Indian Tribes' Inherent Sovereign Authority to Exclude and to Regulate All Gaming Within Their Indian Lands.**

12.     Federally recognized Indian tribes in the United States "exercise 'inherent sovereign authority'" and "remain 'separate sovereigns pre-existing the Constitution.' Thus, unless and 'until Congress acts, the tribes retain' their historic sovereign authority." *Michigan v. Bay Mills Indian Cmty.* ("*Bay Mills*"), 572 U.S. 782, 788 (2014) (citations omitted). Indian Tribes "possess 'inherent sovereign authority over their members and territories.'" *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 689 (2022) (citation omitted).

13.     Among other inherent sovereign powers, Indian tribes "possess their traditional and undisputed power to exclude persons whom they deem to be undesirable from tribal lands." *Duro v. Reina*, 495 U.S. 676, 696 (1990). That includes the "well established" "power to exclude non-members entirely or to condition their presence on the reservation[.]" *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983).

14.     In the 1970s, tribes through their inherent sovereign authority began operating gaming to generate revenue to fund essential governmental services and address community needs.

15.     In 1987, the Supreme Court upheld tribes' inherent sovereign right to operate and regulate gaming on their Indian lands. *California v. Cabazon Band of Mission Indians*

("*Cabazon*"), 480 U.S. 505 (1987). *Cabazon* "held that States lacked any regulatory authority over gaming on Indian lands." *Bay Mills*, 572 U.S. at 794; *West Flagler Assocs., Ltd. v. Haaland* ("*W. Flagler*"), 71 F.4th 1059, 1062 (D.C. Cir. 2023) (same).

16.    The next year, Congress enacted IGRA, 18 U.S.C. §§ 1166-1168; 25 U.S.C. §§ 2701-2721, "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments[,]" 25 U.S.C. § 2702(1). IGRA serves "to ensure that the Indian tribe is the primary beneficiary of the gaming[,]" "to assure that gaming is conducted fairly and honestly[,]" and to establish "Federal standards for gaming on Indian lands," including establishment of the NIGC as "an independent Federal regulatory authority for gaming on Indian lands[.]" *Id.* § 2702(2)-(3). IGRA also recognizes that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not . . . prohibit such gaming activity." *Id.* § 2702(5).

17.    In IGRA, Congress "intended to expressly preempt the field in the governance of gaming activities on Indian lands." S. Rep. 100-446 at 6 (1988); *Gaming Corp. of Am. v. Dorsey & Whitney* ("*Gaming Corp.*"), 88 F.3d 536, 544 (8th Cir. 1996). "Congress thus left states with no regulatory role over gaming [on Indian lands] except as expressly authorized by IGRA, . . . through a tribal-state compact." *Gaming Corp.*, 88 F.3d at 546.

18.    IGRA defines "Indian lands" in 25 U.S.C. § 2703(4) as "(A) all lands within the limits of any Indian reservation; and (B) any lands" which are held either by the United States in trust for an Indian tribe or individual Indian or by an Indian tribe or individual subject to a federal restriction against any alienation and over which an Indian tribe exercises governmental power.

19.    IGRA divides gaming activities into three classes. "Class I gaming" consists of social games solely for prizes of minimal value and traditional forms of Indian gaming, over which

4

tribes exercise exclusive authority. *Id.* §§ 2703(6), 2710(a)(1). "Class II gaming" consists of bingo, similar games, and non-banked card games in which players play and bet only against each other and not a house, such as non-banked poker. *Id.* § 2703(7). Class II gaming is subject to regulation by tribes, with oversight by the NIGC. *Id.* §§ 2704, 2710(b)-(c).

20.     "Class III gaming" consists of "all other forms of gaming that are not class I gaming or class II gaming[,]" *id.* § 2703(8), "involving the three required elements of chance, consideration, and prize or reward." 25 C.F.R. § 293.2(d). IGRA's implementing regulations contain a non-exhaustive list of examples of class III gaming, including without limitation banked card games, slot machines, and "[a]ny sports betting and parimutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai." *Id.* § 502.4(c).

21.     Whether an activity constitutes "gaming" under IGRA does not depend on whether players bet against the "house" or against each other, since class III gaming includes both house-banked and non-banked activities. For example, pari-mutuel betting on horse races and sports betting are class III gaming in which players bet against each other, with the house taking a percentage of the bet as a fee, referred to in the gaming industry as a commission. *See id.* § 502.4.

22.     Under IGRA, "'class III gaming activity' means just what it sounds like—the stuff involved in playing class III games." *Bay Mills*, 572 U.S. at 792. That means "what goes on in a casino—each roll of the dice and spin of the wheel" or "gambling in the poker hall, not the proceedings of the off-site administrative authority" or "off-site licensing or operation of the games." *Id.* Therefore, whether IGRA applies to internet-based gaming depends only whether a bettor initiates bets or wagers while physically located on Indian lands, so the location of servers where bets are accepted and processed is irrelevant. *California v. Iipay Nation of Santa Ysabel* ("*Iipay Nation*"), 898 F.3d 960, 965, 967 (9th Cir. 2018); *Southern Ute Indian Tribe v. Polis*, 810 F. Supp. 3d 1203, 1205-06 (D. Col. 2025), *appeal filed*, No. 25-1440 (10th Cir. Nov. 24, 2025).

23.     Under IGRA, Indian tribes regulate <u>all</u> gaming on their Indian lands. 25 U.S.C. § 2710(a), 2710(d)(1)(A). Accordingly, "IGRA's restrictions on class III gaming applies to any class III gaming activity conducted on Indian lands, including gaming activity conducted by the State." *Cayuga Nation v. State of New York*, 775 F. Supp. 3d 651, 665-667 (N.D.N.Y. 2025); *Coeur d'Alene Tribe v. Idaho*, 842 F. Supp. 1268, 1282 (D. Id. 1994), *aff'd* 51 F.3d 876 (9th Cir. 1995). Under IGRA, a tribe also regulates gaming operated by nonmembers on non-Indian lands within the tribe's reservation. *See Crosby Lodge, Inc. v. NIGC*, 2011 WL 13262030 (D. Nev. 2011).

24.     Under IGRA, "class III gaming activities are lawful on Indian lands only if" they are authorized by, among other things, a tribal gaming ordinance or resolution which has been adopted by the tribe with jurisdiction over those lands and approved by the NIGC Chairman. 25 U.S.C. § 2710(d)(1). Accordingly, "[t]ribes and other operators of . . . gaming operations on Indian lands shall conduct gaming operations according to the requirements of" IGRA and "tribal law . . . under 25 U.S.C. 2710(d)." 25 C.F.R. § 501.2(a).

25.     In addition, while IGRA mandates that all net revenues from any tribal gaming may only be used for governmental and charitable purposes, 25 U.S.C. § 2710(b)(2)(B), (d)(1), gaming operations owned by others located on a tribe's Indian lands must be licensed and regulated by the tribe, pay an assessment to the NIGC, and pay no less than 60% of their net revenue to the tribe, 25 C.F.R. § 522.11. Because of the scope of Indian lands under IGRA, that 60% net revenue requirement applies even to non-Indian businesses located on non-Indian lands within Indian reservations. *See Crosby Lodge, Inc., supra*.

