**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

MESCALERO APACHE TRIBE,
PUEBLO OF ISLETA,
PUEBLO OF POJOAQUE,
and PUEBLO OF SANDIA,

        *Plaintiffs*,

        v.

KALSHI, INC. and KALSHIEX, LLC,

        *Defendants.*

Case No. 2:26-cv-01517-MIS-GJF

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS KALSHI, INC. AND KALSHIEX, LLC'S
<u>MOTION TO DISMISS PLAINTIFFS' COMPLAINT</u>**

4926-4899-0392

Defendants Kalshi, Inc. and KalshiEX, LLC (together, "Kalshi") respectfully submit this motion to dismiss the Complaint filed against them by the Mescalero Apache Tribe, Pueblo of Isleta, Pueblo of Pojoaque, and Pueblo of Sandia (together, "Tribes" or "Plaintiffs") pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 1 ("Complaint").[1]  Undersigned counsel conferred with Plaintiffs in good faith, who indicated their opposition to this Motion.  *See* D.N.M.LR-Civ. 7.1(a).

## PRELIMINARY STATEMENT

 "The inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe."  *Montana v. United States*, 450 U.S. 544, 565 (1981).  But in this case, four tribal plaintiffs have brought suit, asking the Court to subject Kalshi—a nonmember and a nationwide, federally regulated exchange—to their jurisdiction under various tribal laws.  Such a result would contravene the law.  If the Court were to permit Plaintiffs to exercise regulatory authority over Kalshi, hundreds of other tribes could too.  Such piecemeal regulation would be intolerable for an exchange that operates throughout the United States under the oversight of a federal regulator.  And it would undermine the uniform scheme governing the nation's derivative markets that Congress established decades ago.

Yet Plaintiffs ask the Court to let them do precisely that.  For two reasons, they cannot.  *First*, no tribe can enforce its laws against a party it has no power to regulate.  *Second*, no tribe can enforce **tribal** laws that are preempted by **federal** statute.

---

[1] Unless otherwise specified, "¶ __" refers to paragraphs in the Complaint and "Ex. __" refers to exhibits to the Declaration of Olivia S. Choe, dated June 24, 2026, filed herewith.  The Court can take judicial notice of these exhibits because they are either incorporated by reference in the Complaint (Exs. A, C, D) or are otherwise the proper subject of judicial notice (Ex. B).  *See Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013).

4926-4899-0392

The first problem is one of authority. Kalshi is not a member of the Tribes. Under *Montana*—a decision the Complaint conspicuously declines to confront—a tribe's inherent sovereignty does not extend to the conduct of nonmembers, and the two narrow exceptions to that rule do not apply to the activities of a federally regulated, online derivatives exchange based in New York. Plaintiffs cite the Indian Gaming Regulatory Act ("IGRA"), but IGRA sets conditions for gaming on Indian lands. It does not convert tribal ordinances into federal law or bestow upon the Tribes power to police nonmembers that *Montana* recognized has been "implicitly divest[ed]." Plaintiffs also claim to rely on their sovereign right to exclude, but that right protects physical incursions onto tribal territory entirely absent here.

The second problem is one of reach. Congress, through the Commodity Exchange Act ("CEA"), gave the Commodity Futures Trading Commission ("CFTC") exclusive jurisdiction over event contracts traded on Kalshi's exchange. That federal command preempts the very tribal laws that Plaintiffs claim they can enforce. The Unlawful Internet Gambling Enforcement Act ("UIGEA") reinforces the point: it excludes transactions on exchanges like Kalshi from its prohibition on "bets or wagers" otherwise unlawful under state or tribal law, recognizing that such exchanges are regulated only by the CFTC.

As for the claim that Kalshi is violating the Tribes' Compact,[2] it suffers from another fatal flaw: the Compact is a contract between a Tribe and the State that cannot bind a nonparty like Kalshi. Nor does the Complaint identify any Compact provision that Kalshi has violated. The suit should be dismissed.

---

[2] Like Plaintiffs, Kalshi refers to a singular "Compact" throughout this brief because all four Tribes are parties to the standard-form 2015 gaming compact with the State of New Mexico. *See* ¶ 38.

4926-4899-0392

**BACKGROUND**

I.   **LEGAL BACKGROUND**

A.   **Congress Passes the CEA to Federally Regulate the Derivatives Market.**

Congress enacted the CEA in 1936 to bring a measure of federal regulation to derivatives markets.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 362 (1982).  It initially stopped short of a comprehensive federal scheme, instead preserving "any State law applicable" to "transaction[s]" regulated by the CEA.  Pub. L. No. 74-675, 49 Stat. 1491, 1494.  The resulting patchwork of regulations led to calls for a framework that was "uniform throughout the United States."  *Hearings Before the H. Comm. on Agric.*, 93d Cong. 121 (1973).

In 1974, Congress heeded these calls to bring "all futures trading under federal regulation," amending the CEA in two key ways.  *Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 848 (1974).  *First*, it created the CFTC to oversee trading on federally designated "contract market[s]."  7 U.S.C. § 2(a)(1)(A).  *Second*, it vested the CFTC with "exclusive jurisdiction" over trading on those federal exchanges.  *Id.*; *see Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1157 (7th Cir. 1992) ("State laws specifically directed towards the futures markets naturally operate in an area preempted by the CEA.").  The conference report explained that the amendments were designed to "preempt the field insofar as futures regulation is concerned."  H.R. Conf. Rep. No. 93-1383, at 35 (1974).

B.   **The Supreme Court Recognizes the Limits on Tribal Assertion of Inherent Sovereign Authority Over Nonmembers.**

In its seminal 1981 decision regarding tribal authority over nonmembers, the Supreme Court held that "[t]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe."  *Montana*, 450 U.S. at 565.  *Montana* recognized the "implicit divestiture" of tribal sovereignty in areas "involving the relations between an Indian tribe and nonmembers of the tribe."  *Id.* at 564 (citation omitted).  It announced "the general rule" that tribes

- 3 -

have "no jurisdiction over nonmembers." *Nevada v. Hicks*, 533 U.S. 353, 359-60 (2001) (confirming the rule "applies to both Indian and non-Indian land"). That "general rule" gives way in only two limited circumstances: (1) where a tribe seeks to regulate "the activities of nonmembers who enter consensual relationships with the tribe or its members" with conduct physically tied to tribal land; and (2) where a nonmember's conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 565-66; *Plains Com. Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 332 (2008). These narrow exceptions are largely tied to whether the conduct at issue occurs on and relates to tribal lands. *See MacArthur v. San Juan Cnty.*, 497 F.3d 1057, 1071 (10th Cir. 2007) ("Supreme Court precedent clearly limits the regulatory authority of tribes—at least that which is derived solely from their inherent sovereignty—to the reservation's borders.").

### C.    Congress Passes IGRA to Regulate Gaming "on Indian Lands."

Less than a decade after its decision in *Montana*, the Supreme Court decided *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), holding that states could not regulate gaming on Indian lands. *Id.* at 221-22. The following year, in response to that case, Congress passed IGRA. IGRA undid the Supreme Court's abrogation of state authority "within reservations," *id.* at 216 n.18; "literally everything" in IGRA "affords tools" to "either state or federal officials" to "regulate gaming on Indian lands." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794-95 (2014). In enacting IGRA, "Congress was concerned about striking a balance," and thus, "[w]hile preservation of tribal sovereignty was clearly of great concern to Congress, respect for state interests relating to class III gaming was also of great concern." *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1554-55 (10th Cir. 1997). Consistent with *Montana* and its progeny, IGRA made clear that tribes had certain authority over gaming on tribal lands and "nowhere else," *Bay Mills*, 572 U.S., at 795; and Congress provided that tribal authority over Class III gaming was

- 4 -

subject to federal and state regulatory involvement.  25 U.S.C. § 2710(d); 18 U.S.C. § 1166.

IGRA defines three "classes" of gaming activity, 25 U.S.C. §§ 2703(6), (7)(A), (8); affords tribes exclusive jurisdiction over Class I gaming "on Indian lands," *id.* § 2710(a)(1); and, as relevant here, provides that "Class III gaming activities shall be lawful on Indian lands only if such activities are," among other things, "located in a State that permits such gaming" and "conducted in conformance with a Tribal-State compact," *id.* §§ 2710(d)(1)(B)-(C).  IGRA requires that "any Indian tribe" wishing to engage in or authorize Class III gaming activity "on Indian lands" adopt a tribal ordinance and enter into a "Tribal-State compact" with the state in which the Class III gaming would be "located," to be approved by either the Chairman of the National Indian Gaming Commission ("NIGC") or Secretary of the Interior.  *Id.* §§ 2710(d)(1)-(3).  Finally, IGRA provides that the United States district courts have jurisdiction over lawsuits by a state or tribe to enjoin a Class III gaming activity that is "located on Indian lands" ***and*** "conducted in violation of any Tribal-State compact . . . that is in effect."  *Id.* § 2710(d)(7)(A)(ii).

**D.    Congress Passes UIGEA and Preserves Federal Regulation of Derivatives.**

In 2006, Congress returned to gaming-related legislation, this time to address the challenges of regulating internet gaming.  The result was UIGEA.  31 U.S.C. §§ 5361-5367.  Congress was aware it was legislating against the backdrop of IGRA, providing that UIGEA should not be construed as "altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling."  *Id*. § 5361(b).  With UIGEA, Congress addressed head-on the question of cross-jurisdictional internet gaming.  The statute prohibits a person "engaged in the business of betting or wagering" from accepting funds in connection with "unlawful Internet gambling," 31 U.S.C. § 5363, and defines that term to mean:

> [T]o place, receive, or otherwise knowingly transmit a bet or wager by any means which ***involves the use, at least in part, of the Internet where such bet***

> ***or wager is unlawful*** under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made.

*Id*. § 5362(10)(A) (emphasis added). Thus, "unlawful Internet gambling" occurs if a person initiates a "bet or wager" from a state where such conduct is illegal, regardless of whether the online gambling platform is located in a state where such conduct is legal, and vice versa.

Crucially, however, Congress carved out derivatives trading activity—such as the event contracts offered by Kalshi—from UIGEA's reach, ensuring that transactions and market participants on federally regulated exchanges would not fall victim to piecemeal and potentially conflicting regulatory schemes across multiple jurisdictions. The statute's definition of "bet or wager" expressly excludes from that term "any transaction conducted on or subject to the rules of a registered entity . . . under the [CEA]." *Id.* § 5362(1)(E)(ii); *see also* 7 U.S.C. § 1a(40)(A) ("registered entity" includes "a board of trade designated as a contract market" by the CFTC). As a result, UIGEA's prohibitions on "unlawful Internet gambling" do not extend to "transaction[s] conducted on" a designated contract market ("DCM") such as Kalshi—a "registered entity . . . under the [CEA]," preserving the uniform federal regulatory scheme for derivatives trading that Congress had established decades earlier. *See supra* Background Section I.A.

### E.  Congress Further Amends the CEA Through Dodd-Frank and Addresses Regulation of Event Contracts.

Four years after UIGEA's passage, Congress amended the CEA again through the Dodd-Frank Act. Two amendments are relevant here. *First*, Congress added "swaps" traded on a DCM to the CFTC's exclusive jurisdiction, Pub. L. No. 111-203, 124 Stat. 1376, 1672 (2010); 7 U.S.C. § 2(a)(1)(A), and defined "swap" to encompass, among other things, event contracts—that is, contracts "dependent on the occurrence . . . of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §§ 1a(47)(A)(ii), 1a(19)(iv).

- 6 -

4926-4899-0392

*Second*, Congress created a "Special Rule" that authorizes the CFTC to review and prohibit certain event contracts it determines to be "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(i). The CFTC "may"—but need not—deem event contracts contrary to the public interest if they "involve" certain categories, including "gaming." *Id.*; *see also* 17 C.F.R. § 40.11.

Today, the CFTC's regulatory framework is extensive, comprehensive, and exclusive. An exchange must first apply for and receive the CFTC's designation as a DCM. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). Once the CFTC designates an exchange as a DCM, the CFTC has "exclusive jurisdiction" over swaps and futures contracts traded on the exchange, including "event" contracts. 7 U.S.C. §§ 1a(47)(A), 2(a)(1)(A). DCMs are subject to an extensive federal regulatory framework, including 23 "core principles" identified in the CEA. *See id.* § 7(d); 17 C.F.R. Pt. 38. One core principle requires every DCM to offer market participants "impartial access" to its exchange. 17 C.F.R. § 38.151(b). If an exchange violates the CEA or CFTC regulations, the CFTC has recourse to a comprehensive array of enforcement mechanisms. *See, e.g.*, 7 U.S.C. §§ 8(b), 12c, 13. The CEA permits DCMs to list contracts without preapproval from the CFTC by self-certifying that the contracts comply with CFTC requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). Self-certified contracts are immediately effective unless and until the CFTC initiates a review. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).

Earlier this month, the CFTC published a Notice of Proposed Rulemaking ("NPRM") which, among other things, confirms the agency's exclusive jurisdiction over DCMs and clarifies the application of 17 C.F.R. Part 40 to event contracts and prediction markets, including the "factors indicating when event contracts involving sports activities are not contrary to the public interest." Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35806, 35834-35 (proposed June 12, 2026) (to be codified at 17 C.F.R. pt. 40).

4926-4899-0392

## II.    FACTUAL BACKGROUND

Kalshi is a New York-based DCM.  ¶¶ 10-11, 75.  The CFTC designated Kalshi as a contract market in 2020.  ¶ 75.  Since then, Kalshi has offered a variety of event contracts relating to climate, technology, health, popular culture, economics, politics, and, more recently, sports.[3] *See* ¶¶ 76-78, 81; *KalshiEX LLC v. Orgel*, 2026 WL 474869, at \*5 (M.D. Tenn. Feb. 19, 2026).  Kalshi's event contracts are traded exclusively on its DCM.  *See* ¶ 75.

On January 22, 2025, Kalshi self-certified the first of its sports event contracts pursuant to Section 7a-2(c)(1) of the CEA.  ¶¶ 70, 81.  Kalshi's event-contract certifications contain extensive information, including in confidential, non-public appendices, for the CFTC's review.  *See, e.g.*, Ex. A at 2 (referencing confidential appendices).  The CFTC exercises oversight of Kalshi and has not taken issue with the sufficiency of Kalshi's self-certifications.  *See* ¶ 81.[4]

Plaintiffs are federally recognized Indian tribes engaged in gaming activities on their respective lands pursuant to their respective Tribal-State Compacts, Ordinances, and Regulations. ¶¶ 6-9, 36-38, 43.  Plaintiffs nowhere allege that they offer sports betting.

In May, the Pueblo of Isleta ("Isleta") sent a cease-and-desist letter to Kalshi, demanding that Kalshi cease and desist "all class III gaming activities within Isleta's jurisdiction," and

---

[3] In 2023, the CFTC conducted a review of Kalshi event contracts relating to political elections pursuant to the Special Rule.  ¶ 77; 7 U.S.C. § 7a-2(c)(5)(C)(i).  The CFTC determined that Kalshi's political event contracts involved "unlawful conduct" and "gaming" (two enumerated categories under the Special Rule) and that they were contrary to the public interest.  Ex. B at 10-13.  The CFTC's order was later set aside as arbitrary and capricious under the Administrative Procedure Act, *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at \*6, \*13 (D.D.C. Sept. 12, 2024), and the CFTC ultimately abandoned its appeal of that decision, Unopposed Motion for Voluntary Dismissal, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. May 5, 2025) (Dkt. No. 2114321).

[4] Soon after Kalshi self-certified its first sports event contracts in January 2025, the CFTC required, pursuant to 17 C.F.R. 38.5(b), that Kalshi submit a "Demonstration of Compliance" with respect to those contracts.  *Orgel,* 2026 WL 474869, at \*5.  Kalshi complied, responding with memoranda detailing compliance with applicable rules and regulations.  *Id.*  The CFTC took no further action and has since allowed thousands of Kalshi's sports event contracts self-certified pursuant to 7 U.S.C. § 7a-2(c)(1) to be listed, traded, and closed.  *Id.*

4926-4899-0392

threatening "legal action" and a "civil fine." ¶ 99.  On June 1, 2026, Kalshi sent a response, stating that Isleta does not have jurisdiction to enforce its tribal laws against Kalshi.

<div align="center">

**LEGAL STANDARD**

</div>

To survive a motion to dismiss, a complaint must provide sufficient factual allegations to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not entitled to a presumption of truth.  *Alpenglow Botanicals, LLC v. United States*, 894 F.3d 1187, 1195 (10th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 678-79 (2009)).