26.     Congress intended that IGRA encompasses changing technology, so "tribes should be given the opportunity to take advantage of modern methods" of operating gaming by linking players between reservations or states through "telephone, cable, television or satellite." S. Rep. 100-446 at 9. Therefore, IGRA "rejects any inference that Tribes should restrict class II games

6

to . . . current technology" and respects strong concerns for regulating "sophisticated forms of class III gaming . . . on Indian lands[.]" *Id.* at 9, 13. Congress did not intend to freeze gaming on Indian lands "trapped  in a . . . time warp, forever limited to those forms" of gaming commonly used when IGRA was enacted. *See Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018).

27.     For example, by 1986, wide-area progressive systems allowed jackpots to be pooled among computer-powered slot machines at geographically separate properties linked by telecommunications. *See* Intro. to Slots & Video Gaming 4, Intl. Game Tech., available at https://cdn.ca9.uscourts.gov/datastore/library/2013/02/26/Rincon_slots.pdf (last visited May 11, 2026) (cited in *Rincon Band of Mission Luiseno Indians v. Schwarzenegger*, 602 F.3d 1019, 1055 (9th Cir. 2010)). IGRA thus is not limited to activities physically conducted at "brick and mortar" facilities, and tribes and states may negotiate class III gaming compacts addressing statewide remote wagers or internet-based gaming. *See* 25 C.F.R. § 293.26; *W. Flagler*, 71 F.4th at 1063, 1065-66; *Iipay Nation*, 898 F.3d at 968.

**B.     IGRA Expressly Incorporates Federally Approved Tribal Gaming Ordinances and Makes Them Enforceable for All Gaming on Indian Lands.**

28.     By providing that "class III gaming activities shall be lawful on Indian lands only if" authorized by a tribal gaming ordinance approved by the NIGC Chairman, IGRA incorporates and adopts each such ordinance "as it exists whenever a question under the statute arises." *Jam v. Int'l Finance Corp.*, 586 U.S. 199, 209 (2019). Moreover, the fact that IGRA's requirements in part involve compliance with tribal law makes the latter "no less requirements of federal law." *United States v. Kebodeaux*, 570 U.S. 387, 392 (2013). Thus, IGRA's adoption of federally approved tribal gaming ordinances "'gives them the same validity as if [their] provisions had been specially made by Congress[.]'" *Id.* (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 207-8 (1824)).

29.    IGRA's incorporation of federally approved tribal gaming ordinances corresponds to federal incorporation of federally sanctioned tribal liquor control and air regulation. For example, 18 U.S.C. § 1161 provides that the general federal prohibition on liquor in Indian country "does not apply to any act or transaction within any area of Indian country . . . in conformity both with" relevant state laws "and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register." Through that, Congress "delegated authority to the States as well as to the Indian tribes to regulate the use and distribution of alcoholic beverages in Indian country[.]" *Rice v. Rehner*, 463 U.S. 713, 715 (1983), and properly vested "in tribal councils this portion of its own authority[,]" including "over non-Indians, insofar as concerned their transactions on a reservation[.]" *United States v. Mazurie*, 419 U.S. 544, 557-58 (1975).

30.    In turn, the Clean Air Act authorization for Indian tribes for "management and protection of air resources within the exterior boundaries of the reservation or other areas within the tribe's jurisdiction[,]" 42 U.S.C. § 7601(d)(2)(B), "grant[s] tribal jurisdiction over nonmember owned fee land within a reservation without the need to determine, on a case-specific basis, whether a tribe possesses 'inherent sovereign power' under *Montana*." *Arizona Public Service Co. v. EPA* ("*APS*"), 211 F.3d 1280, 1288 (D.C. Cir. 2000). For gaming, like liquor and air regulation, Congress has authorized and delegated authority to tribes to regulate non-Indian conduct within a reservation, even on non-Indian lands. *Cf. id.* at 1290-91 (discussing *Mazurie* and *Rehner*).

**C.    IGRA Exclusively Regulates Gaming on Indian Lands Distinct from Other Federal Gambling Regulation.**

31.    IGRA occupies the field of gaming regulation on Indian lands. IGRA criminalizes gambling in Indian country and incorporates state gaming regulation and prohibitions except for class I and class II gaming regulated by IGRA and class III gaming conducted under tribal-state

gaming compacts. 18 U.S.C. § 1166. Also, while IGRA exempts gaming thereunder from earlier statutes, a later federal gambling law disclaims application to gaming under IGRA.

32. For example, IGRA provides that the Johnson Act, which prohibits interstate transfer of gaming devices (slot machines), 15 U.S.C. § 1175, "shall not apply to any gaming conducted under a Tribal-State compact that . . . is in effect." 25 U.S.C. § 2710(d)(6). And IGRA provides that prohibitions on interstate commerce in lottery tickets, 18 U.S.C. §§ 1301-1304, "shall not apply to any gaming conducted by an Indian tribe pursuant to" IGRA. 25 U.S.C. § 2720.

33. Also, the Wire Act proscribes "knowingly us[ing] a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers . . . on any sporting event or contest" if such betting is illegal in either the jurisdiction where the bet is placed or the wager is accepted. 18 U.S.C. § 1084(a)-(b). However, that does not apply if the bet is placed on Indian lands pursuant to IGRA. *AT&T Corp. v. Coeur d'Alene Tribe*, 295 F.3d 899, 909 (9th Cir. 2002).

34. Next, under 15 U.S.C. § 3004, interstate off-track wagers may occur only with the consent of the host racing association, the horsemen's group, the host state racing commission, and the off-track racing commission where the wager is placed. If a tribe seeks to engage in interstate off-track horse race wagering, it must comply with those consent requirements in addition to IGRA because those federal statutes operate independently and in harmony.

35. Finally, the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"), 31 U.S.C. §§ 5361-67, prohibits payments if a bet or wager is not "legal both where it is 'initiated' and where it is 'received.'" *Iipay Nation*, 898 F. 3d at 965. However, the UIGEA "expressly *disavowed* any intent to 'alter[], limit[], or extend[]' existing federal, state and tribal gaming regulations, including IGRA." *Ho-Chunk Nation v. Kalshi Inc.*, 2026 WL 1284077, *8 (W.D. Wis. May 11, 2026) (quoting 31 U.S.C. § 5361(b)). The UIGEA thus does not "displace[] IGRA's more elaborate system . . . for regulating class III gaming conducted on Indian lands." *Id.* at *9.

## IV.   THE TRIBES' GAMING CONDUCT AND REGULATION

**A.   The Tribes Each Have Conducted Gaming for Over Three Decades Per Compacts.**

36.   The Tribes each have a long history of gaming. Mescalero started gaming in 1975 and Sandia started in 1986, both before IGRA, while Isleta started in 1990 and Pojoaque started in 1992. *See Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1549-1552 (10th Cir. 1997).

37.   In 1995, New Mexico's Governor signed and the U.S. Department of the Interior ("DOI") approved identical tribal gaming compacts for the Tribes and others. *See id.* After those were held to be unauthorized under state law, *id.* at 1550-51 (discussing *State ex. rel. Clark v. Johnson*, 1995-NMSC-048, ¶¶ 37-40, 120 N.M. 562, 904 P.2d 11), the New Mexico Legislature enacted them in 1997 and they were re-signed and re-approved.