<div align="center">

**ARGUMENT**

</div>

**I.     PLAINTIFFS LACK AUTHORITY TO SUE KALSHI FOR VIOLATION OF THE ORDINANCES AND REGULATIONS.**

Plaintiffs allege that Kalshi has violated their Ordinances and Regulations and assert that they have authority to enforce these tribal laws against Kalshi, a nonmember, based upon (1) their "retained, inherent sovereign authority to exclude," and (2) IGRA.  *See, e.g.*, ¶¶ 13, 28, 112, 120, 128, 136.  But under *Montana*, they have no inherent sovereign power over nonmembers, and neither of *Montana*'s two narrow exceptions applies to Kalshi's online exchange, which it operates from offices and on servers entirely off-reservation.  Nor does IGRA give Plaintiffs authority to enforce their tribal laws against Kalshi.  Plaintiffs claim that the statute incorporates their Ordinances and Regulations, but they rely on cases concerning Congressional delegation of legislative power—a wholly distinct concept.  IGRA does neither.  Plaintiffs lack authority to assert jurisdiction over Kalshi, and their claims should be dismissed.

**A.     Plaintiffs Lack Inherent Sovereign Authority Over Kalshi.**

Plaintiffs assert that they possess "inherent authority" to enforce the Ordinances and Regulations against Kalshi.  ¶¶ 108, 112, 116, 124, 132.  But they fail to contend with *Montana*'s

<div align="center">

- 9 -

</div>

"general rule" that tribes lack "civil authority over the conduct of nonmembers" like Kalshi, ¶¶ 10-11, 75, or to show their claims fall under one of its narrow exceptions. *Strate v. A-1 Contractors*, 520 U.S. 438, 446 (1997); *see also MacArthur*, 497 F.3d at 1070 ("only relevant characteristic for purposes of determining *Montana*'s applicability in the first instance is the membership status of the individual or entity over which the tribe is asserting authority.").

### 1.  Neither *Montana* Exception Applies.

*Montana*'s first exception applies only where there is consensual "nonmember conduct **inside the reservation** that implicates the tribe's sovereign interests." *Plains*, 554 U.S. at 332 (emphasis added).  Even consensual nonmember conduct is not deemed to occur "inside the reservation" where it is "entirely conducted over the Internet." *Lexington Ins. Co. v. Smith*, 117 F.4th 1106, 1110-11 (9th Cir. 2024) (*Montana* did not apply where nonmember had "no connection to the reservation" other than business "on the Internet").  Thus, *Montana*'s first exception does not apply where the nonmember's challenged conduct occurs entirely over the internet—even if the member with whom the nonmember allegedly transacts is physically located on the reservation. *See, e.g.*, *Hornell Brewing Co. v. Rosebud Sioux Tribe*, 133 F.3d 1087, 1093 (8th Cir. 1998) (tribal jurisdiction over nonmember company was improper where members alleged injury from viewing advertisements online); *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 782 (7th Cir. 2014) (first *Montana* exception did not apply where nonmembers "did not enter the reservation" to conduct transactions, but rather did so "by accessing a website"); *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 115 (2d Cir. 2014) (similar).

Nor have Plaintiffs alleged facts falling within the second *Montana* exception, which only applies where nonmember conduct is "'catastrophic' for tribal self-government." *Ute Indian Tribe of Uintah & Ouray Reservation v. McKee*, 32 F.4th 1003, 1010 (10th Cir. 2022) (quoting *Plains*, 554 U.S. at 341). Plaintiffs vaguely assert that Kalshi's conduct is a "material affront" to their

sovereignty and "harms all their citizens and residents by exposing them to illegal online sports betting." ¶ 104.  Such generalized allegations do not rise to the level of "catastrophic" impacts that "imperil the subsistence of the tribal community."  *McKee*, 32 F.4th at 1010; *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1153 (10th Cir. 2011) (quoting *Plains*, 554 U.S. at 341).

In any event, even when a *Montana* exception applies, it allows exercise of tribal sovereign authority only up to the physical boundaries of the tribe's lands.  *MacArthur*, 497 F.3d at 1071 ("Supreme Court precedent clearly limits the regulatory authority of tribes . . . to the reservation's borders."); *Plains*, 554 U.S. at 332 ("*Montana* and its progeny permit tribal regulation of nonmember conduct **inside the reservation** that implicates the tribe's sovereign interest.") (emphasis added); *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 653 (2001) ("whatever its derivation," tribal sovereign power "reaches no further than tribal land"); *Montana,* 450 U.S. at 565 ("To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians **on their reservations**.") (emphasis added).  And that is true even where off-reservation activities have on-reservation results.  *UNC Res., Inc. v. Benally*, 514 F. Supp. 358, 362-63 (D.N.M. 1981) (tribe lacked authority over nonmember whose "off-reservation activities" resulted in the discharge of pollution onto Indian land because, "when the issue is Indian tribal power over non-Indians, any civil authority stops at the reservation boundary").  The Tribes cannot assert sovereign authority to regulate "off-reservation activities," which Kalshi's operations in New York indisputably are.  *See id*. at 363; ¶ 97.

### 2.  The Right to Exclude Does Not Permit Tribal Jurisdiction over Kalshi.

Aware that they do not fall within either *Montana* exception, Plaintiffs repeatedly assert that they can enforce their tribal laws against Kalshi under their "retained, inherent sovereign authority to exclude."  *E.g.*, ¶¶ 107, 115, 123, 131.  But the Tenth Circuit has made clear that a tribe's power to exclude is not an independent fount of tribal jurisdiction.  *MacArthur*, 497 F.3d at

- 11 -

4926-4899-0392

1069-70 (membership status is the "*only* relevant characteristic for purposes of determining *Montana*'s applicability") (emphasis added).  It is instead a core sovereign interest whose claimed infringement may give rise to injury falling within *Montana*'s second exception and thus requires analysis under the *Montana* framework.  *See id.*; *Norton v. Ute Indian Tribe of the Uintah & Ouray Reservation*, 862 F.3d 1236, 1241, 1246 (10th Cir. 2017) (analyzing claims that "arose on tribal land" and "implicate[d]" tribe's "core sovereign interest in excluding" under *Montana*).

Here, Kalshi's alleged conduct does not implicate the Tribes' sovereign right to exclude, let alone result in catastrophic injury—whether analyzed under *Montana* or independently.  The power to exclude is grounded in tribal authority over physical territory:  It allows tribes to regulate *physical* entry onto their lands.  *See Strate*, 520 U.S. at 456 (describing the "right to occupy and exclude" as a "landowner's right"); *McKee*, 32 F.4th at 1008 (because challenged conduct occurred on non-Indian fee-land, "the tribal court did not have jurisdiction arising from the Tribe's authority to exclude nonmembers from *its territory*" (emphasis added)).  Where a tribe claims jurisdiction based upon its right to exclude, the challenged conduct must therefore implicate and undermine the tribe's *physical* right to exclude nonmembers from its lands.  *Norton*, 862 F.3d at 1246.

Indeed, the Tenth Circuit requires a tight link between the challenged conduct and the power to physically exclude.  In *Norton*, it held that a trespass claim against nonmember defendants could "plausibl[y]" "fit[ ] within the second *Montana* exception" because it "implicate[d] the Tribe's core sovereign interest in excluding non-Indians from tribal lands." *Id.* at 1246.  But the court held that the remaining personal tort claims—which "*also arose* on tribal land"—fell outside that exception because as non-property-based torts, they did not "implicate the Tribe's core sovereign interest in excluding non-Indians from tribal lands." *Id.* (emphasis added).

The close nexus between challenged conduct and power to exclude that the Tenth Circuit required in *Norton* is absent here.  Plaintiffs admit that Kalshi is based in New York and that, as

4926-4899-0392

an internet business, it operates "in various places around the United States." ¶ 97. Attempting to manufacture physical intrusion into tribal territory, they allege that Kalshi "reaches onto the Tribes' Indian lands by allowing anyone there with a smartphone" to access its exchange. *Id.* But for purposes of *Montana*, business conducted online does not occur "on" Indian lands or implicate tribal property interests.[5] *See Hornell*, 133 F.3d at 1093 ("The Internet is analogous to the use of the airwaves for national broadcasts over which the Tribe can claim no proprietary interest, and it cannot be said to constitute non-Indian use of Indian land."); *Jackson*, 764 F.3d at 768-69 (tribal members' use of the internet to offer loans to nonmembers did not constitute conduct on Indian lands for tribal jurisdiction purposes)[6]; *Colorado v. W. Sky Fin., L.L.C.*, 845 F. Supp. 2d 1178, 1181-82 (D. Colo. 2011) (similar).

Kalshi's online services simply do not implicate—let alone catastrophically threaten—the Tribes' power to ***physically*** exclude nonmembers from Indian land. Plaintiffs' asserted authority to regulate Kalshi on that basis therefore fails.

**B.      IGRA Does Not Give Plaintiffs Authority to Assert Tribal Laws Over Kalshi.**

Plaintiffs alternatively assert that they have authority to enforce their Ordinances and Regulations against Kalshi under IGRA. They cite 25 U.S.C. § 2710(d)(1) and posit that IGRA "incorporates" and "adopts" the Ordinances and Regulations, giving them the force of federal law. ¶ 28 ("IGRA's adoption of federally approved gaming ordinances gives them the same validity as

---

[5] Plaintiffs cite *State of California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960 (9th Cir. 2018), and *S. Ute Indian Tribe v. Polis*, 810 F. Supp. 3d 1203 (D. Colo. 2025), in support of the proposition that IGRA applies where a "bettor initiates bets or wagers while physically located on Indian lands." ¶ 22. Those cases concern IGRA and do not speak to the kind of physical entry that courts have required to trigger the sovereign power to exclude. Nor do they address UIGEA's carveout for the CFTC-regulated conduct at issue here.

[6] *See also Lexington*, 117 F.4th at 1110-11 (9th Cir. 2024) (characterizing *Jackson* as involving activity "entirely conducted over the Internet").

4926-4899-0392

if . . . made by Congress" (citation modified)); *see also* ¶¶ 109, 112, 117, 120, 125, 128, 133, 136. IGRA does no such thing. Section 2710(d)(1) simply sets out the conditions for Class III gaming activities to be lawful on Indian lands, including a requirement that such activity be "authorized by an ordinance or resolution." That language does not turn tribal ordinances into federal law.[7]

Incorporation of external bodies of law into federal law requires express language from Congress that is completely absent from Section 2710(d)(1). The Supreme Court has held that even language stating that a federal statute was "enacted in accordance with" a tribe's resolution is insufficient "to incorporate that resolution into federal law." *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 704 (2022). That is because "Congress knows exactly how to adopt into federal law the terms of another writing or resolution when it wishes"—for example by explicitly saying that "a tribal law or resolution 'shall have the same force and effect as if it were set out in full'" in the federal statute. *Id.* (quoting 25 U.S.C. § 5396(b)); *cf. Haaland v. Brackeen*, 599 U.S. 255, 268 (2023) (holding that a "tribe may pass a resolution altering" the Indian Child Welfare Act because the statute explicitly says "if the Indian child's tribe shall establish a different order . . . by resolution, the agency or court . . . shall follow such order"); *Estate of William Eugene Holsapple*, 2023 WL 4216420, at *1 (IBIA June 6, 2023) (American Indian Probate Reform Act "incorporates the Tribe's definition of [ ] inheritance rights into Federal law" because it explicitly says "laws of the Indian tribe . . . may otherwise define the inheritance rights of adopted-out children").

Indeed, Congress has incorporated external laws into ***other*** sections of IGRA itself. *See, e.g.*, 18 U.S.C. § 1166 ("for purposes of Federal law, all State laws pertaining to [certain issues],

---

[7] One out-of-circuit court has permitted a tribe to assert an IGRA claim—under a provision of the statute requiring, among other things, violation of a Tribal-State compact—by alleging a violation not of any provision of a compact, but rather of an ordinance allegedly incorporated into a compact. *See Ho-Chunk Nation v. Kalshi Inc.*, 2026 WL 1284077 (W.D. Wis. May 11, 2026). Plaintiffs do not assert that they are suing under that provision of IGRA, and Kalshi is seeking interlocutory appeal on this issue. *See id.* at Dkt. No. 101.

4926-4899-0392

shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State"); 25 U.S.C. § 2719(d)(1) (certain Internal Revenue Code provisions "shall apply to Indian gaming operations conducted pursuant to this chapter").  Had Congress intended to incorporate tribal ordinances into IGRA through Section 2710(d)(1), "it presumably would have done so expressly as it did in" the surrounding sections.  *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

In support of their theory, Plaintiffs cite *Jam v. Int'l Finance Corp.*, 586 U.S. 199 (2019), and *United States v. Kebodeaux*, 570 U.S. 387 (2013).  ¶ 28.  Both are inapposite.  *Jam* considered the applicable "scope and content" of an external body of law referenced in a federal statute, not **whether** that law was incorporated into the statute.  *Jam*, 586 U.S. at 209-11.  In *Kebodeaux*, the Court confirmed that Congress could constitutionally make compliance with state law a requirement under the federal Sex Offender Registration and Notification Act ("SORNA").  *Kebodeaux*, 570 U.S. at 393.  But the Court also clarified that SORNA "punish[es] violations of **its** requirements," rather than "of state law."  *Id.* at 398 (emphasis added).  And thus, courts have repeatedly held that violations of SORNA must be based upon violations of its requirements, not of the state laws with which SORNA requires compliance.[8]  *Kebodeaux* does not support the idea that Congress turned tribal ordinances into federal statutes by making compliance with ordinances a requirement under IGRA; it indicates the opposite.

---

[8] *See, e.g.*, *United States v. Ward*, 2014 WL 6388502, at *5 n.17 (N.D. Fla. Nov. 14, 2014); *United States v. Lyte*, 2021 WL 940986, at *2 (D. Ariz. Mar. 12, 2021); *see also United States v. Belaire*, 480 F. App'x 284, 287-88 (5th Cir. 2012) (distinguishing between violations of requirements imposed by SORNA and violations of regulations SORNA directs states to implement).

4926-4899-0392

The Complaint also points to supposed examples of "federal incorporation," but the examples it cites—"federally sanctioned tribal liquor control and air regulation"—are a red herring. ¶ 29. It is true that certain federal statutes authorize tribes to regulate, under limited circumstances, air resources and the use and distribution of liquor on Indian reservations. But they do so through **delegation**, not incorporation, as the cases that Plaintiffs cite make clear. *Rice v. Rehner*, 463 U.S. 713, 728-729 (1983) (discussing delegation of Congress's power to regulate Indian liquor transactions to tribes and states); *United States v. Mazurie*, 419 U.S. 544, 557 (1975) (discussing "Congress' decision to vest in tribal councils this portion of its own authority"); *Arizona Public Service Co. v. EPA* ("*APS*"), 211 F.3d 1280, 1288 (D.C. Cir. 2000) (finding "congressional delegation" of authority to regulate air quality on fee lands to tribes).

Congressional delegation of legislative authority is wholly distinct from incorporation of an external body of law into federal law. *See* Submission of Aviation Ins. Program Claims to Binding Arb., 20 Op. O.L.C. 341, 343 (1996) ("federal law often incorporates the law of other sovereigns," which is distinguishable from "delegation of Congress's legislative power"). Delegation permits Congress to transfer a portion of its own plenary power over Indian affairs to a tribe, authorizing the tribe to exercise authority it would not otherwise possess, while federal incorporation permits Congress to incorporate by reference tribal law already in effect. *See United States v. Enas*, 255 F.3d 662, 666 (9th Cir. 2001) ("When Congress bestows additional power upon a tribe . . . this additional grant of power is referred to as 'delegation.'" (citation omitted)); *United States v. Sharpnack*, 355 U.S. 286, 294 (1958) (distinguishing between "a delegation by Congress of its legislative authority" and "a deliberate continuing adoption by Congress" of state laws "as shall have been already put in effect by the respective States"). Unsurprisingly, in each of the cases Plaintiffs cite, tribes were found to possess delegated authority over nonmembers with indisputably territorial connections to Indian lands. *See Mazurie*, 419 U.S. at 546 (bar located

4926-4899-0392

"within the reservation's boundaries"); *Rehner*, 463 U.S. at 715 (sale of liquor "on an Indian reservation"); *APS*, 211 F.3d at 1287 (air regulation involving nonmember that owned on-reservation land). Kalshi has no comparable territorial link to Plaintiffs' lands.