38.   Since then, each of the Tribes and the State of New Mexico ("State") have entered into multiple successive gaming compacts under IGRA. Currently, each of the Tribes is a party to the standard-form 2015 gaming compact with the State, effective through 2037, available at https://www.bia.gov/as-ia/oig/gaming-compacts (last visited May 11, 2026), and referred to here as the "Compact" due to their identical provisions. Mescalero's and Isleta's Compacts became effective in 2015, Sandia's Compact became effective in 2016, and Pojoaque's Compact became effective in 2017. *See* 80 Fed. Reg. 35,668 (June 22, 2015) (Mescalero); 80 Fed. Reg. 44,992 (July 28, 2015) (Isleta); 81 Fed. Reg. 19,235 (April 4, 2016); 82 Fed. Reg. 49,654 (Oct. 26, 2017).

39.   The Compact only authorizes each Tribe itself to conduct gaming on its respective Indian lands, limits them to two full gaming facilities and one limited legacy gaming facility, and prohibits gaming by anyone under the age of 21. Compact §§ 3(A), 3(C), 4(B)(1).

40.   The Compact also recognizes that internet gaming is not authorized within New Mexico. *See id.* § 17. DOI accordingly found that "non-tribal Internet gaming . . . would conflict with the State's promise of exclusivity" under the Compact. *E.g.*, Letter from Lawrence Roberts,

10

Acting Asst. Sec. – Indian Affairs, DOI, to Francisco Lujan, Governor, Pueblo of Sandia (March 29, 2016), avail. at https://www.bia.gov/as-ia/oig/gaming-compacts (last visited May 11, 2026).

41.    The Compact also requires establishment of and detailed provisions in the Tribes' gaming ordinances, including for protecting the gaming public from criminality, such as fraud, cheating, money laundering, other forms of criminal conduct. Compact §§ 3(B), 4(A)-(B).

42.    The Compact and the Tribes' gaming ordinances address the unique social harms presented by gambling, including by prohibiting underage gaming, *id.* § 4(B)(1), prohibiting the cashing of public assistance checks, *id.* § 4(B)(9), requiring the Tribes to contribute to the support of programs to assist treatment of compulsive gamblers, *id.* § 4(B)(6), requiring the posting of signs notifying patrons of the availability of services for problem gambling, *id.* § 4(F)(1), requiring the Tribes to establish self-exclusion procedures for problem gamblers, *id.* § 4(F)(2), and requiring the Tribes to implementing background checks and licensing processes for employees, *id.* § 5.

**B.    The Tribes Each Extensively Regulate Gaming on Their Indian Lands Under IGRA.**

43.    Under IGRA and the Compact, each of the Tribes' governing bodies have enacted tribal gaming laws which regulate gaming on their respective Indian lands and have been approved by the NIGC Chairman, including Isleta's and Sandia's gaming regulations, and they and their respective NIGC approval letters are published online by the NIGC.[1]

---

[1] https://www.nigc.gov/office-of-general-counsel/gaming-ordinances/ (last visited May 11, 2026); Letter from George T. Skibine, Chairperson, NIGC, to Mescalero Apache Tribe (Dec. 17, 2009); Mescalero Apache Gaming Ordinance ("Mescalero Ordinance"); Pueblo of Isleta Resolution 2024-088A (Oct. 29, 2024) ("Isleta Resolution"); Letter from Sharon M. Avery, Acting Chairwoman, NIGC, to Pueblo of Isleta (Nov. 26, 2024); Pueblo of Isleta Ordinance: Permitted Gaming (Oct. 29, 2024) ("Isleta Ordinance"); Pueblo of Isleta Gaming Regulatory Agency Regulations (Nov. 26, 2024) ("Isleta Regulations"); Letter from Tracie L. Stevens, Chairperson, NIGC, to Pueblo of Pojoaque (Mar. 16, 2012); Gaming Ordinance of the Pueblo of Pojoaque ("Pojoaque Ordinance"); Pueblo of Sandia Ordinance: Permitted Gaming, Resolution No. 94-37 ("Sandia Ordinance"); Letter from Harold Monteau, Chairperson, NIGC, to Pueblo of Sandia (June 21, 1995); Pueblo of Sandia, Tribal Gaming Commission Regulations (Nov. 8, 2023) ("Sandia Regulations") (each also a "Tribe's Ordinance" and altogether, the "Tribes' Ordinances").

44.     The Tribes' Ordinances each incorporate IGRA's definition of class III gaming. *See* Mescalero Ord. § 2(C); Isleta Ord. § 1(B); Pojoaque Ord. § 10-8-2(C); Sandia Ord. § I(D).

45.     Each of the Tribes' gaming laws also prohibit third-party operated mobile sports betting on the Tribe's Indian lands, prohibit gaming by people under the age of 21, require use of net revenues for governmental purposes, impose licensing requirements, and authorize enforcement, and all but Sandia's impose civil penalties for violations.

46.     First, the Mescalero Ordinance provides that "[n]o person may operate or conduct any games of chance within the boundaries of the Reservation except as authorized by the Mescalero Apache Tribal Council." Mescalero Ord. § 5(A). The Mescalero Ordinance also requires that Mescalero have the sole proprietary interest in and to all gaming on Mescalero's Indian lands. *Id.* § 5(B). In addition, consistent with IGRA, 25 U.S.C. § 2710(b)(2)(B), the Mescalero Ordinance provides that net revenues from gaming shall be used only "to fund tribal government operations and programs; provide for the general welfare of the Tribe and its members; promote tribal economic development; donate to charitable organizations; or help fund operations of local government agencies." Mescalero Ord. § 13(A); *see id.* § 12(G).

47.     The Mescalero Ordinance also provides that "[n]o person under 21 years of age may participate in any Class III gaming on the Reservation[.]" *Id.* § 5(D). The Mescalero Ordinance also requires that the Mescalero Apache Tribal Gaming Commission ("MGC") establish a system for licensing and background checks for license applicants. *Id.* §§ 7(B)(4)-(5), 9. Conducting or participating in any gambling on the Mescalero Reservation other than at a licensed and authorized facility is prohibited. *Id.* § 16(A).

48.     The MGC has authority to "investigate any suspicion of wrongdoing related to any gaming activity or find suitable the imposition of a fine upon any person or entity for any cause deemed reasonable by the [MGC]." *Id.* § 7(B)(9). In addition, the MGC may "conduct or cause to

be conducted such investigations as may be necessary to determine in connection with any gaming activity, compliance with law, including this Gaming Ordinance." *Id.* § 7(B)(10). Finally, the MGC is authorized to "take action as may be reasonable and appropriate to enforce this Ordinance and the rules and regulations of the [MGC]." *Id.* § 7(B)(24).

49.     Penalties for violation of the Mescalero Ordinance include civil fines in the amount of $5,000 per day, per violation, and punitive damages for willful and intentional violation of the Tribes' gaming ordinances of up to three times actual damages or $1,000, whichever is higher. *Id.* §§ 17, 18(A). In addition, Mescalero can recover attorney fees, injunctive relief "and/or any other relief that is just and equitable under the circumstances . . . ." *Id.* The Mescalero Ordinance provides for exclusive jurisdiction over administration and enforcement thereunder in the Mescalero Apache Tribal Court but does not preclude enforcement of IGRA or its implementing regulations in federal court. *Id.* § 18(C).