Nothing in IGRA suggests that Congress delegated its authority to tribes (let alone bestowed upon them authority over nonmembers). On the contrary, IGRA imposes requirements that tribal gaming ordinances must satisfy. 25 U.S.C. § 2710(d)(1)(A). Rather than delegating legislative power to tribes to enact ordinances that function as federal law, Congress exercised ***its own*** legislative authority through IGRA to dictate the required contents of tribal law and further assured that tribal ordinances would remain subject to federal oversight by requiring that they be approved by the Chair of the NIGC. *See id.* §§ 2710(d)(1)(A), (e).

Plaintiffs have not established that the Ordinances and Regulations are incorporated in or enforceable through IGRA; their theory of authority fails as a matter of law.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE ORDINANCES AND REGULATIONS.

Even if the Tribes had authority to enforce the Ordinances and Regulations against a DCM like Kalshi, their claims still fail. The CEA gives the CFTC exclusive jurisdiction over Kalshi's event contracts and preempts the Ordinances and Regulations. Plaintiffs cannot plead a violation that federal law forecloses.

### A.    The CEA Grants the CFTC Exclusive Jurisdiction Over Trading on DCMs and Preempts Plaintiffs' Ordinances and Regulations.

The CEA gives the CFTC "exclusive jurisdiction" over trading on DCMs. 7 U.S.C. § 2(a)(1)(A). Under federal law, the CFTC is the exclusive regulator of Kalshi's event contracts. *See* 7 U.S.C. § 1a(47)(A)(ii); *supra* Background Section I.A, E. The only appellate court to have considered the issue has confirmed that, under the CEA, Kalshi's event contracts are subject to the exclusive jurisdiction of the CFTC. *See KalshiEX LLC v. Flaherty*, 172 F.4th 220, 226 (3d Cir.

- 17 -

2026) ("Kalshi's sports-related event contracts are swaps traded on a CFTC-licensed DCM, so the CFTC has exclusive jurisdiction.").[9]   The CFTC has likewise confirmed that Kalshi's event contracts fall within its exclusive jurisdiction, and it has sued nine states—including New Mexico—to defend that jurisdiction against encroachment.[10]   And earlier this month, the CFTC published the NPRM, confirming that event contracts involving sports are derivatives within the agency's exclusive jurisdiction.  91 Fed. Reg. at 35806-08; *see also id.* at 35808 (CEA "granted the CFTC exclusive jurisdiction" to create "a comprehensive federal regulatory framework" governing "the operation of, [and] transactions on, CFTC-registered exchanges").  The NPRM recognizes the role of tribes in regulating gaming, but it also makes clear that "event contracts traded as swaps or futures contracts  .  .  .  are subject to the [CFTC]'s exclusive jurisdiction."  *Id.* at 35859.

The "plain meaning" of Congress's grant of "exclusive" jurisdiction "necessarily denies jurisdiction" to any entity besides the CFTC, including tribes.  *See Johnson*, 2026 WL 1223373, at \*6 (*citing Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992)).  The CEA is a statute of general applicability and "[w]hen a federal law of general applicability is silent on the issue of applicability to Indian tribes"—like the CEA—it "applies equally to Indians."  *United States v. Fox*, 573 F.3d

---

[9] *See also KalshiEX LLC v. Johnson*, 2026 WL 1223373, at \*6-8 (D. Ariz. May 5, 2026) (agreeing with *Flaherty*); *KalshiEX LLC v. Orgel*, 2026 WL 474869, at \*7 (M.D. Tenn. Feb. 19, 2026) ("Kalshi's sports event contracts are 'swaps'" and "[t]he CEA grants the CFTC 'exclusive jurisdiction' over swaps."); *but see KalshiEX LLC v. Schuler*, 2026 WL 657004, at \*4 (S.D. Ohio Mar. 9, 2026); *KalshiEX LLC v. Hendrick*, 2025 WL 3286282, at \*11 (D. Nev. Nov. 24, 2025).

[10] *See U.S. v. New Mexico*, No. 26-cv-1912 (D.N.M. June 12, 2026); *U.S. v. Arizona*, No. 2:26-cv-02246 (D. Ariz. Apr. 2, 2026); *U.S. v. Connecticut*, No. 3:26-cv-498 (D. Conn. Apr. 2, 2026); *U.S. v. Illinois*, No. 1:26-cv-3659 (N.D. Ill. Apr. 2, 2026); *U.S. v. Wisconsin*, No. 26-cv-749 (E.D. Wis. Apr. 28, 2026); *U.S. v. Minnesota*, No. 0:26-cv-02661 (D. Minn. May 19, 2026); *U.S. v. New York*, No. 26-cv-3404 (S.D.N.Y. Apr. 24, 2026); *U.S. v. Kentucky*, No. 3:26-cv-00049 (E.D. Ky. June 23, 2026); *see also* Proposed Intervenor Compl., *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327 (D.R.I. May 28, 2026), Dkt. No. 19-1.

4926-4899-0392

1050, 1052 (10th Cir. 2009); *see also* 7 U.S.C. § 2(a)(1)(A) (conferring "exclusive jurisdiction" to the CFTC without distinguishing between state and tribal regulation). Plaintiffs have no legal basis for asserting that their Ordinances and Regulations apply to Kalshi.

### B. UIGEA Confirms the CEA's Exclusive Effect.

With UIGEA, Congress confirmed its intent to give the CFTC exclusive jurisdiction over trading conducted on DCMs. When considering how online gaming activity should be regulated, including gaming activity initiated on Indian lands, Congress—taking IGRA into account—carved out from federal liability transactions taking place on DCMs like Kalshi. *See* 31 U.S.C. §§ 5362(1)(E)(ii), (10)(C), *id.* § 5363, *id.* § 5365(b)(3); *supra* Background Section I.D. That choice was unsurprising given Congress's decades-long project to establish exclusive federal jurisdiction over the nation's derivatives markets. *See supra* Background Section I.D.

The Complaint concedes that Kalshi is a CFTC-designated DCM. ¶ 75. Under UIGEA, its event contracts thus fall within the carve-out. Plaintiffs ignore the carve-out, asserting instead that "UIGEA expressly disavowed any intent to 'alter[ ], limit[ ], or extend[ ]' federal, state and tribal gaming regulations, including IGRA." ¶ 35 (citing 31 U.S.C. § 5361(b)). Plaintiffs' theory is presumably that UIGEA does not "limit" the authority they claim to have to regulate Kalshi under tribal law. But that would mean the carve-out would have no effect in any case involving state or tribal gaming regulation because recognizing and applying the carve-out would always "alter" tribal or state law. The express exclusion Congress established to preserve the CFTC's exclusive jurisdiction over DCMs would be superfluous in the precise situations where it was meant to apply. The Court should decline Plaintiffs' invitation to read the provision out of the statute. *See Requejo Roman v. Castro*, 816 F. Supp. 3d 1267, 1278 (D.N.M. 2026) ("[t]he rule against surplusage encourages courts to give meaning to every word used in a statute") (citation modified).

The only plausible reading of UIGEA is instead the one that is consistent with UIGEA's text:  Kalshi's event contracts—transactions on a "registered entity"—are not "bets or wagers," but are instead derivatives subject to the CFTC's exclusive jurisdiction.  *Blue Lake Rancheria v. Kalshi, Inc.*, 2025 WL 3141202, at *6 (N.D. Cal. Nov. 10, 2025) ("[S]ince it is undisputed Kalshi is a registered entity under the [CEA], and that its transactions are conducted on the Kalshi internet site, its internet contracts are not bets or wagers under the UIGEA.").  That interpretation aligns with the statutory text and harmonizes the three statutes that bear upon the activity at issue here— the CEA, IGRA, and UIGEA—rather than manufacturing a "positive repugnancy" among them. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992).  Indeed, the New Mexico Attorney General opinion Plaintiffs themselves cite (¶ 94) instructs that IGRA "is to be read *in pari materia*, and construed together with . . . the [UIGEA]."  The Legality of the Jackpocket App in New Mexico, Op. N.M. Att'y Gen. No. 2025-07 (Feb. 26, 2025), https://nmdoj.gov/wp-content/uploads/AG-Opinion-2025-07.pdf.  UIGEA confirms that IGRA does not contemplate— and tribal law does not reach—the activity regulated by the CEA.  *Blue Lake Rancheria*, 2025 WL 3141202, at *6 (UIGEA "contemplates this delineation" with IGRA).

**C.    The CEA Applies to the Tribes.**

Plaintiffs cannot salvage their deficient pleading by invoking tribal sovereignty.  A statute of general applicability such as the CEA is inapplicable to Indian tribes only if (1) it touches "exclusive rights of self-governance in purely intramural-matters," (2) its application would abrogate treaty rights, or (3) legislative history or other proof shows Congress intended it not to apply.  *Nero v. Cherokee Nation of Okla.*, 892 F.2d 1457, 1462-63 (10th Cir. 1989) (citation omitted); *see also United States v. Fox*, 557 F. Supp. 2d 1251, 1257, 1260 (D.N.M. 2007) (same).

4926-4899-0392

None of those conditions exist here.[11]

Plaintiffs try for the first exception by contending Kalshi prevents Plaintiffs from being "the primary financial beneficiaries of the gaming." ¶ 103. But even when a statute of general applicability "reduces the profit earned by the Nation on its gaming activities," it is "questionable" whether such a law "interfere[s] with the right to self-government" or that a tribe's right to self-government could "trump the federal government's authority." *Chickasaw Nation v. United States*, 208 F.3d 871, 884 (10th Cir. 2000); *see also NLRB v. Little River Band of Ottawa Indians*, 788 F.3d 537, 551-53 (6th Cir. 2015) (that a generally applicable statute "may incidentally affect the revenue streams of tribal commercial operations" does not make it an intrusion on "purely intramural matters"). And in fact, the Complaint never alleges that Plaintiffs offer sports betting, so Plaintiffs cannot be "the primary financial beneficiaries" of the activity targeted in their Complaint (¶¶ 98-101)—regardless of Kalshi's actions.

The remaining exceptions fare no better. Plaintiffs identify no clash between the CEA's application and any "right[] guaranteed by Indian treaties," nor do they suggest that Congress intended the CEA "not to apply" to Indian tribes. *Nero*, 892 F.2d at 1462-63. The CEA applies to activity on Plaintiffs' lands, just as it applies nationwide. Because the Ordinances and Regulations are preempted, Plaintiffs' claims must be dismissed.

**D.     Counts II and IV Also Fail as the Tribes' Ordinances and Regulations Rely on Preempted State Law.**

Counts II and IV assert violations of Isleta's and Pueblo of Sandia's ("Sandia") Ordinances and Regulations. *See* ¶¶ 114-121, ¶¶ 130-137. Those tribal laws permit gaming if and to the extent

---

[11] Plaintiffs' citation to *Crosby Lodge, Inc. v. NIGC*, 2011 WL 13262030 (D. Nev. Aug. 16, 2011) for the proposition that they may regulate gaming operated by nonmembers, ¶ 23, is inapposite. There, the nonmember operated a physical business on tribal lands and was specifically licensed by the tribe to conduct Class III gaming on that property. *Crosby*, 2011 WL 13262030, at *1. Kalshi does not operate a physical business on tribal lands, nor is it a licensee.

4926-4899-0392

New Mexico law permits it. *See* Isleta Ordinance § 1(B) (2024) (authorizing "any gaming permitted by the State of New Mexico"); Sandia Ordinance §§ 1(B), (F) (1995) (authorizing same, plus "[a]ny gaming which occurs within the State of New Mexico pursuant to Section 30-19-1, *et seq.*"); *see also* Isleta Regulations § 9(HH) (2024) (prohibiting Class III gaming when not authorized by the Ordinance); Ex. C § 3.3(a) ("These regulations are established and promulgated pursuant to and in accordance with the Ordinance."). The Tribes' prohibitions rise and fall with state law—and state law does not reach Kalshi's conduct for two independently sufficient reasons.

*First*, by its own terms, New Mexico gaming law is preempted by the CEA as applied to event contracts traded on DCMs. *See supra* Argument Section II.A; *see also Flaherty*, 172 F.4th 220; *Johnson*, 2026 WL 1223373; *Orgel*, 2026 WL 474869; *United States v. New Mexico*, Compl., *supra* note 8, at 15. State law cannot render illegal conduct that it cannot reach. It follows that such conduct cannot violate Ordinances prohibiting only what the state prohibits.

*Second*, even setting preemption aside, Kalshi's contracts do not constitute unlawful gambling under New Mexico law. The State's Criminal Code defines "gambling" by reference to "bets," and carves out from the definition of "bet" "bona fide business transactions," including "contracts for the purchase or sale, at a future date, of securities or other commodities" and "agreements to compensate for loss caused by the happening of the chance," as well as agreements "otherwise permitted by law." N.M.S.A. § 30-19-1(B). To state a claim under the Isleta and Sandia Ordinances and Regulations, Plaintiffs therefore must plead that Kalshi's event contracts are ***not*** bona fide business transactions, commodities transactions, hedging contracts, or transactions otherwise permitted by law. They have not done so, nor can they, because Kalshi's event contracts ***are*** bona fide transactions and are permitted by law and are therefore not "gambling" under state law. Furthermore, New Mexico commodities laws expressly permit "transaction[s] within the exclusive jurisdiction of the commodity futures trading commission as

- 22 -

granted under the Commodity Exchange Act," N.M.S.A. § 58-13A-5(A)(1), and (ii) "contract market[s] designated by the commodity futures trading commission," *id.* § 58-13A-4(D).[12] With respect to Counts II and IV, the Complaint fails to allege the predicate it requires.

## III. PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE COMPACT.

Finally, to the extent that Plaintiffs' claims rest upon asserted violations of their Compacts, they fail on two independent grounds: The Compact cannot be enforced against Kalshi, and Plaintiffs fail to plausibly allege a violation.

### A. The Complaint Fails to Plead a Basis for Enforcing a Compact Against a Nonparty to the Compact.

"A compact is a form of contract" between two sovereigns: a tribe and a state. *Citizen Potawatomi Nation v. Oklahoma*, 881 F.3d 1226, 1238 (10th Cir. 2018) (citation omitted); *see also Cachil Dehe Band of Wintun Indians v. Cal.*, 618 F.3d 1066, 1073 (9th Cir. 2010) (same); *Iowa Tribe of Oklahoma v. Okla.*, 2016 WL 1562976, at *2 (W.D. Okla. Apr. 18, 2016) (same); 25 U.S.C. § 2710(d)(3)(A) (tribes "shall request the State . . . enter into negotiations for the purpose of entering into a Tribal-State compact"). For that reason, "courts 'look to federal common law' and general contract principles" in interpreting a compact. *Wichita & Affiliated Tribes v. Stitt*, 658 F. Supp. 3d 1043, 1051 (W.D. Okla. 2023) (citation omitted). "[A] contract cannot bind a nonparty." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002); *see also Fundamental Adm. Servs., LLC v. Patton*, 504 F. App'x 694, 698 (10th Cir. 2012) (same under New Mexico law).

The plain language of the Compact makes abundantly clear that it is a contract between the Tribes and the State. *See Citizen Potawatomi Nation*, 881 F.3d at 1239 ("Under federal contract principles, if the terms of a contract are not ambiguous, this court determines the parties' intent

---

[12] *See also, e.g.*, *id.* § 58-13A-16(A) ("cooperation[ ] with . . . the [CFTC]" "encourage[s] uniform application and interpretation" of its own law governing commodities).

4926-4899-0392

from the language of the agreement itself."). By its own terms, the Compact purports to bind only the two parties to it—New Mexico and the subject tribe. The Compact expressly states that it exists for "the purpose [of] . . . contin[uing] the development of an effective ***government-to-government*** relationship ***between the State and the Tribe***." Compact at § 1.B (emphasis added); *see also id.* at Introduction (defining the Compact as between the "State and the Tribe"). And the duties and obligations the Compact sets forth run exclusively between the State and the Tribes. *See, e.g.*, *id*. at §§ 1, 3, 4, 6; *see also id.* § 7.A (in case of alleged breach, result of arbitration process "shall be enforceable" as "against the State and the Tribe"); Ex. D at 2 ("the Tribe asserts that the State has granted some meaningful concessions to the Tribe").

**B.      Even If the Compact Was Binding on Nonparty Kalshi, Plaintiffs Fail to Identify Any Compact Provision That Kalshi Violated.**

Even if Kalshi could somehow breach a compact to which it is not a party, the Complaint points to no actual provision of the Compact that Kalshi violated. Plaintiffs attempt to sidestep this inconvenient fact through sleight of hand: *First*, they make a series of conclusory averments about what the Compact authorizes and requires—each of which, by Plaintiffs' own pleading, is a privilege granted, or obligation imposed on, ***the Tribes and the State***, not on any third party and certainly not on Kalshi. ¶¶ 39-42. *Second*, they assert in conclusory fashion—without identifying a single operative provision binding Kalshi—that Kalshi "violat[ed]" the Compact. ¶¶ 110, 112, 118, 120, 126, 128, 134, 136. Plaintiffs have not plausibly alleged a compact violation.