50.     Second, the Isleta Ordinance prohibits gaming that is not approved by Isleta and requires that Isleta shall have the "sole proprietary interest in" all gaming on Isleta's Indian lands. Isleta Ord. § 2. The Isleta Ordinance also restricts net revenue from gaming for only the same governmental and charitable uses allowed by IGRA. *Id.* § 3(A); *see* 25 U.S.C. § 2710(b)(2)(B).

51.     The Isleta Ordinance also prohibits gaming by any "person under the age 21[.]" Isleta Ord. § 10(P). Per the Isleta Ordinance, the Pueblo of Isleta Gaming Regulatory Agency ("IGA") has established requirements for licensing and background checks. *Id.* § 6; Isleta Regs. § 9. The Isleta Ordinance requires that all "class III gaming shall be subject to, delimited by, and conducted in compliance with the terms and conditions of the Compact," which recognizes that internet gaming is illegal in New Mexico. Isleta Ord. § 1(C); Compact § 17.

52.     Further, "Class II and Class III Gaming that is not authorized by" Isleta's Ordinance, IGRA, and the Compact "is prohibited on Tribal Lands." Isleta Regs. § 9(HH). The

13

penalties for violation of the Isleta Ordinance include civil fines of $5,000 per day, per violation, and punitive damages for willful and intentional violation of the Tribes' gaming ordinances of up to three times actual damages or $1,000, whichever is higher. *Id.* § 4(C).

53.     Upon issuance of a notice of violation of the Isleta Ordinance, the person or entity found in violation may request a hearing before the IGA within seven days. Isleta Regs. § 4(D)(4). Failure to request a hearing in writing within 7 days shall be deemed a waiver of the hearing and the proposed civil fine assessment shall be deemed a final decision of IGA. *Id.*

54.     Third, the Pojoaque Ordinance provides that "[n]o person may operate or conduct any games of chance within . . . the Pueblo of Pojoaque except in accordance with the provisions of this Gaming Ordinance." Pojoaque Ord. § 10-8-5(A). Nothing there authorizes internet gaming, such as mobile sports betting.

55.     In addition, "[t]he Pueblo of Pojoaque . . . shall have the sole proprietary interest in and responsibility for the operation and conduct of any games of chance operated or conducted on the Pueblo of Pojoaque." *Id.* § 10-8-5(B). And the Pojoaque Ordinance restricts use of net revenue from gaming for only tribal governmental operations and programs, tribal general welfare, and to promote tribal economic development. *Id.* § 10-8-9(G). The Pojoaque Ordinance also provides for licensing and background checks for license applicants. *Id.* § 10-8-7.

56.     Penalties for violation of the Pojoaque Ordinance include civil fines of $5,000 per day, per violation, and punitive damages for willful and intentional violation of up to three times actual damages or $1,000, whichever is higher. *Id.* § 10-8-12(A). In addition, Pojoaque can recover attorney fees, injunctive relief "and/or any other relief that is just and equitable . . . ." *Id.* § 10-8-12(A). The Pojoaque Ordinance provides for exclusive jurisdiction over administration and enforcement thereunder in the Pueblo of Pojoaque Tribal Court but does not preclude enforcement of IGRA or its implementing regulations in federal court. *Id.* § 10-8-12(B).

14

57.     Fourth, the Sandia Ordinance prohibits any class III gaming that is conducted in violation of the IGRA. Sandia Ord. § I(C). The Sandia Ordinance also requires that Sandia have the sole proprietary interest in any gaming conducted within Sandia's Indian lands. *Id.* § 2. And the Sandia Ordinance provides that net revenue from gaming shall be used for only the same governmental and charitable purposes as IGRA allows. *Id.* § 3(A); *see* 25 U.S.C. § 2710(b)(1)(B).

58.     The Sandia Tribal Gaming Commission ("SGC") enforces compliance with the Sandia Ordinance and the Sandia Regulations, IGRA and its implementing regulations, and the Compact, regarding gaming on Sandia's Indian lands. *See* Sandia Regs. §§ 2.1, 4.4.

59.     The Sandia Regulations require background investigations for employees, prohibit wagers by persons under 21 years of age, and address integrity monitoring and problem gambling. *See* Sandia Regs. §§ 6.3 (license required), 6.5 (background investigations), 10.1 (licensing of games), 18.2 (underage gaming prohibition), 18.11 (problem gambling assistance), 18.12 (minimum liability insurance), and 18.14 (self-exclusion program requirements).

## V.     THE COMMODITIES EXCHANGE ACT AND COMMODITIES MARKETS

**A.     The CEA and the CFTC Historically Regulated Only Sales of Physical Commodities.**

60.     The Commodities Exchange Act ("CEA") was enacted in 1936 to replace the 1922 Grain Futures Act and regulate trade in a list of agricultural commodities, including grains, cotton, rice, mill feeds, butter, eggs, and potatoes. 7 U.S.C. § 1 *et seq.* Later additions to that list included additional specific agricultural products, such as wool, onions, livestock products, and orange juice. *See* Commodity Futures Trading Commission ("CFTC"), "History of the CFTC," avail. at https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html (last visited May 11, 2026).

61. By 1973, futures markets offered trade in commodities beyond the enumerated list. The regulated industry, fearing that such unregulated trading could result in scandal which could undermine the markets, sought regulation regarding those additional commodities. *Id.*

62. By 1974, grain and soybean speculation scandals led to major revisions to the CEA. Among those changes were creation of the CFTC to establish and enforce regulations to ensure fair, transparent markets for commodities not otherwise regulated by the Securities and Exchange Commission or state laws. 7 U.S.C. § 2(a)(2). By 1975, the CFTC exercised authority over all commodities trading for which a futures contract is actively traded. *Id.* § 2(a)(1)(A).

63. Through the 1970s and 1980s, the CFTC regulated trading of additional types of commodities, including gold and silver bullion, wheat futures, U.S. government debt futures, potatoes, coffee futures, wheat, corn, oats, soybean oil, and silver and gold futures and options.

**B.    Derivatives Issues Led to the Dodd-Frank Act, Which Precludes Gaming Contracts.**

64. In the early 2000s, financiers and speculators began selling increasingly exotic derivatives, whose price is determined by reference to, dependent on, or derived from, an external event, a commodity price, or price movement. *See* Cong. Research Service, Intro. to Derivatives & the CFTC (Mar. 13, 2025), available at https://www.congress.gov/crs_external_products/R/PDF/R48451/R48451.1.pdf (May 11, 2026).

65. Derivatives played a role in the Great Recession of 2008 by amplifying losses from mortgage-backed securities, which were often based on risky loans based on easily available credit and inadequate regulation. *See* U.S. Financial Crisis Inquiry Comm'n, The Financial Crisis Inquiry Report xvi (Jan. 2011) , available at http://fcic.law.stanford.edu/report (last visited May 11, 2026).

66. As a result of the 2008 financial crisis, Congress amended the CEA with the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), Pub. L. 111-203, 124 Stat. 1376-2223 (July 21, 2010).

67.    Among many changes to the CEA, Dodd-Frank gave the CFTC "exclusive jurisdiction" over all "transactions involving swaps . . . traded or executed on a" Designated Contract Market ("DCM"). 7 U.S.C. § 2(a)(1)(A). A DCM is a board of trade or organized exchange which has been designated by the CFTC to allow trading in options and futures based on commodities. *Id.* § 7. In addition, under Dodd-Frank, it became "unlawful for any person . . . to enter into a swap" outside of a DCM. *Id.* § 2.