At most, Plaintiffs suggest that the Compact does not "authorize[]" Kalshi to conduct internet gaming on Indian lands, have gaming facilities, or offer gaming to those under the age of 21. ¶¶ 39-40 (citing Compact §§ 3(A), 3(C), 4(B)(1)). Kalshi is not engaging in gaming on—or off—Indian lands. But the Court need not reach a conclusion on that issue to dismiss Plaintiffs' claims. The Compact provisions Plaintiffs cite are "silent about what companies like [Kalshi] can

4926-4899-0392

do on the internet, and only outline[ ]  what '[t]he ***Tribe***'" may or must do.  *Blue Lake Rancheria*, 2025 WL 3141202, at \*5 (emphasis added) (citation omitted); *see also* Compact §§ 3(A), 3(C), 4(B)(1).  Compact provisions that "do not mention third parties" cannot be read to "***prohibit*** [the third party's] conduct," even if that conduct is not "authorized."  *Blue Lake Rancheria*, 2025 WL 3141202, at \*5 (emphasis added); *see also Bay Mills*, 572 U.S. at 795 n.6 (states cannot sue tribes under 25 U.S.C. § 2710(d)(7)(A)(ii), which requires violation of a compact, where no enforceable compact is in place, because even unauthorized gaming would not be in violation of a compact).

Plaintiffs also mischaracterize the Compact in an effort to buttress their claims.  Namely, they allege that Section 17 "recognizes that internet gaming is not authorized within New Mexico."  ¶ 40.  In reality, that section provides:  "***In the event that internet gaming is authorized*** within the State, ***the State and the Tribe agree*** that they will reopen good faith negotiations to evaluate the impact, if any, of internet gaming and consider adjustments to the Compact."  Compact § 17 (emphasis added).  By its terms, Section 17 is a forward-looking trigger for "the State and the Tribe" to engage in renegotiation of the Compact; it is not a live regulation, let alone a prohibition binding a nonparty like Kalshi.  That Section 17 recognizes the state of New Mexico law with respect to internet gaming is a far cry from imposing an affirmative obligation on nonparty Kalshi.

## CONCLUSION

For these reasons, the Court should dismiss the Complaint in its entirety and with prejudice.

- 25 -

4926-4899-0392

Dated: June 24, 2026

Respectfully submitted,

*/s/ Erica Stutman*

**SNELL & WILMER L.L.P.**
Jennifer Hadley Catero
Erica J. Stutman
1 E. Washington St., Suite 2700
Phoenix, Arizona 85004
Telephone: 602.382.6000
Facsimile: 602.382.6070
jcatero@swlaw.com
estutman@swlaw.com

**MILBANK LLP**
Olivia S. Choe (*pro hac vice*)
Joshua B. Sterling (*pro hac vice*)
1101 New York Avenue, NW
Washington D.C. 20005
Telephone: 202.835.7500
Facsimile: 202.263.7586
ochoe@milbank.com
jsterling@milbank.com

Grant R. Mainland (*pro hac vice*)
Katherine Kelly Fell (*pro hac vice*)
55 Hudson Yards
New York, NY 10001-2163
Telephone: 212.530.5000
Facsimile: 212.530.5219
gmainland@milbank.com
kfell@milbank.com

*Attorneys for Defendants Kalshi, Inc. and KalshiEX, LLC*

- 1 -

## CERTIFICATE OF SERVICE

I hereby certify that, on this day, I caused a true and correct copy of the foregoing document to be filed with the clerk's office using this Court's CM/ECF system.

This 24th day of June 2026.

*/s/ Erica Stutman*

Erica Stutman

*Counsel for Defendants Kalshi, Inc. and KalshiEX, LLC*

4926-4899-0392

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

MESCALERO APACHE TRIBE,
PUEBLO OF ISLETA,
PUEBLO OF POJOAQUE,
and PUEBLO OF SANDIA,

             *Plaintiffs*,

              v.

KALSHI, INC. and KALSHIEX, LLC,

             *Defendants.*

Case No. 2:26-cv-01517-MIS-GJF

**DECLARATION OF OLIVIA S. CHOE IN SUPPORT OF
<u>KALSHI'S MOTION TO DISMISS</u>**

I, Olivia S. Choe, declare as follows:

1.    I am an attorney and member in good standing of the bar of the District of Columbia. I am a Partner at Milbank LLP, counsel for Defendants Kalshi, Inc. and KalshiEX, LLC (together, "<u>Kalshi</u>") in the above-captioned action.  I make this declaration in support of Kalshi's Motion to Dismiss.  I have personal knowledge of the facts set forth in this declaration, and if called as a witness would competently testify concerning such matters.

2.    Attached hereto as **Exhibit A** is a true and correct copy of KalshiEX LLC's submission to the CFTC containing its self-certification of a sports-based event contract, dated January 22, 2025.

3.    Attached hereto as **Exhibit B** is a true and correct copy of the CFTC's Order in the Matter of the Certification by KalshiEX, LLC of Derivatives Contracts with Respect to Political Control of the United States Senate and United States House of Representatives, dated September 22, 2023.

4. Attached hereto as **Exhibit C** is, upon knowledge and information, an excerpt from a true and correct copy of the Tribal Gaming Commission Regulations of the Pueblo of Sandia ("Sandia") and the Tribal Council Resolution authorizing and adopting the Regulations, provided by Sandia's counsel via email on June 23 and 24, 2026.  A full copy exceeds the page limits set forth in D.N.M.LR-Civ. 10.5 and can readily be provided to the Court upon request.

5. Attached hereto as **Exhibit D** is a true and correct copy of the letter to Sandia Governor Francisco Lujan from Robert Lawrence, Acting Assistant Secretary of Indian Affairs, Department of the Interior, dated March 29, 2016.  The Indian Gaming Compact between Sandia and the State of New Mexico, which was appended to the letter, is omitted in consideration of the page limits set forth in D.N.M.LR-Civ. 10.5, but can readily be provided to the Court upon request.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of June 2026 in Washington, D.C.

Dated: June 24, 2026                                MILBANK LLP

By:  */s/ Olivia S. Choe*
Olivia S. Choe

*Attorney for Defendants Kalshi, Inc. and KalshiEX, LLC*

# EXHIBIT A

January 22, 2025

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing
of the "Will <team> win <title>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies the Commission that it is self-certifying the "Will <team> win <title>?" contract (Contract). The Contract will initially be listed on **January 23, 2025**. The Exchange intends to list the contract on a  custom ▾ basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<team>**
- **<title>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

**KalshiEX LLC**
**Official Product Name: "Will <team> win <title>?"**
**Rulebook: TITLE**
**Kalshi Contract Category:**  Sports ˅
**January 22, 2025**

### CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix E), and the Commission's regulations thereunder.

### I.   Introduction

The "Will <team> win <title>?" Contract is a contract relating to American sports leagues.[1]

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, and E.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new

---

[1] The Contract has not been endorsed by the National Football League, the National Hockey League, the National Basketball Association, or the National Collegiate Athletic Association. The use of the terms National Football League, National Hockey League, National Basketball Association, or National Collegiate Athletic Association does not indicate an endorsement of this product.

Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2**

Based on the above analysis, the Exchange certifies that:

- ❏ The Contract complies with the Act and Commission regulations thereunder.
- ❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: January 22, 2025

**Attachments:**

Appendix A - Contract Terms and Conditions
Appendix B - Trading Prohibitions
Confidential Appendices

*KalshiEX LLC*

# APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: "Will \<team\> win \<title\>?"**
**Rulebook: TITLE**

*KalshiEX LLC*

# TITLE

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the winner of <title>. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agencies are the Associated Press, ESPN, The Wall Street Journal, and Fox Sports.

**Type:** The type of Contract is an Event Contract.

**Issuance:** The Contract is based on the outcome of a recurrent event. Thus, Contract iterations will be issued on a recurring basis, and future Contract iterations will generally correspond to the next year that <title> is awarded.

**<team>:** <team> refers to an entity participating in a sport.

**<title>**: <title> refers to a given sports title, and will include a specified year and/or other distinguishing information, e.g., "The 2025 National Football League Super Bowl" or "The 2025 National Football League American Football Conference Championship". <title> may refer to the titles of the National Football League, the National Hockey League, National Basketball Association, or the National Collegiate Athletic Association.[2]

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that it is reported that the first official final result of <title> event is that <team> holds the title.

- If the <title> event is postponed past its scheduled date (e.g. because of severe weather or other emergencies), then the market will remain open and will resolve after the sooner of (1) the winner being reported or (2) two years following the <title> event's original scheduled date.
- If the <title> event is suspended during play, then the market will remain open and will resolve after the sooner of (1) the winner being reported or (2) two years following the <title> event's original scheduled date.
- If the <title> event is moved to be earlier than its scheduled date, then the market will remain open and will resolve after the winner is reported.

---

[2] The Contract has not been endorsed by the National Football League, the National Hockey League, the National Basketball Association, or the National Collegiate Athletic Association. The use of the terms National Football League, National Hockey League, National Basketball Association, or National Collegiate Athletic Association does not indicate an endorsement of this product.

- If the <title> event is cancelled outright (or declared "no contest") before it is played, or after it has started, then the markets for eligible teams (not disqualified or eliminated) will resolve so "Yes" holders receive $1/[the number of eligible teams (not disqualified or eliminated) remaining for which there is a strike listed] rounded down to the nearest cent and "No" holders receive $1 minus the Yes payout.
- If multiple teams are reported <title> holders, then the markets for those teams will resolve so "Yes" holders receive $1/[the number of teams declared <title> holders] rounded down to the nearest cent and "No" holders receive $1 minus the Yes payout. For example, if two teams tie in the <title> event and both teams are reported as <title> holder, both "Yes" and "No" holders for each <team> shall receive $0.50 per share.
- If <team> forfeits the <title> event, the market will resolve to "No" for the forfeiting team.
- If the <title> event is ended early, before regulation time has ended, but the associated governing body declares that the event is over and there is a winner or multiple winners, or a tie, then the market will resolve based on that determination.
- If <team> is disqualified before the Contract expires – even if the <title> event has finished – the market for <team> will resolve to "No". If this causes another team to be formally declared the winner of <title>, the contract will resolve on the basis of which team is named <title> holder.
- Note that any revisions after Expiration will not be considered. Therefore if <team> or its opponent is disqualified or stripped of its title after the Contract expires, that will not impact the market's resolution.
- If <team> was eliminated from contention for <title>, then the market will resolve "No". A team is eliminated from contention for <title> when it is reported so by the Source Agency.
- If <team> is eliminated from contention for <title>, and the market for <team> resolved to No, but then <team> is re-entered into contention (for example, because a team that was originally in contention was disqualified), then a new market with the same <team> may be created. The original market will remain resolved to No.

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

**Expiration Date:** The latest Expiration Date of the Contract shall be the day after the day the title event has an official final result. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00, unless otherwise specified in accordance with the Contract's terms and conditions.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will be instituting additional prohibitions for trading the TITLE contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former players, coaches, and staff of the National Football League, the National Hockey League, National Basketball Association, and the National Collegiate Athletic Association;
- Paid employees of the league and league participants;
- Owners of teams and the league;
- and household members and immediate family of all above.

These prohibitions apply to the appropriate values of <title>. For example, former players of the National Football League are not prohibited from trading on iterations of the Contract related to the National Basketball Association unless they are part of any other group listed for that league. To clarify, "league" here refers to any of the four organizations in the first bullet point.

# EXHIBIT B

UNITED STATES OF AMERICA

Before the

COMMODITY FUTURES TRADING COMMISSION

_____

In the Matter of the Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the United States Senate and United States House of Representatives

_____

## ORDER

### BACKGROUND

By a submission dated June 12, 2023 (the "Submission"), KalshiEX LLC ("Kalshi"), a designated contract market ("DCM"), filed a certification of congressional control political event contracts (the "Congressional Control Contracts"), pursuant to section 5c(c)(1) of the Commodity Exchange Act ("CEA") and Commodity Futures Trading Commission ("CFTC" or "Commission") Regulation 40.2. On June 23, 2023, the Commission commenced review of the Submission pursuant to Commission Regulation 40.11(c), because the Commission determined that the Submission comprised contracts that may involve, relate to, or reference an activity enumerated in Commission Regulation 40.11(a)(1) and CEA section 5c(c)(5)(C)(i). By letter dated June 23, 2023, the Commission informed Kalshi of its determination to commence review of the Congressional Control Contracts pursuant to Commission Regulation 40.11(c), and requested that Kalshi suspend the listing and trading of the Congressional Control Contracts during the pendency of the review period. In addition, on June 23, 2023, the Commission

1

opened a comment period to request public comments to assist the Commission's evaluation of the Submission.  The public comment period ended on July 24, 2023.[1]

The Congressional Control Contracts are cash-settled, binary (yes/no) contracts based on the question: "Will <chamber of Congress> be controlled by <party> for <term>?"  Kalshi describes the Congressional Control Contracts as event contracts.  The settlement values of the Congressional Control Contracts are determined by the party affiliation of the leader of the identified chamber of the United States Congress on the expiration date.  In the case of the House of Representatives, the leader is the Speaker of the House ("Speaker"), and in the case of the Senate, the leader is the President Pro Tempore ("Pres Pro Temp").  Upon settlement, an absolute amount is paid to the holder of one side of the contract, and no payment is made to the counterparty.  All contracts trading on Kalshi are fully-collateralized.

The Congressional Control Contracts have a notional value of one dollar with a minimum price fluctuation of $0.01, and must be purchased in multiples of 5,000 contracts per order.  The Congressional Control Contracts have tiered position limits, depending on the category of market participant and whether that market participant has "demonstrated established economic hedging need," which may be demonstrated to Kalshi according to means and methods established by Kalshi.

The  terms of the Congressional Control Contracts prohibit certain individuals and entities from trading the contracts, namely: 1) candidates for federal or statewide public office; 2) paid campaign staffers on Congressional campaigns; 3) paid employees of Democratic and Republican Party organizations; 4) paid employees of political action committees ("PACs") and

---

[1] The Commission received 1,378 comments, including four comments that were received after the close of the public comment period but were added to the comment file.  *See* https://comments.cftc.gov/PublicComments/CommentList.aspx?id=7394.

2

"Super PACs" (independent expenditure only political committees); 5) paid employees of major polling organizations; 6) existing members of Congress; 7) existing paid staffers of members of Congress; 8) household members and immediate family members of any of the above; and 9) "any of the above listed institutions themselves."

## LEGAL STANDARD

Under CEA section 5c(c)(5)(C)(i), the Commission may determine that contracts in certain excluded commodities, as defined in CEA section 1a(19), are contrary to the public interest if the contracts involve: (1) activity that is unlawful under any Federal or State law; (2) terrorism; (3) assassination; (4) war; (5) gaming; or (6) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.[2]

CEA section 5c(c)(5)(C)(ii) provides that "[n]o . . . contract . . . determined by the Commission to be contrary to the public interest under [CEA section 5c(c)(5)(C)(i)] may be listed or made available for clearing or trading on or through a registered entity[,]" including a DCM (such as Kalshi).[3]

Commission Regulation 40.11(a)(l) provides that registered entities, including DCMs, "shall not list for trading or accept for clearing" any contract based upon an excluded commodity, as defined in CEA section 1a(19)(iv), that "involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law. . ."[4]  Commission Regulation 40.11(a)(2) further provides that registered entities, including DCMs, "shall not list for trading or accept for clearing" any contract based upon an excluded

---

[2] CEA section 5c(c)(5)(C)(i); 7 U.S.C. § 7a-2(c)(5)(C)(i).
[3] CEA section 5c(c)(5)(C)(ii); 7 U.S.C. § 7a-2(c)(5)(C)(ii).
[4] 17 C.F.R. §§ 40.11(a)-(a)(1).

commodity, as defined in CEA section 1a(19)(iv), that "involves, relates to, or references an activity that is similar to an activity enumerated in [Commission Regulation] 40.11(a)(1) … and that the Commission determines, by rule or regulation, to be contrary to the public interest."[5]

Under Commission Regulation 40.11(c), when a contract that is submitted to the Commission by a registered entity, pursuant to Commission Regulation 40.2 or Commission Regulation 40.3, is based upon an excluded commodity, as defined in CEA section 1a(19)(iv), "which may involve, relate to, or reference" an activity enumerated in Commission Regulation 40.11(a)(1) or Commission Regulation 40.11(a)(2), the Commission is authorized to commence a 90-day review of the contract.[6] Commission Regulation 40.11(c)(1) requires the Commission to request that the registered entity suspend the listing or trading of such contract during the 90-day review period.[7] The Commission must ultimately issue an order approving or disapproving such contract by the end of its review or at the end of any extended period agreed to or requested by the registered entity.[8]

---

[5] 17 C.F.R. §§ 40.11(a)-(a)(2).
[6] 17 C.F.R. § 40.11(c).
[7] 17 C.F.R. § 40.11(c)(1).
[8] 17 C.F.R. § 40.11(c)(2).