68.    Dodd-Frank also provides that "[n]o agreement, contract, or transaction determined by the [CFTC] to be contrary to the public interest . . . may be listed or made available for clearing or trading on or through a" DCM "if the agreements, contracts, or transactions involve—(I) activity that is unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(i)-(ii) (the "Special Rule").

69.    With that, Congress intended to prevent use of the CEA to enable gambling:

> Mrs. FEINSTEIN.
>        It is very important to restore CFTC's authority to prevent trading that is contrary to the public interest. . . .
>        I am glad the Senator is restoring this authority to the CFTC. I hope it was the Senator's intent, as the author of this provision, to define "public interest" broadly so that the CFTC may consider the extent to which a proposed derivative contract would be used predominantly by speculators or participants not having a commercial or hedging interest. Will CFTC have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to a hedging or economic use?
> Mrs. LINCOLN.
>        That is our intent. The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose.  Rather, they would be used solely for gambling.

156 Cong. Rec. S5906-07, 2010 WL 2788026 (July 15, 2010).

17

70.    Dodd-Frank also allows a DCM to "self-certify" that a contract it proposes to offer complies with the CEA. 7 U.S.C. § 7a-2(c)(1). In such a situation, the CFTC has authority to review the contract to determine if it violates the Special Rule. *Id.* § 7a-2(c)(2); 17 C.F.R. § 40.2(c).

71.    The CEA does not abrogate, repeal, or limit IGRA or tribal gaming authority or ordinances, since it does not reference them or even use the words "Indian" or "tribe." The CEA's only references to "gaming" are (1) the prohibition against the listing of agreements involving gaming as stated in the Special Rule, and (2) the preemption for "State or local" laws governing certain gaming and bucket shops. 7 U.S.C. § 7a-2(c)(5)(C)(i); *id.* §§ 16(e)(2), 27f(b); *see* 17 C.F.R. § 40.11 (prohibiting listing of contracts involving gaming).

72.    One year after enactment of Dodd-Frank, the CFTC prohibited contracts based on activities listed in Dodd-Frank and provided for case-by-case submissions to consider compliance with the Special Rule. Provisions Common to Registered Entities, 76 Fed. Reg. 44,776, 44,785 (July 21, 2011) (final rule including 17 C.F.R. 40.11 ("Rule 40.11")). By that, "[t]he CFTC has, by rulemaking, concluded that event contracts involving the enumerated activities are contrary to the public interest and DCMs are thus prohibited from listing them." *KalshiEx, LLC v. Schuler* ("*Schuler*"), 2:25-cv-01165, 2026 WL 657004, *2 (S.D. Ohio Mar. 9, 2026) (citing Rule 40.11), *appeal docketed*, 26-3196 (6th Cir. Mar. 11, 2026). Rule 40.11 remains in force today.

73.    The CFTC's "impartial access" rule requires that DCMs apply "access criteria that are impartial, transparent and applied in a non-discriminatory manner," and "comparable fee structures" for all who have access to its markets. 17 C.F.R. § 38.151.

74.    From its predecessor's formation in 1922 until Kalshi's self-certification for sports outcome event contracts in January 2025, neither the CFTC nor any of its predecessors ever allowed or regulated markets for or contracts involving the outcome of sporting events, and the CEA had never been invoked to allow such activity.

18

## VI.    KALSHI'S OPPOSITION TO AND OPERATION OF GAMING

**A.    Kalshi Initially Asserted that the Special Rule and 40.11 Prohibit Sports Betting.**

75.    Kalshi was established in 2018 and certified as a DCM in November 2020. *See* CFTC, Order of Designation, *In re Application of KalshiEX LLC*, (Nov. 3, 2020), available at https://www.cftc.gov/filings/documents/2020/orgkexkalshidesignation201103.pdf (last visited May 11, 2026).

76.    Until June 2023, Kalshi issued no contracts that would have implicated the Special Rule. *See* CFTC, Designated Contract Markets Products for Kalshi, available at https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts?Date_From=2018-01-01&Organization=KEX&col=Date&dir=ASC&page=4 (last visited May 11, 2026).

77.    In June 2023, Kalshi sought to self-certify congressional-control contracts for bets on which political party would control Congress after the 2024 elections, and the CFTC responded in part by issuing a letter stating that those contracts may violate the Special Rule and Rule 40.11.[2]

78.    In response, Kalshi sued the CFTC in the U.S. District Court for the District of Columbia ("DDC"), arguing that the Special Rule and Rule 40.11 prohibit activities other than elections contracts, mainly sports betting, and that offering contracts on a DCM based on the outcome of sporting events or contests would violate the Special Rule and Rule 40.11. *See KalshiEx, LLC v. CFTC* ("*CFTC*"), 1:23-cv-03257 (D.D.C. filed Nov. 1, 2023).

79.    In that litigation, Kalshi argued: "The 'gaming' category [of the Special Rule] reaches contracts contingent on games – for example, whether someone will win the Powerball

---

[2]CFTC, Release No. 8728-23: CFTC Announces Review of Kalshi Cong. Control Contracts & Public Comment Period (June 23, 2023), https://www.cftc.gov/PressRoom/PressReleases/8728-23 (last visited May 11, 2026); Letter from CFTC to KalshiEx LLC (June 23, 2023), available at https://www.cftc.gov/sites/default/files/filings/ptc/23/06/ptc0623230001.pdf (May 11, 2026).

lottery by a certain date, or whether a certain team will win the Super Bowl. <u>It thus functions as a check on attempts to launder casino-style or sports gambling through the derivatives markets</u>." Mot. for Summ. J. by KalshiEx, LLC, *CFTC*, Dkt. No. 17 at 16 (Jan. 25, 2024) (emphasis added).

80.    Later, at the hearing on its summary judgment motion, Kalshi elaborated: "Contracts that involve games are probably not the type of contracts that we want to be listed on an exchange, because they don't have any real economic value to them. But again, what's tying that together is the existence of the game, because the game is the thing that doesn't have intrinsic economic significance." Mot. Hrg. Trans., *CFTC,* Dkt. No. 40 at 15 (Sept. 12, 2024). Kalshi therefore understood, as of September 2024, that the CEA does not allow contracts based on the outcome of sporting events to be traded on DCMs.[3]

**B.    Since the 2024 Election, Kalshi Has Offered and Accepted Sports Bets.**

81.    While the DDC held that Kalshi's congressional control contracts were not "gaming" within the meaning of the Special Rule, after the 2024 election, the CFTC withdrew its appeal to the D.C. Circuit. Kalshi publicly reversed their interpretation of the CFTC's statutory scheme from arguments they made at the DDC. Almost immediately after the new administration began, Kalshi self-certified and began offering "contracts" on the outcomes of sporting events, beginning with a January 22, 2025 self-certification for contracts described as: "Will <team> win <title>?".    *See*    CFTC,    DCM    Products:    54955,    available    at https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/54955 (last visited May 11, 2026). In its self-certification letter to the CFTC, Kalshi explained that such

---

[3]The Court should take judicial notice of these adjudicative facts, as they are "not subject to reasonable dispute" since they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

a contract on the outcome of a sporting event "is a contract relating to American sports leagues," and that <team> "refers to an entity participating in a sport," while <title>

> refers to a given sports title, and will include a specified year and/or other distinguishing information, e.g., 'The 2025 National Football League Super Bowl' or 'The 2025 National Football League American Football Conference Championship'. <title> may refer to the titles of the National Football League, the National Hockey League, National Basketball Association, or the National Collegiate Athletic Association.