## FINDINGS

Having reviewed the complete record in this matter, including the Submission and the public comments received, the Commission makes the following findings and determinations pursuant to CEA section 5c(c)(5)(C) and Commission Regulation 40.11:

### The Congressional Control Contracts Involve Enumerated Activities

**WHEREAS,** the Commission has evaluated whether the Congressional Control Contracts involve an activity enumerated in CEA section 5c(c)(5)(C)(i) and Commission Regulation 40.11(a)(1).

**WHEREAS,** the term "involve" is not defined for purposes of CEA section 5c(c)(5)(C)(i).

**WHEREAS,** an undefined term in a statute is generally given its ordinary meaning.[9] To determine the ordinary meaning of undefined statutory terms, courts typically look to dictionary definitions for guidance.[10]

**WHEREAS,** definitions of the word "involve" include "to relate to or affect," "to relate closely," to "entail," or to "have as an essential feature or consequence."[11]

---

[9] *See Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187, 115 S.Ct. 788 (1995); *See also*, *Morrisette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240 (1952) (holding that undefined statutory words that are not terms of art are given their ordinary meanings, frequently derived from the dictionary).

[10] *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000).

[11] *See Involve Definition,* MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/involve (last visited September 7, 2023); Random House College Dictionary 703 (Revised ed. 1979); Riverside University Dictionary 645 (1983); *see also* Roget's International Thesaurus 1040 (7th ed. 2010) (giving as synonyms "entail" and "relate to").

**WHEREAS,** the Commission has considered assertions by Kalshi and some commenters that, under CEA section 5c(c)(5)(C)(i), contracts "involve" an enumerated activity only if that activity is the contract's underlying.

**WHEREAS,** when the CEA refers to a contract's underlying, it uses the word "underlying,"[12] or it refers to what the contract is "based on"[13] or "based upon."[14]

**WHEREAS,** CEA section 5c(c)(5)(C)(i) itself uses "based upon" to refer to the underlying: it applies with respect to "contracts … in [certain] excluded commodities that are *based upon* the occurrence, extent of an occurrence, or contingency" (emphasis added).[15]  The underlying must therefore be a kind of excluded commodity, but that is all that CEA section 5c(c)(5)(C)(i) says about the underlying.

**WHEREAS,** in CEA section 5c(c)(5)(C)(i), the requirement that the contract "involve" an enumerated activity is separate:

> In connection with the listing of … ***contracts*** … ***in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency*** … the Commission may determine that ***such*** … ***contracts*** … are contrary to the public interest ***if the*** … ***contracts*** … ***involve*** [an enumerated activity] (emphasis added).[16]

**WHEREAS,** in context, "based upon" and "involve" have different meanings for purposes of CEA section 5c(c)(5)(C)(i): "based upon" refers to the contract's underlying (as it does elsewhere in the CEA), and "involve" refers to the enumerated activities and retains its broader ordinary meaning.  In other words, the contract must be "based upon" a type of excluded

---

[12] *E.g.*, 7 U.S.C. §§ 6c(d)(2)(A)(i), 20(e), 25(a)(1)(D)(ii).
[13] *E.g.*, 7 U.S.C. §§ 2(a)(1)(C)(i)(I), 2(a)(1)(C)(iv), 6b(e).
[14] *E.g.*, 7 U.S.C. § 2(a)(1)(C)(ii).
[15] CEA section 5c(c)(5)(C)(i); 7 U.S.C. § 7a-2(c)(5)(C)(i)
[16] *Id.*

6

commodity, and the contract must "involve" an enumerated activity.  But the contract need not be "based upon" an enumerated activity.

**WHEREAS,** Congress's choice of the broader term "involve" means that CEA section 5c(c)(5)(C)(i) can capture both contracts whose underlying *is* one of the enumerated activities, and contracts with a different connection to one of the enumerated activities because, for example, they "relate closely" to, "entail," or "have as an essential feature or consequence" one of the enumerated activities.[17]

**WHEREAS,** the legislative history of CEA section 5c(c)(5)(C) supports the plain meaning of the term "involve,"[18] and indicates that the question for the Commission in determining whether a contract "involves" one of the activities enumerated in CEA section 5c(c)(5)(C)(i) is whether the contract, considered as a whole, involves one of those activities.[19]

---

[17] The types of activities enumerated in CEA section 5c(c)(5)(C)(i) – including terrorism, war, and activities that are unlawful under federal or state law – of themselves support a broad reading of the term "involve," to ensure that the Commission has the authority that Congress intended to prevent trading on Commission-regulated markets that is contrary to the public interest.  *See* footnotes 29 and 31, *infra*

[18] In a colloquy with Senator Diane Feinstein on the Senate floor regarding the proposed Dodd-Frank Act provision that ultimately was enacted as CEA section 5c(c)(5)(C), Senator Blanche Lincoln, then-Chair of the Senate Committee on Agriculture, Nutrition and Forestry, stated that, among other things, the provision was intended to "prevent gambling through futures markets" and to restrict exchanges from "construct[ing] an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament."  *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln), *available a*t https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf.  None of the Super Bowl, the Kentucky Derby, or the Masters Golf Tournament are, of themselves, "gaming."  Rather, the statement of Senator Lincoln, who is identified in the colloquy as one of the authors of CEA section 5c(c)(5)(C), focuses on the overall characteristics of the contract.  It does not base the evaluation of whether the contract involves an enumerated activity – here, "gaming" – on the underlying alone.  Indeed, it is difficult to conceive of a contract whose underlying event, itself, is "gaming."  If "involve" were to refer only to a contract's underlying, contracts based on the outcome of sporting events such as horse races and football games would not qualify, because sports typically are not understood to be "gaming" – they are understood to be "games."  In effect, if "involve" were to refer only to a contract's underlying, the scope of certain prongs of CEA section 5c(c)(5)(C)(i) could effectively be limited to a null set of event contracts, which could not have been Congress's intent.

[19] For example, giving the term its ordinary meaning, a contract "involves" one of the activities enumerated in CEA section 5c(c)(5)(C)(i) if trading in the contract amounts to the enumerated activity.

<u>Gaming</u>

**WHEREAS,** the term "gaming" is not defined in the CEA or Commission regulations.

**WHEREAS,** as discussed above, an undefined term in a statute is generally given its ordinary meaning, and to determine the ordinary meaning of undefined statutory terms, courts typically look to dictionary definitions for guidance.  In addition, courts consider the construction of similar terms in other statutes, as well as the purpose of the statute being interpreted.[20]

**WHEREAS**, the term "gaming" includes betting or wagering on elections, as demonstrated by the following:

A.    Dictionaries define the term "gaming" to mean "gambling."[21]

B.    Under most state laws, "gambling" involves a person staking something of

value upon the outcome of a game, contest, or contingent event.[22]

---

[20] *See, e.g.*, *Sanders v. Jackson*, 209 F.3d 998, 1000-02 (7th Cir. 2000).

[21] *See, e.g., Gaming Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/gaming (defining the noun "gaming" as "the practice or activity of playing games for stakes: gambling") (last visited March 14, 2023); *Gaming Definition*, DICTIONARY.COM, https://www.dictionary.com/browse/gaming (defining "gaming" as "gambling") (last visited Sept. 7, 2023); *Gaming Definition*, Black's Law Dictionary, https://thelawdictionary.org/gaming/ (last visited September 10, 2023) (refers to gambling as gaming and cross-refers the definition to gambling).

[22] *See, e.g.*, GA. CODE ANN. § 16-12-21(a)(1) (West 2020) (". . . A person commits the offense of gambling when he . . .[m]akes a bet upon the partial or final result of any game or contest or upon the performance of any participant in such game or contest . . . ."); KY. REV. STAT. ANN. § 528.010(6)(a) (West 2023) ("'Gambling' means staking or risking something of value upon the outcome of a contest, game, gaming scheme, or gaming device which is based upon an element of chance, in accord with an agreement or understanding that someone will receive something of value in the event of a certain outcome."); MICH. COMP. LAWS § 750.301 (2023) ("Any person or his or her agent or employee who, directly or indirectly, takes, receives, or accepts from any person any money or valuable thing with the agreement, understanding or allegation that any money or valuable thing will be paid or delivered to any person where the payment or delivery is alleged to be or will be contingent upon the result of any race, contest, or game or upon the happening of any event not known by the parties to be certain . . . ."); N.Y. PENAL LAW § 225.00(2) (McKinney 2015) ("A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome."); TEX. PENAL CODE ANN. § 47.02(a) (West 2019) ( "A person commits an offense [of gambling] if he: (1) makes a bet on the partial or final result of a game or contest or on the performance of a participant in a game or contest . . . ."); VA. CODE ANN. § 18.2-325(1) (West 2022) ("'Illegal gambling' means the making, placing, or receipt of any bet

8

C.      The Unlawful Internet Gambling Enforcement Act ("UIGEA"), a federal statute, defines the term "bet or wager" as "the staking or risking by any person of something of value upon the outcome of a contest of others, a sporting event, or a game subject to chance, upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome . . ."[23]

D.      To bet or wager on elections is to stake something of value upon the outcome of contests of others, namely, contests between electoral candidates.

E.      Several state statutes, on their face, link the terms "gaming" or "gambling" to betting or wagering on elections.[24]

---

or wager . . . of money or other consideration or thing of value, made in exchange for a chance to win a prize, stake, or other consideration or thing of value, dependent upon the result of any game, contest, or any other event the outcome of which is uncertain or a matter of chance . . .").

[23] 31 U.S.C. § 5362(1)(A).  The UIGEA, 31 U.S.C. §§ 5361-5367 (2006), prohibits gambling businesses from knowingly accepting payments in connection with the participation of another person in a bet or wager that involves the use of the Internet and that is unlawful under any federal or state law.  Unlike the Wire Act, 28 U.S.C. § 1084 (1961), the UIGEA defines a "bet or wager", but it criminalizes it only if it is connected with unlawful Internet gambling that violates any federal or state law.  *See* 31 U.S.C. § 5362.  The UIGEA does not alter the definitions in other federal and state laws and expressly excludes any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the CEA from the definition of "bet or wager."  *See id*. at § 5362 (1)(E).

[24] *See*, *e.g.*, 720 ILL. COMP. STAT. ANN. 5/28-1 (West 2011) ("A person commits gambling when he . . . [m]akes a wager upon the result of any game, contest, or any political nomination, appointment or election . . . ."); NEB. REV. STAT. § 28-1101(4) (2011) ("A person engages in gambling if he or she bets something of value . . . upon the outcome of a game, contest, or election . . . ."); N.M. STAT. ANN. § 44-5-10 (1978) ("Bets and wagers authorized by the constitution and laws of the United States, or by the laws of this state, are gaming within the meaning of this chapter."); N.D. CENT. CODE. ANN. § 12.1-28-01 (West 2011) ("Gambling means risking any money . . . upon . . . the happening or outcome of an event, including an election . . . over which the person taking the risk has no control.").  *See also* GA. CODE. ANN. § 16-12-21(a)(2) (West 2011) ("A person commits the offense of gambling when he . . . [m]akes a bet upon the result of any political nomination, appointment, or election . . . ."); MISS. CODE ANN. § 97-33-1 (West 2011) ("If any person . . . shall wager or bet . . . upon the result of any election . . . he shall be fined in a sum not more than Five Hundred Dollars . . . ."); S.C. CODE ANN. §  16-19-90 (2011) ("Any person who shall make any bet or wager of money . . . upon any election in this State shall be guilty of a misdemeanor . . . ."); TEX. PENAL CODE ANN. § 47.02(a)(2) (West 2011) ("A person commits an offense if he . . . makes a bet on the result of any political nomination, appointment, or election . . . .").

**WHEREAS**, the Congressional Control Contracts involve "gaming," pursuant to CEA section 5c(c)(5)(C)(i) and Commission Regulation 40.11(a)(1), because taking a position in the Congressional Control Contracts would be staking something of value upon the outcome of a contest of others.  The Congressional Control Contracts are premised on the outcome of Congressional election contests, which ultimately determine the party affiliation of the Speaker and the Pres Pro Temp.[25]

---

[25] Kalshi argues that elections are not "contests" even if they are at base competitions, and that, if the Congressional Control Contracts constitute gaming, all event contracts are also arguably gaming.  Certain commenters agreed, with one arguing that the Congressional Control Contracts are no more like gaming than anything else trading in traditional financial markets, and another arguing that recognizing the Congressional Control Contracts as gaming would imply that all futures contracts are gaming.  The Commission disagrees, and notes, first, that it is common parlance to refer to elections as contests.  *See, e.g.*, *A Frozen Needle in GOP Contest*, The Washington Post (Sept. 3, 2023); *Biden: Dems revitalizing manufacturing*, Houston Chronicle (Sept. 10, 2022) (discussing the "contest to control Congress"). One commenter similarly stated that elections fall squarely within the definition of a "contest," citing the following definition in the Cambridge English Dictionary: "a competition to do better than other people, esp. to win a prize or achieve a position of leadership or power: 'In the last election, he survived a close contest against a political newcomer.'"  Moreover, the Commission reiterates that many state statutes, on their face, specifically link the terms gaming and gambling to betting or wagering on elections.  As such, unlike all futures contracts (or all financial instruments), the Congressional Control Contracts fall squarely within statutory definitions of gaming.  More generally, the Commission notes that a common thread throughout the large majority of definitions of "gaming" and "gambling" is the act of staking something of value on the outcome of a contest of others.  To take a position in the Congressional Control Contracts would be to stake something of value upon the outcome of a contest of others, since the Congressional Control Contracts are premised on the outcome of contests between electoral candidates (which ultimately determine the party affiliation of the Speaker and the Pres Pro Temp).  By contrast, futures contracts traditionally have not been premised on the outcome of a contest of others.  As discussed *infra,* futures contracts traditionally have served hedging and risk management functions, and have therefore been designed to correlate to direct and quantifiable changes in the price of commodities or other financial assets or instruments.  As also discussed *infra*, the economic impacts of the outcome of contests for Congressional control are too diffuse and unpredictable to serve the hedging and risk management functions that futures contracts have traditionally been intended to serve.