Self-Certif. Letter from KalshiEx, LLC to CFTC (Jan. 22, 2025), App. A, available at https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01222514045.pdf (May 11, 2026).

82.     Kalshi has advertised that it offers legal sports betting. *See, e.g.*, https://adstransparency.google.com/?region=US (search "Kalshi") (last visited May 12, 2026); Dustin Gouker, "Ten Times Kalshi Said People Could Bet On Things," The Event Horizon, (April 3, 2025), available at https://nexteventhorizon.substack.com/p/ten-times-kalshi-said-people-could (last visited May 11, 2026).

83.     Kalshi enables sports betting on its application through what it calls a "prediction market." Kalshi does not explicitly define what prediction market means. In practice, however, prediction markets like Kalshi allow bettors to put money at stake—or bet or wager—on the outcome of sporting events, by buying a binary position in a "contract."

84.     For example, for whether the University of New Mexico ("UNM") Lobos men's basketball team would beat the New Mexico State University ("NMSU") Aggies men's basketball team on November 15, 2025, Kalshi offered a "contract" with binary positions: "yes" (UNM wins), or "no" (NMSU wins). In Kalshi's prediction market, and as illustrated below, this means that a bettor would have to bet $0.64 on the favored Lobos to win $1.00, but would have to bet only $0.36 on the underdog Aggies to win $1.00. Kalshi's application therefore showed the odds of a UNM victory at 64% at the start of the game:



85.    There is nothing new about making markets on, publishing odds for, and accepting wagers on the outcome of sporting events. Bookmakers have been providing the same service as Kalshi since at least the late 1700s, publishing odds for outcomes of sporting events, taking no position on either side of the bet, and accepting a fee from each transaction.

> What [Kalshi co-founder Tarek] Mansour is describing – a balanced book, fees on both sides, no house risk on outcomes – has been the operating model of sports betting, both legal and illegal. The genius of the operation, which reached its mature form with the invention of the point spread in the 1940s, was precisely its exchange-like structure. Bookmakers weren't gamblers; they were market-makers. . . .
>
> The point spread allowed bookmakers to attract roughly equal action on both sides of any sporting event, regardless of the talent gap between teams. With a balanced book, the outcome was irrelevant to profitability. Bookmakers collected roughly 10% vigorish from losing bettors, netting approximately 5% of total action however the game went. . . . By the 1970s it was a national market, with a single price – the Vegas line – set each week and followed from Boston to Los Angeles.
>
> Exchange-model sports betting is not a new financial innovation. It is the mid-20th century sports betting model . . . .

22

Aaron Brown, "Kalshi is half right about prediction markets," Bloomberg News (April 13, 2026), available at https://www.bloomberg.com/opinion/articles/2026-04-13/kalshi-ceo-tarek-monsour-is-half-right-about-prediction-markets (last visited May 11, 2026).

86.    Kalshi's sports betting event contracts have all the hallmarks and characteristics that sports bettors expect in sports gambling: straight bets (which team will win), over/unders (based on total points scored by both teams), point spreads (will a team win by a certain number of points), proposition bets (will a specific outcome occur within the game, such as a player scoring a certain number of points), and parlays (groups of proposition bet outcomes occurring together).

87.    Among many other offerings Kalshi provides, one could bet on whether Liverpool would beat Paris St. Germain in the Champions League game held on April 14, 2026, including the point spread, the over/under, and player and game proposition bets:



88.    As one Court recently observed:

Kalshi characterizes its sports-related event contracts in various ways, but at bottom, they are sports wagers. As Justice Potter Stewart famously said about pornography in his concurrence in *Jacobellis v. State of Ohio*, "I know it when I see it." These are sports wagers and everyone who sees them knows it. That includes Kalshi, who has advertised itself as the "first app for legal sports betting in all 50 states." Kalshi has not disputed that is how it advertised itself, nor has it successfully distinguished its arguments here from its own plain words.

23

*KalshiEx, LLC v. Hendrick* ("*Hendrick*"), 817 F. Supp. 3d 1014, 1029 (D. Nev. 2025), *appeal docketed,* No. 25-7516 (9th Cir. Nov. 28, 2025) (citations omitted).

89.   Kalshi has admitted to the U.S. Patent and Trademark Office that it operates "[b]ookmaking services, namely, providing of information related to sports betting; organizing, arranging, conducting sports betting and gambling tournaments, competitions and contests[.]"[4]

90.   Courts around the country have reached the conclusion that Kalshi's prediction markets constitute sports betting.[5]

**C.   Kalshi Operates Sports Betting for Underage Patrons Within the Tribes' Indian Lands Even Though It Could Avoid Those Via Geofencing.**

91.   Kalshi offers sports gambling events contracts for sale to anyone 18 years of age and older through its mobile smartphone app, which is available everywhere in the United States, including on the Tribes' Indian lands in New Mexico. *See* Kalshi.com, "Signing Up as an Individual," available at https://help.kalshi.com/en/articles/13823778-signing-up-as-an-individual (last visited May 11, 2026).

92.   Geofencing is a technology commonly used by the gaming industry nationwide, including in New Mexico. Geofencing uses GPS, Wi-Fi, cellular data, and IP address information,

---

[4]Kalshi Inc., U.S. Trademark Application Serial No. 99301848 (filed July 24, 2025), available at https://tsdr.uspto.gov/documentviewer?caseId=sn99301848&docId=APP20250724183402&linkId=4#docIndex=3&page=1 (last visited May 11, 2026); Kalshi Inc., U.S. Trademark Application Serial No. 99488522 (filed Nov. 10, 2025), available at https://tsdr.uspto.gov/documentviewer?caseId=sn99488522&docId=APP20251110164741#docIndex=3&page=1 (last visited May 11, 2026).

[5]*See Hendrick*, *supra*; *Schuler*, *supra*; *KalshiEx, LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. Aug. 1, 2025), *appeal docketed*, 25-1892 (4th Cir. Aug. 6, 2025)); *North Am. Derivatives Exchange, Inc. v. Nevada*, No. 2:25-cv-00978, 2025 WL 2916151 (D. Nev. Oct. 14, 2025), *appeal docketed*, 25-7187 (9th Cir. Nov. 14, 2025); *but see KalshiEx, LLC v. Orgel*, 3:26-cv-00034 (M.D. Tenn. 2026); *KalshiEx, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026).

24

among others, to physically locate internet-connected devices and geographically circumscribe a state, city, zip code, or even a building. *See* Rahul Awati, Geofencing, (Dec. 20, 2022), available at https://www.techtarget.com/whatis/definition/geofencing (last visited May 11, 2026).

93.     Geofencing has been used since the mid-1990s and can be accurate to within three meters. *See* Wikipedia, "Geofence," available at https://en.wikipedia.org/wiki/Geofence (last visited May 11, 2026).