<u>Activity That Is Unlawful Under State Law</u>

**WHEREAS,** in many states, betting or wagering on elections is prohibited by statute[26] or common law.[27]

---

[26] ARIZ. REV. STAT. ANN. § 16-1015 ("A person who, before or during an election provided by law, knowingly makes, offers or accepts a bet or wager . . . upon any contingency whatever arising out of [an] election, is guilty of a class 2 misdemeanor."); ARK. CODE ANN. § 7-1-103 (20) (West) ("No person shall make any bet or wager upon the result of any election . . . ."); COLO REV. STAT. ANN. § 31-10-1531 (West) ("It is unlawful for any person, including any candidate for public office, before or during any municipal election, to make any bet or wager with a qualified elector or take a share or interest in, or in any manner become a party to, any such bet or wager or provide or agree to provide any money to be used by another in making such bet or wager upon any event or contingency whatever arising out of such election."); GA. CODE. ANN. § 16-12-21(a)(2) (West 2011) ("A person commits the offense of gambling when he . . . [m]akes a bet upon the result of any political nomination, appointment, or election . . . ."); IDAHO CODE ANN. § 18-2314 (West) ("Every person who makes, offers, or accepts any bet or wager upon the result of any election . . . is guilty of a misdemeanor."); 720 ILL. COMP. STAT. ANN. 5/28-1 (West 2011) ("A person commits gambling when he . . . [m]akes a wager upon the result of any game, contest, or any political nomination, appointment or election . . . ."); MD CODE, ELECTION LAW § 16-902 ("A person may not make a bet or wager on the outcome of an election held under this article."); MICH COMP. LAWS ANN. § 168.931 (I) (West) ("A person shall not keep a room or building for the purpose, in whole or in part, of recording or registering bets or wagers, or of selling pools upon the result of a political nomination, appointment, or election."); MISS. CODE ANN. § 97-33-1 (West 2011) ("If any person . . . shall wager or bet . . . upon the result of any election . . . he shall be fined in a sum not more than Five Hundred Dollars . . . ."); NEB. REV. STAT. § 28-1101(4) (2011) ("A person engages in gambling if he or she bets something of value . . . upon the outcome of a game, contest, or election . . . ."); NEV. REV. STAT. ANN. § 293.830 (West) ("Any person who makes, offers or accepts any bet or wager upon the result of any election . . . is guilty of a gross misdemeanor."); N.J. STAT. ANN. § 19:34-24 (West)("No person shall make, lay or deposit any bet, wager or stake, to be decided by the result of any election . . . or by any contingency connected with or growing out of any election."); N.C. GEN. STAT. ANN. § 163-274 ("It shall be unlawful . . . [f]or any person to bet or wager any money or other thing of value on any election."); N.D. CENT. CODE. ANN. § 12.1-28-01 (West 2011) ("Gambling' means risking any money . . . upon . . . the happening or outcome of an event, including an election . . . ."); OKLA STAT. ANN. TIT. 21, § 181 (West) ("Every person who makes, offers or accepts any bet or wager upon the result of any election . . . is guilty of a misdemeanor."); OR. REV. STAT. ANN. § 260.635 (West) ("No candidate shall make or become party to a bet of anything of pecuniary value on any event or contingency relating to a pending election" and "[n]o person, to influence the result of any election, shall make a bet of anything of pecuniary value on the result of a pending election, or on any event relating to it."); 18 PA. STAT. § 5514 (West) ("A person is guilty of a misdemeanor of the first degree if he . . . receives, records, registers, forwards, or purports or pretends to forward, to another, any bet or wager upon the result of any political nomination, appointment or election . . . ."); S.C. CODE ANN. § 16-19-90 (2011) ("Any person who shall make any bet or wager of money . . . upon any election in this State shall be guilty of a misdemeanor . . . ."); TENN. CODE ANN. § 2-19-129 (West) ("A person commits a Class C misdemeanor if such person makes any bet or wager of money or other valuable thing upon any election."); TEX. PENAL CODE ANN. § 47.02(a)(2) (West 2011) ("A person commits an offense if he . . . makes a bet on the result of any political nomination, appointment, or election . . . ."); W. VA. CODE ANN. § 3-9-22 (West) ("It shall be unlawful to bet or wager money or other thing of value on any election held in this state"). A number of states also have more limited statutes in place. See, e.g., S.D. CODIFIED LAWS § 12-26-19 ("Any person who shall directly or indirectly make a bet with a voter depending upon the result of any election, with the intent thereby to procure the challenge of such voter or to prevent his voting at an election, is guilty of a Class 2 misdemeanor."); WIS. STAT. ANN. § 6.03 (West) ("No person shall be allowed to vote in any election in which the person has made or become interested, directly or indirectly, in any bet or wager depending upon the result of the election.").

11

**WHEREAS,** the Congressional Control Contracts involve "activity that is unlawful under … State law," pursuant to CEA section 5c(c)(5)(C)(i) and Commission Regulation 40.11(a)(1), because taking a position in the Congressional Control Contracts would be staking something of value upon the outcome of contests between electoral candidates (which ultimately

---

[27] Alabama, *White v. Yarbrough*, 16 Ala. 109, 110 (1849) ("A wager on an election is void as against public policy"); Arkansas, *Williams v. Kagy*, 3 S.W.2d 332, 333-34, 176 Ark. 484, 3 (1928) ("Even before the passage of the statute quoted, this court ruled . . . that wagers upon elections then pending are calculated to endanger the peace and harmony of society and have a corrupting influence upon the morals and are contrary to sound policy"); Colorado, *Maher v. Van Horn*, 60 P. 949, 17-18 (Colo. 1900) ("[W]ager contracts on the result of elections are contrary to public policy and void and will not be enforced by the courts"); Delaware, *Gardner v. Nolen*, 3 Del. 420, 420 (Del. Super. Ct. 1842) ("As within the policy of prohibiting betting on elections, an election wager cannot be recovered though laid after the closing of the polls"); Georgia, *McLennan v. Whidon*, 48 S.E. 201, 202-03, 120 Ga. 666 (1904), quoting *Leverett v. Stegal*, 23 Ga. 259 (1857) (finding that all gambling contracts are illegal but noting that "If there be any class of gambling contracts which should be frowned upon more than another it is bets on elections. They strike at the foundations of popular institutions, corrupt the ballot box, or, what is tantamount to it, interfere with the freedom and purity of elections"); Indiana, *Worthington v. Black*,  13 Ind. 344, 344-345 (1859) ("It has been often decided that wagers upon the result of an election are against the principles of sound policy, and consequently illegal . . ."); Iowa, *David v. Ransom*, 1 Greene 383, 383-85 (Iowa 1848) ("A wager or bet made between parties on the result of an election is void.  If the wager is made before an election, illegal votes are often secured, and others induced, contrary to the better judgment of the voter; or if made after an election, the parties interested might be led to exert a corrupt influence upon the canvassing, and returns of the votes"); Kansas, *Reynolds v. McKinney*, 4 Kan. 94, 101 (1866) ("[A bet] involving an inquiry into the validity of the election of a public officer. … was therefore, illegal and void on principles of public policy"); Massachusetts, *Ball v. Gilbert*, 53 Mass. 397, 400-02 (1847) (a wager upon the event of an election to a public office - at the federal, state, or local level -  is illegal and void on numerous public policy grounds); Missouri, *Hickerson v. Benson*, 8 Mo. 8 (1843) (wagers on the result of public elections and collateral matters are "clearly" against public policy and "sound morality" and consequently illegal and void at common law); Nebraska, *Specht v. Beindorf*, 56 Neb. 553, 76 N.W. 1059 (1898) (promissory note premised on the election of a public official is a wager on the result of an election and void on grounds of public policy); New York, *Rust v. Gott*, 1828 WL 1964 (N.Y. Sup. Ct. 1828) (wager on the event of an election is illegal and void, even where made after the poll of election is closed but before the canvass is complete); North Carolina, *Bettis v. Reynolds*, 34 N.C. 344, 345-48 (1851) ("the practice of betting on elections has a direct tendency to cause undue influence[,]" and even where neither party was a voter, a wager on the result of a Presidential election void as against public policy); Oregon, *Willis v. Hoover*, 9 Or. 418, 419-20 (1881) (wagers on the result of public elections are illegal and void upon grounds of public policy); Rhode Island, *Stoddard v. Martin*, 1 R.I. 1, 1 (1828) (all wagers on elections and judicial decisions "are of immoral tendency, against sound policy," and therefore void); Tennessee, *Russell v. Pyland*, 21 Tenn. 131, 133 (1840) (a note premised on the outcome of an election is illegal and void under common law principles); Texas, *Thompson v. Harrison*, 1842 WL 3625, at \*1 (Tex. 1842) (wagers on the result of public elections are "contrary to good morals" and void on grounds of public policy); Wisconsin, *Murdock v. Kilbourn*, 6 Wis. 468, 470-71 (1857) (wager upon the event of a public election is contrary to public policy, illegal, and void).

determine the party affiliation of the Speaker and the Pres Pro Temp), and in many states such conduct is illegal.[28]

**The Congressional Control Contracts Are Contrary to the Public Interest**

**WHEREAS,** the Commission has evaluated whether the Congressional Control Contracts are contrary to the public interest.

**WHEREAS**, the legislative history of CEA section 5c(c)(5)(C) indicates Congressional intent for the Commission to consider, among other things, in its evaluation of whether a contract is contrary to the public interest for purposes of that provision, a form of the "economic purpose test" that was applied to determine whether a contract was contrary to the public interest under former CEA section 5(g) prior to its deletion by the Commodity Futures Modernization Act of 2000 ("CFMA").[29]

---

[28] Kalshi argues that many state gaming laws carve out exceptions for Commission-regulated products and, relatedly, that the Commission's jurisdiction over futures and swaps preempts any state gaming laws as to those products. Seen in this context, Kalshi argues, the state laws that prohibit betting or wagering on elections do not and cannot refer to Commission-regulated event contracts, and the Congressional Control Contracts are therefore not unlawful under state law. This misses the point. CEA section 2(a)(1) grants the Commission "exclusive jurisdiction" over futures and swaps traded on a DCM. 7 U.S.C. § 2(a)(1). This "preempts the application of state law," *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), so transacting these products on a DCM cannot, in and of itself, be an "activity that is unlawful under any … State law." On the other hand, these products may still "involve … activity" that is unlawful under a state law, in the sense, for example, that transactions in the products may "relate closely" to, "entail," or "have as an essential feature or consequence" an activity that violates state law. *See* Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/involve (last visited Oct. 12, 2022); Random House College Dictionary 703 (Revised ed. 1979); Riverside University Dictionary 645 (1983). Here, state laws (that are not preempted by the CEA) prohibit wagering on elections. Taking a position in the Congressional Control Contracts would be staking something of value on the outcome of contests between electoral candidates, such that wagering on elections is "an essential feature or consequence" of the contracts. Thus, while transactions in the Congressional Control Contracts on a DCM do not violate, for example, state bucket-shop laws, they nevertheless involve an activity that is unlawful in a number of states—wagering on elections. To permit such transactions on a DCM would undermine important state interests expressed in statutes separate and apart from those applicable to trading on a DCM.

[29] 7 U.S.C. § 7(g), *as amended* by the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 8 Stat. 1389 (1974). In the colloquy between Senator Feinstein and Senator Lincoln on the Senate floor regarding the proposed Dodd-Frank Act provision that ultimately was enacted as CEA section 5c(c)(5)(C), Senator Feinstein referenced the Commission's pre-CFMA authority "to prevent trading that is contrary to the public interest," and asked Senator Lincoln whether, with respect to CEA section 5c(c)(5)(C), the intent was to "define 'public interest' broadly so that the CFTC may consider the extent to which a proposed derivative contract would be used

**WHEREAS,** the general "Findings and Purpose" provision of the CEA, at CEA section 3, states that "[t]he transactions subject to [the CEA] . . . are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair, and secure financial facilities,"[30] and thus recognizes hedging – and, in particular, price hedging (the "managing [of] price risks") – as a public interest that transactions subject to the CEA are intended to serve.

**WHEREAS,** the Commission has the discretion to consider other factors in its evaluation of whether a contract is contrary to the public interest for purposes of CEA section 5c(c)(5)(C), and the legislative history of CEA section 5c(c)(5)(C) supports consideration of whether a contract may threaten the public good.[31]

---

predominantly by speculators or participants not having a commercial or hedging interest." Senator Feinstein asked whether the Commission would "have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to a hedging or economic use[,]" and Senator Lincoln replied, "That is our intent." *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln), *available a*t https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf. Pre-CFMA Commission guidelines articulated the economic purpose test as an evaluation of "whether [a] contract reasonably can be expected to be, or has been, used for hedging and/or price basing on more than an occasional basis." 17 C.F.R. § 5, Appendix A- Guideline No. l (repealed 2001). The colloquy between Senators Feinstein and Lincoln suggests a modification of the "on more than an occasional basis" standard; it suggests that the Commission should consider whether a contract is used predominantly by speculators or market participants not having a commercial or hedging interest.

[30] CEA section 3(a); 7 U.S.C. § 5(a). Section 3 further states that it is the purpose of the CEA to serve such public interests "through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission." CEA section 3(b); 7 U.S.C. § 5(b).

[31] In the colloquy on the Senate floor, Senator Lincoln further confirmed for Senator Feinstein that CEA section 5c(c)(5)(C) would empower the Commission to prevent trading in contracts "that may serve a limited commercial function but threaten the public good by allowing some to profit from events that threaten our national security." Senator Lincoln cited terrorist attacks, war and hijacking as examples of events that "pose a real commercial risk to many businesses in America," but stated that "a futures contract that allowed people to hedge that risk would also involve betting on the likelihood of events that threaten our national security. That would be contrary to the public interest." Senator Feinstein thanked Senator Lincoln for this confirmation, concluding that, "[a] futures market is for hedging." *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln), available at https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf.

**WHEREAS,** in light of the foregoing, in evaluating whether the Congressional Control Contracts are contrary to the public interest, the Commission has considered the contracts' hedging utility and price-basing utility.[32]  Additionally, the Commission has considered the potential impact that trading in the Congressional Control Contracts may have on election integrity, or the perception of election integrity – as well as the extent to which permitting trading in the Congressional Control Contracts could require the Commission to assume a role in overseeing the electoral process.[33]

<u>Hedging and Price Basing Utility</u>

**WHEREAS,** control of a chamber of Congress does not, in and of itself, have sufficiently direct, predictable, or quantifiable economic consequences for the Congressional Control Contracts to serve an effective hedging function.

**WHEREAS,** the Commission has considered comments from Kalshi and others that state that Congressional control impacts a wide variety of assets and cash flows, for a variety of

---

[32] *See* footnote 29, *supra*.

[33] In making findings regarding whether the Congressional Control Contracts are contrary to the public interest, the Commission distinguishes two staff no-action positions referenced by some commenters that have been issued by the Commission's Division of Market Oversight ("Division") to two academic institutions.  Subject to specified terms, these no-action positions state that the Division will not recommend enforcement action against the academic institutions for operating, without registration as a DCM, SEF, or foreign board of trade, small-scale not-for-profit markets that offer trading in political and economic indicator event contracts for academic purposes. CFTC Staff Letter No. 93-66 (June 18, 1993), issued to the University of Iowa, *available at* https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf; CFTC Staff Letter No. 14-130 (Oct. 29, 2014), issued to Victoria University of Wellington, New Zealand, *available at* https://www.cftc.gov/csl/14-130/download.  The terms of these staff no-action positions contemplate that each market will be operated by the relevant academic institution for academic purposes and without compensation. The terms of the no-action positions also contemplate limitations on, among other things, the number of market participants and the number of contracts that each market participant may hold.  In issuing the no-action positions, the Division did not recognize the political event contracts that would be offered by the markets as having hedging or price-basing utility.  In issuing each of the no-action positions, the Division explicitly noted that it was not rendering an opinion on the legality of the academic institutions' activities under state law.  Kalshi has not submitted that the Congressional Control Contracts would be subject to analogous limitations to those contemplated under the Division's no-action positions, including limitations providing for the market for the Congressional Control Contracts to be operated on a small-scale, not-for-profit basis for academic purposes.

entities, and that market participants already engage in behavior aimed at hedging risks related to Congressional control.  Kalshi notes that Congress has extensive powers to influence the economy and that shifts in political power often portend changes in policy.

**WHEREAS,** the Commission has considered detailed examples provided by Kalshi of statements from private research firms attempting to predict broad-ranging economic impacts of various political outcomes, and academic research indicating that the marketplace generally considers political risks in its operation (citing, for example, links between changes in the price of equities and other assets, and expected changes in Congressional control).

**WHEREAS,** the Commission has also considered similar assertions from commenters that the effect of Congressional control on the economy is sufficiently predicable and measurable for the Congressional Control Contracts to have a hedging purpose.

**WHEREAS,** conversely, several commenters expressed the view that the economic effects of Congressional control are too attenuated and unpredictable for the Congressional Control Contracts to serve as an effective hedging tool.

**WHEREAS,** the Commission finds that while control of a chamber of Congress may ultimately have economic effects, those eventual economic effects are both diffuse and unpredictable.  While the likelihood of adoption of a given policy may increase or decrease based on the composition of Congress, many intervening events and variables exist between control of a chamber of Congress and the actual implementation of such a policy.[34]  Furthermore,

---

[34] There are several steps required to enact legislation.  Proposed legislation must be approved by both chambers of Congress and by signature of the president or a Congressional override of a presidential veto.  During that process, the nature of proposed legislation can change in dramatic ways.  Beyond that, legislation requires implementation and is subject to judicial review.  All of these dynamics make it difficult to predict the nature, magnitude, and timing of policy outcomes resulting from a given party's control of a chamber of Congress.

the likelihood of implementation is not dependent on control of a chamber of Congress alone; it also depends upon many other things, including, for example, whether a party controls one or both chambers of Congress, the size of its majority, votes by individual party members, and the political affiliation of the president.

**WHEREAS,** control of a chamber of Congress could, following a number of independent intervening events, generally affect a wide variety of personal liabilities and economic factors, but that does not establish that the Congressional Control Contracts can be used for specific, identifiable hedging purposes and thus does not establish the hedging utility of the Congressional Control Contracts.  Rather, it further indicates that control of a chamber of Congress does not have a direct, predictable, or quantifiable impact on any commodity or other financial asset. [35]

**WHEREAS,** the Congressional Control Contracts result, upon settlement, in a payout of either $1 or $0, depending on the party in control of the relevant chamber of Congress, with settlement and payout occurring only once every two years, to coincide with the election cycle.