94.     For example, when Jackpocket, Inc. ("Jackpocket") offered online mobile play of the New Mexico Lottery under a March 2022 agreement with the New Mexico Lottery Authority ("NMLA"), on information and belief, Jackpocket geofenced to exclude all Indian lands in New Mexico. However, once the New Mexico Attorney General issued a formal legal opinion in February 2025 that the Jackpocket app constitutes internet gaming, on information and belief, the NMLA terminated their agreement and Jackpocket geofenced around all of New Mexico.

95.     Kalshi's sports betting business has grown greatly by evading gaming regulations. In December 2024, just before Kalshi began to offer sports betting, its daily volume of transactions was just over $4 million. *See* Kalshidata.com, Daily Kalshi data since the first trade, available at https://www.kalshidata.com (last visited May 11, 2026). With sports betting, Kalshi's daily volume is now about $800 million on about 800 million daily contracts. *Id.* Reportedly, more than 80% of Kalshi's monthly betting volume of $10.4 billion is due to sports betting.[6]

96.     Kalshi recently secured a second $1 billion funding round, and the company is reportedly valued at about $22 billion. *See* Denitsa Tsekova and Lydia Beyoud, "Kalshi gets $1

---

[6]*See* Nick Devor, "Kalshi Still Needs Sports, Even as Courts Close In," Barron's (Mar. 11, 2026), available at https://www.barrons.com/articles/kalshi-sports-prediction-markets-a5bc21ef?gaa_at=eafs&gaa_n=AWEtsqfCwWKmPD2GGBsfhY_yKa_uIZg_Ci9nscipEA4i3of8GlS1AEuMcK1VK7pu2uc%3D&gaa_ts=69cc2ccc&gaa_sig=lcSVOIp7lcXW2Xf6OH33t68h5-PuxtUEalvfUMtlcqiIXP5lHpKJhRid6eiYxfwoUHfGRHfCzKbL9ARq4LxZyw%3D%3D (last visited May 11, 2026).

Billion in New $22 Billion Funding Round," Bloomberg (Mar. 19, 2026), available at https://www.bloomberg.com/news/articles/2026-03-19/kalshi-gets-1-billion-in-new-funding-at-22-billion-valuation (last visited May 11, 2026).

97.     While Kalshi's offices are located in New York City and its servers are presumably located in various places around the United States (due to the decentralized nature of the internet and server farms and data centers located throughout the country), Kalshi reaches onto the Tribes' Indian lands by allowing anyone there with a smartphone to place bets on the outcomes of sporting events, in violation of the Tribes' Ordinances, the Compact, and IGRA.

## VII.    THE TRIBES' DETERMINATIONS OF KALSHI'S ILLEGAL GAMBLING ON THEIR INDIAN LANDS

98.     After an investigation, Mescalero via the MGC has determined that Kalshi is illegally operating internet-based mobile sports betting on Mescalero's Indian lands.

99.     After an investigation, Isleta via the IRA has determined that Kalshi is illegally operating internet-based mobile sports betting on Isleta's Indian lands. On May 12, 2026, Isleta issued a letter to Kalshi notifying Kalshi that it is in violation of Isleta's laws and demanding that Kalshi cease its offering of sports betting event contracts on Isleta's Indian lands.

100.     After an investigation, Pojoaque via its Pojoaque Tribal Gaming Commission ("PGC") has determined that Kalshi is illegally operating internet-based mobile sports betting on Pojoaque's Indian lands.

101.     After an investigation, Sandia via the SGC has determined that Kalshi is illegally operating internet-based mobile sports betting on Sandia's Indian lands.

102.     The boundaries of each of the Tribes' Indian lands are geographically well-defined and it is feasible and reasonable to use geolocation services to geofence around them.

103. Kalshi's gaming activities within each of the Tribes' Indian lands violates each of the respective Tribe's Ordinances, the Compact, and IGRA, including required background investigations for employees, the prohibition on wagers by persons under 21 years of age, and requirements relating to integrity monitoring and problem gambling, that the Tribes shall be the primary financial beneficiaries of the gaming, with net revenues used in compliance with IGRA.

104. Kalshi's operation of illegal gaming within the Indian lands of each of the Tribes is a material affront to their sovereignty and harms all their citizens and residents by exposing them to illegal online sports betting.

105. If Kalshi continues operating mobile sports betting within the Tribes' Indian lands after the filing of this Complaint, Kalshi will have continued to willfully and intentionally violate IGRA, the Compact, and the Tribes' Ordinances.

## VIII.   CAUSES OF ACTION

**First Cause of Action – Violation of Mescalero's Compact and Ordinance**

106. Mescalero realleges and incorporates by reference all allegations in each paragraph above as if separately stated here.

107. Mescalero has retained, inherent sovereign authority to exclude persons whom it deems to be undesirable from its Indian lands either entirely or to condition their presence there.

108. The Mescalero Ordinance implements IGRA, the Compact, and Mescalero's inherent authority to exclude by restricting class III gaming within the Mescalero Reservation to Mescalero, only for persons 21 years of age or older, and by prohibiting internet sports betting.

109. The Compact and the Mescalero Ordinance are federally enforceable under IGRA, which prohibits any class III gaming activity on a tribe's Indian lands unless it is authorized by tribal-state compact that is in effect and a tribal gaming ordinance enacted by the governing body of the tribe and approved by the NIGC Chairperson.

27

110.    Kalshi's sports betting is a class III gaming activity under IGRA, the Compact, and the Mescalero Ordinance and operates on Mescalero's Indian lands by allowing individuals 18 years of age or older and physically located on Mescalero's Indian lands to place bets on the outcome of sporting events using Kalshi's mobile sports betting application.

111.    Kalshi has never applied to, nor received from, Mescalero a license to operate mobile sports betting on Mescalero's Indian lands and Kalshi could reasonably geofence around and avoid the Mescalero Reservation.

112.    Kalshi's operation of internet-based mobile sports betting within the Mescalero Reservation violates IGRA, the Compact, and the Mescalero Ordinance, which is enforceable here based either on Mescalero's inherent authority to exclude or as authorized, incorporated in, and made enforceable under 25 U.S.C. § 2710(d)(1).

113.    Kalshi's continued violation of the Mescalero Ordinance by operation of internet-based mobile sports betting within the Mescalero Reservation after the filing and service of this Complaint is willful and intentional.

**Second Cause of Action – Violation of Isleta's Compact, Ordinance, and Regulations**

114.    Isleta realleges and incorporates by reference all allegations in each paragraph above through paragraph 105 as if separately stated here.

115.    Isleta has retained, inherent sovereign authority to exclude persons whom it deems to be undesirable from its Indian lands either entirely or to condition their presence there.

116.    The Isleta Ordinance and Isleta Regulations implement IGRA, the Compact, and Isleta's inherent authority to exclude by restricting class III gaming within Isleta's Indian lands to Isleta itself, only for persons 21 years of age or older, and by prohibiting internet sport betting.

117.     The Compact and the Isleta Ordinance and Isleta Regulations are federally enforceable under IGRA, which prohibits any class III gaming activity on a tribe's Indian lands

unless it is authorized by tribal-state compact that is in effect and a tribal gaming ordinance enacted by the governing body of the tribe and approved by the NIGC Chairperson.

118. Kalshi's sports betting is a class III gaming activity under IGRA, the Compact, and the Isleta Ordinance and Isleta Regulations and operates on Isleta's Indian lands by allowing individuals 18 years of age or older and physically located on Isleta's Indian lands to place bets on the outcome of sporting events using Kalshi's mobile sports betting application.