---

[35] Kalshi implies that the Congressional Control Contracts should be permitted to trade because certain other contracts currently trading on Commission-regulated exchanges involve a degree of removal from the actual risk that is intended to be hedged.  As a preliminary matter, the Commission notes that an exchange's certification of a product for trading pursuant to CEA section 5c(c)(1) and Commission Regulation 40.2 does not entail or amount to Commission approval of that product.  Further, while Kalshi does not cite to specific contracts in most of the examples it provides, the contracts that Kalshi appears to be referring to for comparison generally have more specific and targeted hedging utility than the Congressional Control Contracts and are otherwise materially different from such contracts. For example, Heating and Cooling Degree Day futures contracts that Kalshi appears to reference do not settle based on an overarching nationwide heating degree day/cooling degree day calculation – they settle based on a calculation at a very specific location.  Similarly, real estate index contracts that Kalshi appears to reference settle based on the value of the index in a specific metropolitan area, with the index itself based on real estate price values. In contrast, the Congressional Control Contracts are based on which political party will control the relevant chamber of Congress – they are not based on or tied to any actual price or related values. Furthermore, certain of the event contracts that Kalshi appears to reference do not fall within the scope of CEA section 5c(c)(5)(C) and Commission Regulation 40.11 – which apply with respect to contracts in certain types of excluded commodities – and most of the contracts that Kalshi appears to reference are not event contracts at all.

**WHEREAS,** the payout for the Congressional Control Contracts is not tied in any way to actual or estimated losses incurred elsewhere, and a loss on the Congressional Control Contracts is not offset by a related gain elsewhere, as is the case for contracts with hedging and risk management capabilities.

**WHEREAS,** the binary payout of the Congressional Control Contracts further limits their utility as a vehicle for hedging any eventual economic effects resulting from which party controls a chamber of Congress, as does their frequency of settlement.

**WHEREAS,** price-basing occurs when producers, processors, merchants, or consumers of a commodity establish commercial transaction prices based on the futures price for that or a related commodity.[36]

**WHEREAS**, the Commission has considered comments from Kalshi and others that the outcome of Congressional elections could affect the pricing of a number of diverse commercial transactions because the outcome could impact the pricing of various commodities underlying those transactions.

**WHEREAS,** other commenters stated that the Congressional Control Contracts cannot have price-basing utility for the same reason that they do not have hedging utility – namely, that the economic ramifications of an election are indirect and unpredictable, and therefore cannot help determine the price of a commodity or financial asset in a predictable manner.

**WHEREAS,** even if some level of political risk may be embedded in the pricing of many commercial transactions, that does not, in itself, support a finding that the Congressional Control Contracts serve a price-basing function.

---

[36] *See* CFTC Futures Glossary, *available at* https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm#P.

**WHEREAS**, since the economic effects of control of a chamber of Congress are diffuse and unpredictable, the price of the Congressional Control Contracts is not directly correlated to the price of any commodity, and so the price of the Congressional Control Contracts could not predictably be used to establish commercial transaction prices.

**WHEREAS,** in light of the foregoing, the Commission finds that it has not been demonstrated that the Congressional Control Contracts could reasonably be expected to be used for hedging and/or price basing on more than an occasional basis or that the Congressional Control Contracts could reasonably be expected to be used predominantly by market participants having a commercial or hedging interest.

<u>Election Integrity and the Commission's Role in the Electoral Process</u>

**WHEREAS,** more than 600 commenters – a significant proportion of the public commenters on the Submission – expressed concerns about the effect that the Congressional Control Contracts could have on election integrity, including concerns that the Congressional Control Contracts are inconsistent with ideals of democracy and the sanctity of the electoral process.

**WHEREAS,** these commenters included members of Congress, who expressed concern about the potential impact of the Congressional Control Contracts on the electoral process.  A comment letter from six United States Senators stated that "[e]stablishing a large-scale, for-profit political event betting market in the United States … would profoundly undermine the sanctity and democratic value of elections … There is no doubt that mass commodification of our

19

democratic process would raise widespread concerns about the integrity of our electoral process."[37]

**WHEREAS**, the Congressional Control Contracts could potentially be used in ways that would have an adverse effect on the integrity of elections, or the perception of integrity of elections – for example, by creating monetary incentives to vote for particular candidates, even when such votes may be contrary to a voter's (or an organized group of voters') political preferences or views of such candidates.

**WHEREAS**, the Congressional Control Contracts raise concerns that conduct designed to artificially affect the electoral process could also, intentionally or otherwise, manipulate the market in the Congressional Control Contracts, or that the market in the Congressional Control Contracts could be manipulated to influence elections or electoral perceptions.  In particular, several commenters (including members of Congress) stated that the Congressional Control Contracts could incentivize the spread of misinformation by individuals or groups seeking to influence perceptions of a political party or a party candidate's success.

**WHEREAS**, the public interest in guarding against such misinformation is all the more pressing in the context of contracts rooted in the outcome of United States federal elections.[38]

---

[37] The signatories to the letter are Senators Jeffrey Merkley, Sheldon Whitehouse, Edward Markey, Elizabeth Warren, Chris Van Hollen, and Diane Feinstein (the "Six Senators").  Senator Amy Klobuchar filed a separate comment letter expressing "concern" with the Submission.  The comment letter from the Six Senators underscores differences between a potential market for the Congressional Control Contracts and the markets for political event contracts in respect of which the Division has previously issued staff no-action positions. Kalshi is a for-profit entity seeking to offer a broad-based market in the Congressional Control Contracts.  Kalshi has not submitted that the Congressional Control Contracts would be subject to analogous limitations to those contemplated under the Division's no-action positions.  In particular, Kalshi has not submitted that the markets for the Congressional Control Contracts would be operated on a small-scale, not-for-profit basis for academic purposes.

[38] Kalshi cites to a paper on the history of election betting in the United States for the premise that such betting did not negatively affect the political process.  *See* Paul Rhode and Coleman Strumpf, "Historical Presidential Betting Markets," Journal of Economic Perspectives, Vol. 18, No. 2 (Spring 2004).  The Commission notes that the markets examined in that study existed in a very different historical context – before 1940 – and that the study nonetheless

**WHEREAS**, the Congressional Control Contracts have no underlying cash market with bona fide economic transactions to provide directly correlated price forming information. Rather, price forming information for the Congressional Control Contracts is driven in large measure by polling, voter surveys, and other informational sources that are unregulated, frequently have opaque underlying processes and procedures, and may not follow scientifically reliable methodologies. This differs from the informational sources (*e.g.*, government issued crop forecasts, weather forecasts, federal government economic data, market-derived supply and demand metrics for commodities, market-based interest rate curves, etc.) used for pricing the vast majority of commodities underlying Commission-regulated derivatives contracts.

**WHEREAS,** the opaque and unregulated sources of price forming information for the Congressional Control Contracts may increase the risk of manipulative activity relating to the trading and pricing of the contracts, while decreasing Kalshi's and the Commission's ability to detect such activity.

**WHEREAS**, the Commission has considered assertions by Kalshi and other commenters that the Congressional Control Contracts would serve as a check on misinformation and inaccurate polling, stating that market-based alternatives tend to be more accurate than polling or other methods of predicting election outcomes.

---

acknowledges both attempts to manipulate the odds and concerns that the betting markets provided a potential means of influencing elections. Several other commenters noted specific examples of manipulation or attempted manipulation incidents on election markets, while others downplayed these incidents.

21

**WHEREAS,** there is also research suggesting that election markets may incentivize the creation of "fake" or unreliable information in the interest of moving the market, and a number of commenters also raised this concern.[39]

**WHEREAS,** the Congressional Control Contracts prohibit certain individuals and entities likely to have a stake in the outcome of elections from trading in the contracts – including paid employees of political campaigns and major polling organizations.  However, these trading prohibitions would not prevent such individuals and entities from engaging in other activity – intended to create the impression of likely electoral success or failure on the part of a particular political candidate or candidates – that could artificially move the market in the Congressional Control Contracts.

**WHEREAS,** the trading prohibitions for the Congressional Control Contracts also do not exclude all individuals or entities who could have a motivation to create the impression of likely electoral success or failure on the part of a political candidate or candidates.[40]

**WHEREAS,** if trading in the Congressional Control Contracts were to be permitted, the Commission, as regulator of the markets in those contracts, would be required to investigate suspected manipulation in those markets.  By extension, the Commission could find itself investigating election-related activities – potentially including the outcome of an election itself. Several commenters stated that this was not a role for which the Commission is equipped or

---

[39] *See* Yeargain, Tyler, "Fake Polls, Real Consequences: The Rise of Fake Polls and the Case for Criminal Liability," Missouri Law Review, Volume 85, Issue 1 (Winter 2020) *citing* Enten, Harry, "Fake Polls are a Real Problem," *available at* https://fivethirtyeight.com/features/fake-polls-are-a-real-problem/ (Aug. 22, 2017) (noting how a seemingly false or unreliable poll caused significant movement on an event contract market and suggesting that such poll could have been, or at least could be, created to cause such market movement; further arguing that such false polls can have a real and detrimental effect on elections).

[40] Such individuals and entities could include, for example, Congressional campaign volunteers, consultants to Congressional campaigns, or donors or other supporters of political parties or individual Congressional candidates.

well-suited, with two members of the House of Representative stating in a joint comment letter that "because the CFTC is not equipped or authorized to enforce election laws, the prospect of the Commission assuming the role of an 'election cop' raises very serious concerns about the misalignment of such a role with the CFTC's historic mission and mandate as established by Congress."[41]

**Therefore**, the Commission FINDS that:

Pursuant to section 5c(c)(5)(C)(i) of the Commodity Exchange Act and Commission Regulation 40.11, the Congressional Control Contracts: (1) involve gaming and activity that is unlawful under State law; and (2) are contrary to the public interest.

**Accordingly, IT IS HEREBY ORDERED THAT:**

Pursuant to CEA section 5c(c)(5)(C)(ii) and Commission Regulation 40.11(a)(1), the Congressional Control Contracts are prohibited and shall not be listed or made available for clearing or trading on or through Kalshi.

**The provisions of this Order shall be effective as of this date.**

By the Commission.

Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Date:  September 22, 2023

---

[41] Comment Letter of Reps. Sarbanes and Raskin at 3.

23

# EXHIBIT C



Stuart Paisano
Governor

Michael E. Montoya
Lt. Governor

**PUEBLO of SANDIA**
481 Sandia Loop Road
Bernalillo, New Mexico 87004

(505) 867-3317
Fax (505) 867-9235
www.sandiapueblo.nsn.us

# AUTHORIZATION OF UPDATES TO THE STGC REGULATIONS

Resolution 2023 - __18 4__

At a duly called meeting, the Pueblo of Sandia Tribal Council ("Council") passed the following resolution:

**WHEREAS**, the Pueblo of Sandia ("Pueblo") is governed by a Council made up of appointed representatives who act in accordance with the custom and tradition, and;

**WHEREAS**, the Council is the governing body of the Pueblo and is empowered to act in the best interest and well-being of the Sandia people, and is charged with the duty of protecting the health, security, and general welfare of the Pueblo, and;

**WHEREAS**, the Council is the ultimate authority to negotiate permits, contracts, and official documents on behalf of the community, and;

**WHEREAS**, the Council, by Resolution 95-16, established the Sandia Tribal Gaming Commission ("STGC") for the purpose of regulating gaming conducted by the Pueblo of Sandia on its tribal lands and further charged the STGC with developing gaming regulations to be approved by the Council, and that such regulations be updated every three (3) years, and;

**WHEREAS**, the STGC, in consultation with the Pueblo, Sandia Resort & Casino ("SRC") Executive Management, and the Pueblo General Counsel completed draft proposed revisions to the STGC Regulations, submitted to the Pueblo in February, 2021, and;

**WHEREAS**, due to pending amendments to the federal regulations of the National Indian Gaming Commission ("NIGC") that could have had a substantial effect on portions of the STGC Regulations, update of the STGC Regulations was postponed until finalization of the NIGC's regulation amendments, with the NIGC's final rule published to the Federal Register on August 15th 2023, and;

**WHEREAS**, the STGC, after further consultation with SRC Executive Management and Pueblo Leadership, finalized its draft regulation amendments, incorporating the federal rule changes, and submitted the draft and supporting documents to the Pueblo on September 29th, 2023 for consideration by the Council, and;

**NOW THEREFORE BE IT RESOLVED,** the Council authorizes and adopts the proposed revised STGC Regulations as submitted to the Pueblo on September 29th, 2023, and;

Y:\2023Resolutions\23rc002.sm

**BE IT FURTHER RESOLVED** that Governor and Tribal officials take all steps necessary and appropriate to carry out the intent of the resolution.

# CERTIFICATION

The foregoing resolution was considered and adopted at a duly called meeting of the Pueblo of Sandia Tribal Council on this **08** day of **November 2023** at which time a quorum was present with ____ in favor, ____ opposed, and ____ abstaining.

_____
Governor

*ATTESTED:*

_____
Secretary

_____
Council Member

_____
Council Member

_____
Council Member

_____
Council Member

_____
Council Member

_____
Council Member

Certification Resolution 2023_____
Last Page

**18** 4

# PUEBLO OF SANDIA
# TRIBAL GAMING COMMISSION
# REGULATIONS

## Table of Contents

REGULATION 1 - DEFINITIONS ....................................................................................................1

REGULATION 2 - RESPONSIBILITIES OF THE COMMISSION ...........................................12

    2.1    Commission Responsibilities................................................................... 12
    2.2    Commission Reporting Requirements to Tribal Council...................................... 13
    2.3    Commission Reports to Other Entities ................................................... 13
    2.4    Waiver………………………………………………………………………………13

REGULATION 3 - COMMISSION ORGANIZATION AND PROCEDURES .....................................14

    3.1    Commission Organization ...................................................................... 14
    3.2    Meetings............................................................................................... 15
    3.3    Issuance, Amendment and Repeal of Regulations............................................ 16
    3.4    Adjudicative Hearings ........................................................................... 16
    3.5    Declaratory Rulings .............................................................................. 18
    3.6    Commission Staff Investigations and Inspections ............................................. 19

REGULATION 4 - ENFORCEMENT ACTIONS AND VIOLATIONS ........................................22

    4.1    General Policy for Conduct of Gaming on Pueblo Lands ................................... 22
    4.2    Licensing Disciplinary Action ................................................................ 22
    4.3    Violations Discovered by Licensees ........................................................ 22
    4.4    Violations Discovered by Commission Staff............................................... 22
    4.5    Types of Disciplinary Action.................................................................. 22

REGULATION 5 - ETHICS, CONFLICTS OF INTEREST AND PROHIBITED ACTIVITIES............26

    5.1    Policy ………………………………………………………………………………26
    5.2    Enforcement....................................................................................... 26
    5.3    Conflict of Interest - Commissioners, Commission Staff, and Licensees ........... 26
    5.4    Enforcement Procedure......................................................................... 28
    5.5    Conflict of Interest - Gaming Operation Employees ......................................... 28
    5.6    Express Violations ............................................................................... 29

REGULATION 6 - GENERAL LICENSING PROVISIONS APPLICABLE TO ALL LICENSES AND
LICENSEES ...............................................................................................................................31

    6.1    Revocable Privilege ............................................................................. 31
    6.2    Violation of Law or Regulations............................................................. 31
    6.3    Licenses Required ............................................................................... 31
    6.4    Applications and Fees .......................................................................... 31
    6.5    Background Investigations...................................................................... 32
    6.6    Temporary Permits.............................................................................. 33
    6.7    License.............................................................................................34

6.8    Licensing Procedures for Licenses. ........................................................................ 34
6.9    License Term; Renewal ........................................................................................... 35
6.10   Additional, Reopened or Random Investigations While Holding a License ........ 35
6.11   Suspension of License............................................................................................. 36
6.12   Revocation of License............................................................................................. 37
6.13   Conditional License ................................................................................................ 38
6.14   Licensee Responsibility to Update and Correct Information................................. 39
6.15   Criminal Arrests or Convictions as Grounds for License Suspension, Revocation, or Conditions.......................................................................................................... 39
6.16   Confidentiality and Handling of Licensing Information ........................................ 39
6.17   Maintenance of Files and Records.......................................................................... 40
6.18   Fees......................................................................................................................... 41