119. Kalshi has never applied to, nor received from, Isleta a license to operate mobile sports betting on Isleta's Indian lands and Kalshi could reasonably geofence around and avoid Isleta's Indian lands.

120. Kalshi's operation of internet-based mobile sports betting within Isleta's Indian lands violates IGRA, the Compact, and the Isleta Ordinance and Isleta Regulations, which are enforceable here based either on Isleta's inherent authority to exclude or as authorized, incorporated in, and made enforceable under 25 U.S.C. § 2710(d)(1).

121. Kalshi's continued violation of the Isleta Ordinance and Isleta Regulations by operation of internet-based mobile sports betting within Isleta's lands after the filing and service of this Complaint is willful and intentional.

**Third Cause of Action – Violation of Pojoaque's Compact and Ordinance**

122. Pojoaque realleges and incorporates by reference all allegations in each paragraph above through paragraph 105 as if separately stated here.

123. Pojoaque has retained, inherent sovereign authority to exclude persons whom it deems to be undesirable from its Indian lands either entirely or to condition their presence there.

124. The Pojoaque Ordinance implements IGRA, the Compact, and Pojoaque's inherent authority to exclude by restricting class III gaming within Pojoaque's Indian lands to Pojoaque itself, only for persons 21 years of age or older, and by prohibiting internet sport betting.

125.    The Compact and the Pojoaque Ordinance are federally enforceable under IGRA, which prohibits any class III gaming activity on a tribe's Indian lands unless it is authorized by tribal-state compact that is in effect and a tribal gaming ordinance enacted by the governing body of the tribe and approved by the NIGC Chairperson.

126.    Kalshi's sports betting is a class III gaming activity under IGRA, the Compact, and the Pojoaque Ordinance and operates on Pojoaque's Indian lands by allowing individuals 18 years of age or older and physically located on Pojoaque's Indian lands to place bets on the outcome of sporting events using Kalshi's mobile sports betting application.

127.    Kalshi has never applied to, nor received from, Pojoaque a license to operate mobile sports betting on Pojoaque's Indian lands and Kalshi could reasonably geofence around and avoid Pojoaque's Indian lands.

128.    Kalshi's operation of internet-based mobile sports betting within Pojoaque's Indian lands violates IGRA, the Compact, and the Pojoaque Ordinance, which is enforceable here based either on Pojoaque's inherent authority to exclude or as authorized, incorporated in, and made enforceable under 25 U.S.C. § 2710(d)(1).

129.    Kalshi's continued violation of the Pojoaque Ordinance by operation of internet-based mobile sports betting within Pojoaque's lands after the filing and service of this Complaint is willful and intentional.

**Fourth Cause of Action – Violation of Sandia's Compact, Ordinance, and Regulations**

130.    Sandia realleges and incorporates by reference all allegations in each paragraph above through paragraph 105 as if separately stated here.

131.    Sandia has retained, inherent sovereign authority to exclude persons whom it deems to be undesirable from its Indian lands either entirely or to condition their presence there.

132. The Sandia Ordinance and Sandia Regulations implement IGRA, the Compact, and Sandia's inherent authority to exclude by restricting class III gaming within Sandia's Indian lands to Sandia itself, only for persons 21 years of age or older, and by prohibiting internet sports betting.

133. The Compact and the Sandia Ordinance and Sandia Regulations are federally enforceable under IGRA, which prohibits any class III gaming activity on a tribe's Indian lands unless it is authorized by tribal-state compact that is in effect and a tribal gaming ordinance enacted by the governing body of the tribe and approved by the NIGC Chairperson.

134. Kalshi's sports betting is a class III gaming activity under IGRA, the Compact, and the Sandia Ordinance and Sandia Regulations and operates on Sandia's Indian lands by allowing individuals 18 years of age or older and physically located on Sandia's Indian lands to place bets on the outcome of sporting events using Kalshi's mobile sports betting application.

135. Kalshi has never applied to, nor received from, Sandia a license to operate mobile sports betting on Sandia's Indian lands and Kalshi could reasonably geofence around and avoid Sandia's Indian lands.

136. Kalshi's operation of internet-based mobile sports betting within Sandia's Indian lands violates IGRA, the Compact, and the Sandia Ordinance and Sandia Regulations, which are enforceable here based either on Sandia's inherent authority to exclude or as authorized, incorporated in, and made enforceable under 25 U.S.C. § 2710(d)(1).

137. Kalshi's continued violation of the Sandia Ordinance and the Sandia Regulations by operation of internet-based mobile sports betting within Sandia's lands after the filing and service of this Complaint is willful and intentional.

## IX. PRAYERS FOR RELIEF

138. The Plaintiff Tribes ask for a judgment in their favor and against Kalshi as follows:

31

a.    declare that Kalshi's offer and operation of internet-based sports betting for individuals located on the Tribes' respective Indian lands is unlawful class III gaming in violation of IGRA and the Tribes' respective Compacts, Ordinances, and Regulations;

b.    preliminarily and permanently enjoin Kalshi from offering internet-based sports betting for individuals located on the Tribes' Indian lands;

c.    order Kalshi to pay civil penalties to each of Mescalero, Isleta, and Pojoaque under their respective Ordinances and Regulations, as applicable, per violation, per day, for offering sports betting on the respective Indian lands;

d.    award to the Tribes damages and attorneys' fees as provided for in the Tribes' Ordinances for willful and intentional violation of the Tribes' gaming ordinances if continued after May 31, 2026; and

e.    grant such other relief as the Court may determine to be appropriate under the circumstances, in the exercise of its sound discretion.

Respectfully submitted May 12, 2026,

Rey-Bear McLaughlin, LLP

/s/Daniel I.S.J. Rey-Bear
Daniel I.S.J. Rey-Bear
Timothy H. McLaughlin
Brian P. McClatchey*
421 W Riverside Ave, Suite 1004
Spokane, WA 99201-0410
telephone: 505-238-1954
dan@rbmindianlaw.com
tim@rbmindianlaw.com
brian@rbmindianlaw.com

Nelva Cervantes
Office of General Counsel
Mescalero Apache Tribe
P.O. Box 227
Mescalero, NM 88340
telephone: 575-464-4494

32

ncervantes@mescaleroapachetribe.com

*additional attorney for Mescalero Apache Tribe*

Lindsay Cutler
Jordan Oglesby
Legal Department
Pueblo of Isleta
P.O. Box 1270
Isleta, NM 87022
telephone: 505-869-9716
lindsay.cutler@isletapueblo.com
jordan.oglesby@isletapueblo.com

*additional attorneys for Pueblo of Isleta*

Dianna Kicking Woman
Robert A. Waldroup
Alicianna Martinez
Legal Department
Pueblo of Pojoaque
30 Buffalo Thunder Trail
Santa Fe, NM 87506
telephone: 505-455-4581
dwoman@pojoaque.org
rwaldroup@pojoaque.org
acmartinez@pojoaque.org

*additional attorneys for Pueblo of Pojoaque*

Steffani A. Cochran
General Counsel
Pueblo of Sandia
481 Sandia Loop
Bernalillo, NM 87501
telephone: 505-771-7967
scochran@sandiapueblo.nsn.us

*additional attorney for Pueblo of Sandia*

*pro hac vice admission pending