REGULATION 7 - LICENSING OF EMPLOYEES.........................................................................42

7.1    License Required .................................................................................................... 42
7.2    Dual Licenses Prohibited ....................................................................................... 42
7.3    Applications, Fingerprints....................................................................................... 42
7.4    Failure to Complete Initial License Application Process or Appearing Under the Influence of Drug or Alcohol During the License Application Process ............... 42
7.5    Fingerprints for Employees; List ........................................................................... 42
7.6    Background Investigations...................................................................................... 43
7.7    Standards for Licensing .......................................................................................... 43
7.8    License Classifications............................................................................................ 46
7.9    License Term, Renewal Timeframe........................................................................ 46
7.10   Duty to Carry Licenses; Surrender of License....................................................... 46
7.11   Responsibility to Report Suspension, Resignation or Termination ....................... 46
7.12   Employment Status Report ..................................................................................... 46
7.13   Duty to Report Criminal Charges, Arrests, Warrants, Incarceration..................... 47
7.14   Production of Records or Evidence ........................................................................ 48

REGULATION 8 - LICENSING OF VENDORS .............................................................................49

8.1    License Required .................................................................................................... 49
8.2    Applications and Background Investigations ......................................................... 49
8.3    Ongoing Responsibilities of Licensee ................................................................... 49
8.4    License Term and Renewal..................................................................................... 50
8.5    Standards for Licensing .......................................................................................... 50
8.6    Monthly Gaming Vendor Report Required ............................................................ 52
8.7    Termination of Business Relationship with Vendor............................................... 52
8.8    Violation of Contract ............................................................................................. 53
8.9    Transfer of License ................................................................................................ 53
8.10   Access to Gaming Vendor Licensee's Premises and Production of Records........ 53

REGULATION 9 - LICENSING OF MANAGEMENT CONTRACTORS ..........................................54

9.1    License Required .................................................................................................... 54
9.2    Application and Background Investigations........................................................... 54
9.3    Standards for Licensing .......................................................................................... 54

REGULATION 10 - APPROVAL OF GAMING DEVICES AND CONVERSIONS, ASSOCIATED EQUIPMENT, NEW GAMES AND APPLICATIONS AND SYSTEMS ............................................57

    10.1    Requirements ............................................................................. 57
    10.2    Approval of Gaming Devices and Conversions; Applications and Procedures ... 57
    10.3    Recordkeeping ........................................................................... 59
    10.4    Approval to Modify Gaming Devices.......................................... 59
    10.5    Gaming Machine Installations and Software Upgrades................... 59
    10.6    Marking, Registration, Distribution and Shipping of Gaming Devices............... 60
    10.7    Approval to Sell or Dispose of Gaming Devices and Associated Equipment...... 61
    10.8    Maintenance and Maintenance Agreements of Gaming Devices, Games and Associated Equipment ................................................................ 61
    10.9    Summary Suspension of Approval of Gaming Devices ..................... 61
    10.10    Applications and Systems Installations, Modifications and Upgrades...…….....58
    10.11    New Games; Applications and Procedures.................................... 62
    10.12    Associated Equipment; Applications and Procedures ...................... 63
    10.13    Reserved Rights of Commission................................................. 65
    10.14    Changes of Number and Location of Slot Machines, or Gaming Tables. ............ 65
    10.15    Temporary Suspension of Game or Device ................................... 65
    10.16    Removal of a Game, Gaming Device, Associated Equipment, Gaming Software and Hardware and Applications and Systems....................................... 66

REGULATION 11 - LICENSING OF GAMING FACILITIES..................................................67

    11.1    License Required ....................................................................... 67
    11.2    Application................................................................................. 67
    11.3    Standards for Licensing ............................................................. 67
    11.4    Unsuitable Locations ................................................................. 69
    11.5    License Term; Renewal .............................................................. 69
    11.6    Posting of Gaming Facility License............................................. 70
    11.7    General Renovations of Gaming Facility ..................................... 70
    11.8    Monitoring and Oversight........................................................... 71

REGULATION 12 - SURVEILLANCE ................................................................................72

    12.1    Surveillance Systems ................................................................. 72
    12.2    System Staffing Requirements..................................................... 72
    12.3    Surveillance Room Accessibility................................................. 72
    12.4    Surveillance System Equipment ................................................. 73
    12.5    Digital Media Retention and Access............................................ 74
    12.6    Required Surveillance Coverage: Gaming Machines and Class II Gaming Systems. ................................................................................... 75
    12.7    Required Surveillance Coverage: Card Games............................... 75
    12.8    Required Surveillance Coverage: Table Games ............................. 76
    12.9    Required Surveillance Coverage: Keno and Bingo ......................... 76
    12.10    Required Surveillance Coverage: Pari-mutuel and Event Wagering.................... 76
    12.11    Required Surveillance Coverage: Casino Cage and Vault ................. 77
    12.12    Required Surveillance Coverage: Count Rooms ............................. 77

12.13   Required Surveillance Coverage: Kiosks ............................................................ 77
12.14   Required Surveillance Coverage: IT Server Room ............................................ 78
12.15   Required Surveillance Coverage: Security Offices ............................................ 78
12.16   Required Surveillance Coverage: Employee Break Rooms ................................ 78
12.17   Surveillance Log ............................................................................................... 78
12.18   Accomplishment of Purpose ............................................................................. 78

REGULATION 13 - INTERNAL CONTROLS AND GAME RULES ................................................... 80

13.1    Tribal Minimum Internal Control Standards ....................................................... 80
13.2    Gaming Operation Internal Controls .................................................................. 80
13.3    Game Rules ....................................................................................................... 81

REGULATION 14 - ACCOUNTING REGULATIONS ..................................................................... 82

14.1    Commission Compliance Procedures .................................................................. 82
14.2    Accounting Records ........................................................................................... 82
14.3    Record Retention ............................................................................................... 83
14.4    Financial Statements .......................................................................................... 83
14.5    Audited Financial Statements ............................................................................ 83
14.6    Accounting Internal Controls ............................................................................. 83
14.7    Revenue Computations ...................................................................................... 84
14.8    Mandatory Count Procedure .............................................................................. 85
14.9    Handling of Cash ............................................................................................... 85
14.10   Minimum Bankroll Requirements ...................................................................... 85

REGULATION 15 - TECHNICAL STANDARDS ............................................................................ 87

15.1    Technical Standards for Gaming Devices, On-Line Slot Systems and Associated
        Equipment ......................................................................................................... 87
15.2    Technical Standards for Class II Gaming Systems .............................................. 87

REGULATION 16 - CARD GAMES .............................................................................................. 88

16.1    Card Game Drop Box Procedures ...................................................................... 88
16.2    Accounting for Exchanges between Card Table Banks and the Card Room Floor
        Bank(s) or Casino Cage .................................................................................... 88
16.3    Accounting for Transfers between the Casino Cage and the Card Room Floor
        Bank(s) or Card Table Banks ............................................................................ 88
16.4    Limits on the Use of Card Table Banks and Card Room Floor Bank(s) ............. 88
16.5    Rake-off and Time Buy-in ................................................................................. 89
16.6    Prohibition on the Use of Card Game Shills and Proposition Players ................. 89
16.7    Posting of Rules ................................................................................................ 89

REGULATION 17 - CHIPS ........................................................................................................... 90

17.1    Approval of Chips; Applications ........................................................................ 90
17.2    Specifications for Chips ..................................................................................... 90
17.3    Promotional and Tournament Chips ................................................................... 91
17.4    Other Instruments .............................................................................................. 91
17.5    Use of Chips ...................................................................................................... 92
17.6    Redemption and Disposal of Discontinued Chips .............................................. 93

17.7    Destruction of Counterfeit Chips .......................................................... 93
REGULATION 18 - GENERAL OPERATING STANDARDS AND REQUIREMENTS ......................95
18.1    Suitable Methods of Operation ............................................................ 95
18.2    Underage Gaming Patrons ................................................................... 96
18.3    Hours of Operation .............................................................................. 96
18.4    Security Reports.................................................................................. 96
18.5    Security of Cash Assets ...................................................................... 96
18.6    Reporting Suspected Crime by a Nonmember of the Pueblo of Sandia ............... 96
18.7    Prohibitions on Cashing Certain Checks, and Other Banking Transactions ........ 96
18.8    Extension of Credit to Patrons ............................................................ 97
18.9    Prohibition on Alcohol Sales and Service in Class III Gaming Area……………94
18.10   Complimentaries …………………………………………………………....…94
18.11   Funding Compulsive Gamblers' Assistance ...................................... 97
18.12   Minimum Liability Insurance ............................................................ 97
18.13   Notice of Promotions, Tournaments and Special Events..................... 97
18.14   Compliance with Statewide Self-Exclusion Program Under Terms of the
        Compact………………………………...…………………………………...……..98
REGULATION 19 - RESOLUTION OF PATRON DISPUTES.................................................99
19.1    Scope…..…………………………………………………….………………….99
19.2    Approval of Gaming Operation Policy and Procedure ........................ 99
19.3    Notice and Administrative Handling of Disputes................................ 99
19.4    Review by Commission ..................................................................... 100
19.5    Appeals ............................................................................................ 100
19.6    Notice to Patrons.............................................................................. 100
19.7    Employee Training............................................................................ 101

### 3.3    Issuance, Amendment and Repeal of Regulations.

(a)    These regulations are established and promulgated pursuant to and in accordance with the Ordinance.  The Commissioners will, from time to time, promulgate, amend and repeal such regulations, consistent with the objective and purposes of the Ordinance and other applicable laws and regulations, as they may deem necessary or desirable in carrying out the policy and provisions of those laws and regulations.

(b)    The Commissioners shall review these regulations and update those portions of the regulations as deemed necessary, but at least every three (3) years, to keep the regulations current and to ensure the proper and effective regulation of gaming activities on Pueblo lands.  The Commissioners, in their discretion, may take into consideration any comments or suggestions regarding the regulations presented to the Commissioners in writing.

(c)    A full text of final regulations will be made available to parties requesting a copy and reasonable copying charges may be assessed.

### 3.4    Adjudicative Hearings.

(a)    **Hearings**.  Whenever any provision of the Ordinance, these regulations, or other written resolution of the Tribal Council provides for a hearing on any action and a hearing is requested, the Commissioners shall schedule a hearing and shall give the parties written notice of hearing specifying the date, time and place of the hearing and the particular matter to be heard.

(b)    **Requesting A Hearing.**  A hearing must be requested in writing within five (5) business days after receipt of the written notice of the action, except where a different time period to request a hearing is specified.

(c)    **Scheduling A Requested Hearing.**  If a hearing is requested within the specified time period, the Commissioners shall set a hearing date within thirty (30) calendar days after receipt of the request for a hearing.  The party requesting the hearing may, for good cause shown, request an extension which may be granted in the Commissioners' discretion.  If the party requesting the hearing fails to appear for a hearing without excuse, the Commissioners will interpret the absence as an indication that the party no longer wishes to pursue the matter and the hearing will be dismissed.

(d)    **Commissioner Attendance**.  The Commissioners shall endeavor to hold all hearings before all four Commissioners but in no case shall the Commissioners hold a hearing with fewer than two Commissioners present.

(e)    **Hearing Procedure**.    Adjudicative hearings will be conducted in accordance with the following rules:

> (1)    The person requesting the hearing (the "petitioner") shall be permitted to submit documentary or physical evidence and testimony from the petitioner or other person in support of petitioner's case.

# EXHIBIT D

 **United States Department of the Interior**

OFFICE OF THE SECRETARY
Washington, DC 20240

**MAR 2 9 2016**

The Honorable Francisco I. Lujan
Governor, Pueblo of Sandia
481 Sandia Loop Road
Bernalillo, New Mexico  87004

Dear Governor Lujan:

On December 21, 2015, our Office received from the State of New Mexico (State) a copy of the Indian Gaming Compact (2015 Compact) between the State and the Pueblo of Sandia (Tribe). The Compact is similar to several Tribal-State compacts between the State and five other New Mexico Tribes approved by operation of law on June 22, 2015.

Under the Indian Gaming Regulatory Act (IGRA), the Secretary of the Interior (Secretary) may approve or disapprove a proposed compact within 45 days of its submission.[1]  If the Secretary does not approve or disapprove the proposed compact within 45 days, IGRA states that the compact is "considered to have been approved by the Secretary, but only to the extent the Compact is consistent with the provisions of [IGRA]."[2]

To assist us in our review of the 2015 Compact, we requested that the Tribe provide additional information and a financial analysis.  We have completed our review of the 2015 Compact and the response submitted by the Tribe.  As noted above, the Compact is similar to compacts submitted in 2015 by five tribes located in New Mexico, and our concerns remain the same. Accordingly, no action was taken on the 2015 Compact within the 45-day review period and it is considered approved by operation of law, but only to the extent it is consistent with the provisions of IGRA.[3]

**Discussion**

The IGRA requires States to engage in good faith negotiations to address issues that are relevant to each individual sovereign Tribe.  The IGRA provides for an Indian Tribe and a State to enter into a compact governing gaming activities on the Indian lands of the Tribe.  Here, our understanding is that each of the New Mexico Tribes, including the Pueblo of Sandia, made an independent determination that adopting the 2015 Compact was in its best interest.

**Revenue Sharing Provisions**

As part of our required review pursuant to IGRA, we closely scrutinize any revenue sharing requirements in gaming compacts.  We first examine whether the state has offered meaningful concessions that it was not otherwise required to negotiate, such as exclusive rights to operate

---

[1] 25 U.S.C. § 2710 (d)(8).

[2] 25 U.S.C. § 2710 (d)(8)(C).

[3] 25 U.S.C. § 2710 (d)(8)(C).

2

class III gaming or other benefits sharing a gaming-related nexus. We then examine whether the value of the concessions provide substantial economic benefits to the tribe to justify the revenue sharing negotiated.

Under the first prong of our analysis, the Tribe asserts that the State has granted some meaningful concessions to the Tribe.[4] The Tribe will continue to receive partial exclusivity over slot machines while maintaining full exclusivity over all other forms of class III gaming under IGRA. Non-tribal commercial casinos may operate a maximum of 750 slot machines for 18 hours a day at up to 6 locations for the duration of the 2015 Compacts. We consider this exclusivity to be a meaningful concession under our test. The fact that the compact does not provide for limitations on the Tribe's operations regarding the number of slot machines and hours of operation, however, is generally not a meaningful concession as that is generally considered a regulatory issue over which the State is obligated to negotiate under IGRA.

Under the second prong of our analysis, the Tribe contends that the 2015 Compact has terms more favorable than its current compact.[5] The Tribe projects that its revenue sharing payments under the 2015 Compact will decrease compared to the terms of the 2007 Compact. Moreover, if the State permits any additional non-tribal gaming, the Tribe's obligation to make revenue sharing payments will cease.

While the State has conceded partial exclusivity over slot machines and full exclusivity over other forms of Class III gaming, we remain skeptical about the overall value of the 2015 Compact's additional claimed concessions. However, given the Tribe's response showing that it will receive economic benefits compared to the 2007 Compact, we take no action within the 45-day time limit on this issue.

**Free Play and Point Play**

Section 7 of the 2015 Compact provides a two-year period from its effective date for the State to pursue its assertion that the Tribe's net win should not deduct wins and losses arising from free play or point play. Our position remains the same. Free play and point play must be treated according to industry standards and Generally Accepted Accounting Principles (GAAP) by excluding both from the definition of "net win," which forms the basis for revenue sharing calculations.

**Internet Gaming Ambiguity**

Section 17 of the 2015 Compacts provides that Internet gaming is prohibited in the State. This section further provides, however, that if the State authorizes Internet gaming, the parties will reopen negotiations to evaluate the impacts of Internet gaming and consider adjustments to the Compact. Presumably, if the State permits Internet gaming, it would constitute an expansion of gaming in the State.[6] Our view is that if non-tribal Internet gaming is allowed in the State, it

---

[4] *See* Letter from Isaac Lujan, Governor of the Pueblo of Sandia to Paula L. Hart, Director, Office of Indian Gaming, (Jan. 12, 2016).

[5] The Tribe estimates a cost savings of $400,000 per calendar quarter. *See Letter from Governor Lujan at 2.*

[6] At this time, the lawfulness of internet gaming is unsettled and we take no position as to the legality of internet gaming under the circumstances presented.

3

would conflict with the State's promise of exclusivity and affect the value of the concession by the State, thereby triggering the Tribe's right to cease payments to the State.

**Conclusion**

We have taken no action on the 2015 Compact within the 45-day review period. As a result, the 2015 Compact is considered to have been approved, but only to the extent it is consistent with the provisions of IGRA. The 2015 Compact will become effective upon its publication of notice in the *Federal Register*.[7] A similar letter will be sent to the Honorable Susana Martinez, Governor of the State of New Mexico.

Sincerely,

Lawrence S. Roberts
Acting Assistant Secretary – Indian Affairs

---

[7] *See* 25 U.S.C. § 2710(d)(3)(8).