UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MESCALERO APACHE TRIBE,
PUEBLO OF ISLETA,
PUEBLO OF POJOAQUE,
and PUEBLO OF SANDIA,

Plaintiffs,

v. No. 2:26-cv-1517-MIS-GJF

KALSHI INC. and KALSHIEX LLC,

Defendants ORAL ARGUMENT REQUESTED

**PLAINTIFFS' CONSOLIDATED MOTION FOR PRELIMINARY INJUNCTION AND RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

BACKGROUND .......... 2

I. THE COMPLAINT ALLEGES AND SEEKS TO ENJOIN AND TO IMPOSE CIVIL PENALTIES FOR KALSHI'S VIOLATIONS OF THE COMPACT AND THE TRIBAL GAMING LAWS AS MADE ENFORCEABLE UNDER IGRA .......... 2

II. THE TRIBES' INVESTIGATIONS CONFIRM KALSHI'S VIOLATIONS OF THE COMPACT AND TRIBAL GAMING LAWS ON THE TRIBES' INDIAN LANDS .......... 4

RESPONSE TO KALSHI'S MOTION TO DISMISS .......... 6

I. THE MTD SHOULD BE DENIED BECAUSE THE COMPLAINT ALLEGES FACTS STATING FACIALLY PLAUSIBLE CLAIMS FOR RELIEF AND THE TRIBES HAVE FEDERAL AUTHORITY TO SUE KALSHI .......... 7

A. The Complaint States Plausible Claims that Kalshi Operates Class III Gaming on Indian Lands that Violates IGRA, the Compact, and Tribal Gaming Laws .......... 7

B. Congress Intended That § 2710(d)(1) Incorporates By Reference the Duly Adopted and NIGC-Approved Tribal Gaming Laws to Confirm and Enforce the Tribes' "Exclusive Right to Regulate Gaming on Indian Lands[.]" .......... 10

C. Kalshi's Unfounded Arguments Cannot Avoid IGRA's Express Incorporation of the Tribal Gaming Laws. .......... 12

D. Whether Federally Delegated or Incorporated, the Tribal Gaming Laws are Enforceable Against Kalshi's Sports Betting On Indian Lands .......... 15

II. DODD-FRANK DOES NOT PREEMPT THE TRIBAL GAMING LAWS AND DID NOT IMPLIEDLY PARTLY REPEAL IGRA. .......... 18

A. The CEA and Dodd-Frank Do Not Preempt the Tribal Gaming Laws Since They Say Nothing About Tribes or Indian Lands Gaming, Much Less Clearly Preempt IGRA-Sanctioned Tribal Regulation of Indian Lands Gaming .......... 18

B. Dodd-Frank Also Did Not Impliedly Partly Repeal IGRA's Exclusive Regulation of On-Reservation Online Sports Betting Since Dodd-Frank is Wholly Silent About That .......... 20

C. The Major-Questions Doctrine and "No Elephants in Mouseholes" Canon Preclude Implied Repeal of IGRA or Preemption of Tribal Gaming Laws ......... 23

III. KALSHI'S REMAINING ARGUMENTS ALSO ALL FAIL ........................................ 25

A. The Unlawful Internet Gambling Enforcement Act ("UIGEA") is Irrelevant Here Both Substantively and Because It Disclaims Any Change to IGRA...........25

B. The Tribal Gaming Laws are Enforceable Against Kalshi Without Regard to Preemption of or Reference to State Gambling Laws ......................................26

C. The Complaint Explains How Kalshi Violates the Compact By Violating the Tribal Gaming Laws Because the Compact Requires Enactment and Enforcement of Those Laws ....................................................................27

D. A Mere Notice of Proposed Rulemaking Does Not Shield Kalshi from Liability Under the Tribal Gaming Laws.............................................................28

TRIBES' MOTION FOR PRELIMINARY INJUNCTION....................................................... 29

I. A PRELIMINARY INJUNCTION SHOULD ISSUE SINCE THE TRIBES ARE LIKELY TO SUCCEED ON THE MERITS, THEY WILL BE IRREPARABLY HARMED WITHOUT AN INJUNCTION, THE PUBLIC INTEREST FAVORS AN INJUNCTION, AND THE BALANCE OF THE EQUITIES FAVORS THE TRIBES...........................................................................................................29

II. THE TRIBES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS THAT KALSHI OPERATES SPORTS BETTING ON THE TRIBES' INDIAN LANDS IN VIOLATION OF IGRA, THE COMPACT, AND THE TRIBAL GAMING LAWS SINCE THE FACTS AND LAW SUPPORT THOSE CLAIMS ...........................................................................................................311

III. THE TRIBES LIKELY WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION BECAUSE THEY OTHERWISE WILL BE UNABLE TO ENFORCE THEIR GAMING LAWS ON THEIR INDIAN LANDS, A HARM THAT IS IRREPARABLE UNDER GOVERNING LAW ..............33

IV. THE EQUITIES FAVOR A PRELIMINARY INJUNCTION FOR THE TRIBES SINCE HARM TO THEIR ABILITY TO ENFORCE THEIR LAWS ON THEIR INDIAN LANDS STRONGLY OUTWEIGHS KALSHI'S ORDINARY, MONETARY HARMS FROM GEOFENCING.............................................................34

V. A PRELIMINARY INJUNCTION HERE ADVANCES THE PUBLIC INTEREST SINCE IT FURTHERS PUBLIC INTERESTS OF IGRA, THE COMPACT, THE TRIBES' GAMING LAWS, DODD-FRANK, AND THE CFTC'S REGULATIONS.........................................................................................................36

CONCLUSION....................................................................................................................39

**EXHIBITS**

1. Decl. of Maria Ramos (July 17, 2026) ("Mescalero Ramos Decl.").

2. Decl. of Dorothea Notah (June 24, 2026) ("Isleta Notah Decl.").

3. Decl. of Sylvia Castillon (July 21, 2026) ("Isleta Castillon Decl.).

4. Decl. of Erik Mendoza (July 13, 2026) ("Isleta Mendoza Decl.").

5. Decl. of Terrence Bailey (July 17, 2026) ("Pojoaque Bailey Decl.").

6. Decl. of Guadalupe Flores (July 14, 2026) ("Pojoaque Flores Decl.").

7. Decl. of Trista Tafoya (July 8, 2026) ("Sandia Tafoya Decl.").

8. Decl. of Brandon Hurtado (July 8, 2026) ("Sandia Hurtado Decl.").

9. Pueblo of Isleta Ord.: Permitted Gaming (Eff. Nov. 26, 2024) ("Isleta Ord.")

# TABLE OF AUTHORITIES

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 3 .......... 27

## STATUTES

7 U.S.C. § 2(a)(1)(A) .......... 20

7 U.S.C. § 5 .......... 20

7 U.S.C. § 5(b) .......... 21

7 U.S.C. § 6(b)(1) .......... 20

7 U.S.C. § 6(b)(2) .......... 20

7 U.S.C. § 7a-2(c)(5) .......... 3, 19

7 U.S.C. § 7a-2(c)(5)(C)(i) .......... 19, 28, 38

7 U.S.C. § 16(e)(2) .......... 19

7 U.S.C. § 27f(b) .......... 19

18 U.S.C. § 1161 .......... 14

18 U.S.C. § 1166 .......... 13

18 U.S.C. § 1651 .......... 12

25 U.S.C. § 1915(c) .......... 12

25 U.S.C. § 2205(a)(1) .......... 13

25 U.S.C. § 2205(a)(3) .......... 13

25 U.S.C. § 2205(b) .......... 13

25 U.S.C § 2206(j)(2)(B)(iii)(II) .......... 13

25 U.S.C. § 2701(4) .......... 34

25 U.S.C. § 2701(5) .......... 11, 15

25 U.S.C. § 2702 .......... 21

25 U.S.C. § 2702(1) .......... 36

25 U.S.C. § 2702(2) .......... 36, 37

25 U.S.C. § 2702(3) .......... 9

25 U.S.C. § 2703(4) .......... 15

25 U.S.C. § 2703(7)(A)(ii) .......... 13

25 U.S.C. § 2703(7)(C) .......... 13

25 U.S.C. § 2703(7)(E) .......... 13

25 U.S.C. § 2703(8) .......... 9

25 U.S.C. § 2707(a) .......... 13

25 U.S.C. § 2710(a) .......... 28

25 U.S.C. § 2710(b)(1) .......... 13

25 U.S.C. § 2710(b)(2)(B) .......... 7

25 U.S.C. § 2710(d) .......... 28

25 U.S.C. § 2710(d)(1) .......... passim

25 U.S.C. § 2710(d)(1)(A) .......... 10, 11

25 U.S.C. § 2710(d)(6) .......... 13

25 U.S.C. § 2710(d)(7)(A) .......... 9

25 U.S.C. § 2719(d)(1) .......... 13

28 U.S.C. § 3701 .......... 22

31 U.S.C. § 5361(b) .......... 26

31 U.S.C. § 5363 .......... 25

101 Stat. 666, 668-69 (1987) .......... 12

Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"),
P.L. 111-203, 124 Stat. 1376-2223 (2010) .......... passim

Mescalero Apache Tribe, Ord. 09-13 § 5(A) (Dec. 9, 2009) .................................................. 8, 31

Mescalero Apache Tribe, Ord. 09-13 § 5(B) (Dec. 9, 2009) .................................................. 8, 31

Mescalero Apache Tribe, Ord. 09-13 § 5(D) (Dec. 9, 2009) .................................................. 8, 36

Mescalero Apache Tribe, Ord. 09-13 § 12(G) (Dec. 9, 2009) ...................................................... 8

Mescalero Apache Tribe, Ord. 09-13 § 13(A) (Dec. 9, 2009) ...................................................... 8

Professional and Amateur Sports Protection Act, 28 U.S.C. § 3701-3704 ..................................22

Pueblo of Isleta Ord.: Permitted Gaming § 1(C) (eff. Nov. 26, 2024) ............................. 8, 31, 37

Pueblo of Isleta Ord.: Permitted Gaming § 2 (eff. Nov. 26, 2024) ........................................ 8, 31

Pueblo of Isleta Ord.: Permitted Gaming § 3(A) (eff. Nov. 26, 2024) ......................................... 8

Pueblo of Isleta Ord.: Permitted Gaming § 10(P) (eff. Nov. 26, 2024) ........................................ 8

Pueblo of Pojoaque, Third Am. & Restated Gaming Ord. § 10-8-5(A)-(B) (eff. Mar. 16, 2012) ..........................................................................................8, 31

Pueblo of Pojoaque, Third Am. & Restated Gaming Ord. § 10-8-9(G) (eff. Mar. 16, 2012) ..........................................................................................8

Pueblo of Sandia Ord.: Permitted Gaming, Res. No. 94-37 § I(C) (eff. Feb. 15, 1995) .... 8, 31, 37

Pueblo of Sandia Ord.: Permitted Gaming, Res. No. 94-37 § 2 (eff. Feb. 15, 1995) .............. 8, 31

Pueblo of Sandia Ord.: Permitted Gaming, Res. No. 94-37 § 3 (eff. Feb. 15, 1995) .................... 8

Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361-5367 ..................................25

**REGULATIONS**

17 C.F.R. § 38.151 .......................................................................................................... 38, 39

17 C.F.R. § 40.11 ......................................................................................................... 3, 28, 38

17 C.F.R. § 40.11(a)(1) ........................................................................................................... 38

25 C.F.R. § 293.2(d) .................................................................................................................. 9

25 C.F.R. § 293.26 ..................................................................................................................... 7

25 C.F.R. § 501.2(a) ................................................................................................................... 8

25 C.F.R. § 502.4(c) .......... 2, 9

25 C.F.R. § 522.11 .......... 8

Ariz. Admin. Code § R19-4-117 .......... 35

Pueblo of Isleta Gaming Regulations § 10(P) .......... 36

Pueblo of Isleta Gaming Regulations § 9(HH) .......... 31, 37

Sandia Tribal Gaming Commission Regulations § 6.3 .......... 36

**CASES**

Ah Sin v. Wittman, 198 U.S. 500 (1905) .......... 37

Arizona Public Service Co. v. EPA, 211 F.3d 1280 (D.C. Cir. 2000) .......... 14-15

Ashcroft v. Iqbal, 556 U.S. 662 (2009) .......... 7, 24

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) .......... 7, 24

Berneike v. CitiMortgage, Inc., 708 F.3d 1141 (10th Cir. 2013) .......... 2

Branch v. Smith, 538 U.S. 254 (2003) .......... 21, 22

Cayuga Nation v. New York State Gaming Comm'n., 775 F. Supp. 3d 651 (N.D.N.Y. 2025) .......... 15

Chatrie v. United States, 609 U.S. __, 2026 WL 1855568 (June 29, 2026) .......... 5

Coeur d'Alene Tribe v. State of Idaho, 842 F. Supp. 1268 (D.Idaho 1994) .......... 15

Colorado v. Western Sky Financial, 845 F. Supp. 2d 1178 (D.Colo. 2011) .......... 18

Crosby Lodge, Inc. v. NIGC, 2011 WL 13262030 (D. Nev. Aug. 16, 2011) .......... 17

Curtis v. Oliver, 479 F. Supp. 3d 1039 (D.N.M. 2020) .......... 35

Dish Network Service, LLC v. Laducer, 725 F.3d 877 (8th Cir. 2013) .......... 17

El Encanto, Inc. v. Hatch Chile Co., 825 F.3d 1161 (10th Cir. 2016) .......... 10, 11

Epic Sys. Corp. v. Lewis, 584 U.S. 497 (2018) .......... 20-23

Estate of William Eugene Holsapple, 2023 WL 4216420 (IBIA June 6, 2023) .......... 13

Fish v. Kobach, 840 F.3d 710 (10th Cir. 2016) .......... 30

Flood v. ClearOne Communications, Inc., 618 F.3d 1110 (10th Cir. 2010) .......... 30

Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000).......... 24

Gaming Corp. of Am. v. Dorsey & Whitney, 88 F.3d 536 (8th Cir. 1996).......... 18

Garland v. Cargill, 602 U.S. 406 (2024).......... 31

Gibbons v. Ogden, 9 Wheat. 1 (1824) .......... 10

Haaland v. Brackeen, 599 U.S. 255 (2023) .......... 12

Ho-Chunk Nation v. KalshiEx, LLC, 2026 WL 1284077 (W.D.Wis. May 11, 2026).......... 27, 28

Hornell v. Rosebud Sioux Tribal Court 133 F.3d 1087 (8th Cir. 1998).......... 17

In re Winter Storm Uri Natural Gas Litigation, ___ F.4th _, 2026 WL 1944831
(10th Cir. July 6, 2026) ..........19, 27

Interstate Consol. St. Ry. Co. v. Commonwealth of Massachusetts, 207 U.S. 79 (1907)...... 10, 13

Jackson v. Payday Financial, 764 F.3d 765 (7th Cir. 2014) .......... 17

Jam v. Int'l Finance Corp., 586 U.S. 199 (2019).......... 10, 11, 14

KalshiEX, LLC v. Flaherty, 172 F.4th 220 (3rd Cir. 2026) .......... 26

KalshiEX, LLC v. Hendrick, 817 F. Supp. 3d 1014 (D.Nev. 2025).......... 31, 32, 39

KalshiEX, LLC v. Martin, 793 F. Supp. 3d 667 (D. Md. 2025).......... 38

KalshiEX, LLC v. Schuler, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026), appeal filed,
No. 26-3196 (6th Cir. Mar. 11, 2026), inj. pending appeal denied, 2026 WL 1295806
(6th Cir. Apr. 24, 2026)..........22, 24, 35

KalshiEX, LLC v. Schuler, 2026 WL 1295806 (6th Cir. Apr. 24, 2026).......... 19

Kansas Natural Res. Coalition v. U.S. Dep't. of Interior, 971 F.3d 1222 (10th Cir. 2020) .......... 10

Learning Resources v. Trump, 607 U.S. 229, 146 S.Ct. 628 (2026) .......... 23

Lexington Ins. Co. v. Smith, 117 F.4th 1106 (9th Cir. 2024).......... 16

Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024) ..........29

Maine Health Cmty. Options v. United States, 590 U.S. 296 (2020) .......... 21

Maryland v. King, 567 U.S. 1301 (2012) .......... 33-34

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353 (1982) .......... 18, 19

Merrion v. Jicarilla Apache Tribe, 455 U.S. 130 (1982) .......... 22

Montana v. United States, 450 U.S. 544 (1981) .......... 14

Morton v. Mancari, 417 U.S. 535 (1974) .......... 21, 22

Murphy v. NCAA, 584 U.S. 453 (2018) .......... 22, 38

Navajo Nation v. Dalley, 896 F.3d 1196 (10th Cir. 2018) .......... 16, 32

Nebraska v. Parker, 577 U.S. 495 (2016) .......... 15

Nessel v. KalshiEX, LLC, No. 26-1087-CZ (Mich. 30th Dist. June 29, 2026) .......... 32

Nevada ex rel. Nevada Gaming Control Board v. KalshiEX, LLC, No. 26 OC 00050 1B (June 4, 2026) .......... 32

New Mexico v. Kalshi, Inc., No. 26-cv-01857 (D.N.M. filed June 8, 2026) .......... 27

New Mexico v. U.S. Dep't of Interior, 854 F.3d 1207 (10th Cir. 2017) .......... 25

N.L.R.B. v. Pueblo of San Juan, 276 F.3d 1186 (10th Cir. 2002) .......... 11, 19-20

Nova Health Systems v. Edmonson, 460 F.3d 1295 (10th Cir. 2006) .......... 30

Oneok, Inc. v. Learjet, Inc., 575 U.S. 373 (2015) .......... 19

Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs., 769 F.3d 105 (2d. Cir. 2014) .......... 18

Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234 (10th Cir. 2001) .......... 30, 33

Pueblo of Jemez v. United States, 790 F.3d 1143 (10th Cir. 2015) .......... 7

Pueblo of Pojoaque v. New Mexico, 863 F.3d 1226 (10th Cir. 2017) .......... 18, 26

Pueblo of Pojoaque v. Wilson, 619 F. Supp. 3d 1095 (D.N.M. 2022) .......... 20

Quik Payday, Inc. v. Stork, 549 F.3d 1302 (10th Cir. 2008) .......... 17

Rice v. Rehner, 463 U.S. 713 (1983) .......... 14

S. Ute Indian Tribe v. Polis, 810 F. Supp. 3d 1203 (D. Colo. 2025) ........................................... 16

Seneca-Cayuga Tribe of Oklahoma v. State of Oklahoma ex rel. Thompson,
874 F.2d 709 (10th Cir. 1989) ........................................................................................ 30, 33

Shoshone-Bannock Tribes of Ft. Hall Res. v. U.S. Dep't of the Interior, 153
F.4th 748 (9th Cir. 2025) ..................................................................................................... 10

Tohono O'Odham Tribes v. Schwartz, 837 F.Supp. 1024 (D. Ariz. 1993) ................................. 30

United States ex rel. Mtn. Contr., Inc. CHP Solns., LLC, 787 F. Supp. 3d
1216 (D.N.M. 2025) .............................................................................................................. 2

United States v. Borden Co., 308 U.S. 188 (1939) ....................................................................... 22

United States v. Dire, 680 F.3d 446 (4th Cir. 2012) ..................................................................... 12

United States v. Fulcar, __ F.4th __, 2026 WL 1948536 (1st Cir. July 6, 2026) ........................ 12

United States v. Kebodeaux, 570 U.S. 387 (2013) ................................................................. 10, 14

United States v. Mazurie, 419 U.S. 544 (1975) ............................................................................ 14

United States v. Minor, 121 F.4th 1085 (5th Cir. 2024) ............................................................... 12

United States v. New Mexico, No. 26-cv-01912 (D.N.M. filed June 12, 2026) .......................... 27

United States v. Pursley, 577 F.3d 1204 (10th Cir. 2007) .............................................................. 2

Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah, 790 F.3d 1000 (10th Cir. 2015) ....... 30, 33

West Virginia v. EPA, 597 U.S. 697 (2022) .................................................................................. 23

White Mountain Apache Tribe v. Bracker, 448 U.S. 136 (1980) .......................................... 26, 27

Whitman v. American Trucking Assn's, 531 U.S. 457 (2001) ...................................................... 24

Williams v. Lee, 358 U.S. 217 (1959) ........................................................................................... 24

Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008) ...................................... 29

Ysleta Del Sur Pueblo v. Texas, 596 U.S. 685 (2022) ........................................................... 11, 12

Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F.Supp. 1119 (W.D. Pa. 1997) ............................. 17

**OTHER AUTHORITIES**

CFTC Advisory Letter No. 25-36, 2025 WL2817302 (Sept. 30, 2025) ...................................... 35

Dan Bernstein, Eben Novy-Williams, and Michael McCann, "Kalshi puts geolocation providers on edge amid rapid rise," Sportico.com (Oct. 16, 2025), available at: https://www.sportico.com/business/tech/2025/kalshi-geolocation-technology-prediction-markets-1234873796/ ....................................................................................32

Daniel O'Boyle, "Michigan Ban on Kalshi Sports Contracts Extended, With Geofencing To Begin Aug. 12," available at: https://www.ingame.com/michigan-ban-kalshi-sports-contracts-extended-geofencing/ (last visited July 20, 2026)...........................6

Dustin Gouker, "The Current: Jackpocket Leaves Another State After AG Opinion," https://closingline.substack.com/p/the-current-jackpocket-leaves-nm (last visited July 20, 2026)........................................................................................................6

https://jackpocket.com/regulators (last visited July 20, 2026)...................................................... 6

https://kalshi.com/category/sports/all-sports (last visited July 20, 2026)...................................... 9

https://radar.com/product/geofencing (last visited July 20, 2026)................................................ 5

https://sportsbook.draftkings.com/retailsportsbook (last visited July 20, 2026) ........................... 6

https://sportsbook.fanduel.com (last visited July 13, 2026) ......................................................... 6

https://www.geocomply.com/global-sports/ (last visited July 20, 2026) ....................................... 6

Jill R. Dorson, "Past Is Prescient: New Mexico Tribes Make Case Congress Didn't Intend Sports Contracts In Complaint Against Kalshi," available at https://www.ingame.com/new-mexico-tribes-sue-kalshi/ (last visited May 17, 2026) .............33

Kalshi Member Agreement § VI, available at https://kalshi.com/docs/kalshi-member-agreement.pdf (last visited July 20, 2026) ......................................................................6

Kalshi Privacy Policy, available at: https://kalshi.com/privacy-policy (last visited June 23, 2026)..........................................................................................................................35

Michael Grady, "Millions of People are Blocked by Pornhub Because of Age Verification Laws," Techdirt, https://www.techdirt.com/2024/01/04/millions-of-people-are-blocked-by-pornhub-because-of-age-verification-laws/ (last visited July 20, 2026)..........................................................................................................................5

Natl. Indian Gmaing Commission, FY2025 Gross Gaming Revenue Report 3 (July 2026), available at https://www.nigc.gov/nigc-announces-46-2-billion-in-fy-2025-gross-gaming-revenues-2/ (last visited July 21, 2026)...........................................................24

New Mexico Att'y. Gen. Opinion No. 2025-07 (Feb. 26, 2025), available at: https://nmdoj.gov/wp-content/uploads/AG-Opinion-2025-07.pdf (last visited July 20, 2026)....6

New Mexico Tribal-State Gaming Compact § 1 ....35

New Mexico Tribal-State Gaming Compact § 1(E)-(F)....28

New Mexico Tribal-State Gaming Compact § 2(Q)....28

New Mexico Tribal-State Gaming Compact § 3(A)....8, 28

New Mexico Tribal-State Gaming Compact § 3(A)-(B) ....28

New Mexico Tribal-State Gaming Compact § 3(C) ....8

New Mexico Tribal-State Gaming Compact § 4(A)(1) ....28

New Mexico Tribal-State Gaming Compact § 4(B)(1) ....8, 28

New Mexico Tribal-State Gaming Compact § 4(B)(15) ....28, 38

New Mexico Tribal-State Gaming Compact § 4(D)....28

New Mexico Tribal-State Gaming Compact § 17 ....8, 28, 29, 34

Provisions Common to Registered Entities, 76 Fed.Reg. 44776 (July 27, 2011).... 29, 38

Plaintiffs Mescalero Apache Tribe ("Mescalero"), Pueblo of Isleta ("Isleta"), Pueblo of Pojoaque ("Pojoaque"), and Pueblo of Sandia ("Sandia") (each a "Tribe" and together, "Tribes") hereby move for issuance of a preliminary injunction and oppose the Motion to Dismiss ("MTD") filed by Defendants Kalshi, Inc. and KalshiEx, LLC (together, "Kalshi"), Doc. 21.

The MTD should be denied because the Tribes' Complaint asserts legally sound and factually sufficient claims for violation of the Indian Gaming Regulatory Act ("IGRA"), the Tribes' identical, federally enforceable gaming compacts with the State of New Mexico ("Compact"), and the Tribes' respective federally approved and enforceable gaming ordinances (together, "Tribal Gaming Laws"). The Tribes can enforce IGRA, the Compact, and their Tribal Gaming Laws because IGRA expressly incorporates the Compact and the Tribal Gaming Laws and delegates the Tribes sole authority to regulate all class III gaming on their Indian lands. That incorporation encompasses the allegations that Kalshi operates online sports betting on the Tribes' Indian lands. Moreover, the Dodd-Frank Act neither impliedly partly repeals IGRA nor clearly preempts the Tribal Gaming Laws for those operations, and all Kalshi's other arguments fail.

Kalshi also should be enjoined under Federal Rule of Civil Procedure ("FRCP") 65 from continuing to openly offer and operate obviously illegal sports betting on the Tribes' Indian lands. The Tribes' investigations establish Kalshi's ongoing violations of IGRA, the Compact, and their Tribal Gaming Laws. Those ongoing violations impede the Tribes' sovereign ability to enforce their Tribal Gaming Laws under IGRA and the Compact on their Indian lands, which constitutes irreparable harm under the law of this Circuit. In turn, the balance of the equities and the public interest together favor this injunction because the Tribes' authority to enforce their Tribal Gaming Laws under IGRA and the Compact strongly outweigh Kalshi's purely and ordinary monetary compliance burden to geofence around the Tribes' Indian lands. Kalshi opposes this Motion.

## BACKGROUND

### I. THE COMPLAINT ALLEGES AND SEEKS TO ENJOIN AND TO IMPOSE CIVIL PENALTIES FOR KALSHI'S VIOLATIONS OF THE COMPACT AND THE TRIBAL GAMING LAWS AS MADE ENFORCEABLE UNDER IGRA.

The Tribes filed this action to enforce the Compact and their Tribal Gaming Laws under IGRA, which prohibit Kalshi's sports-betting operation on the Tribes' Indian lands. Compl., Doc. 1 ¶¶ 1-5. IGRA exclusively regulates gaming on Indian lands, prohibits class III gaming there outside effective tribal-state gaming compacts and federally approved tribal gaming laws, confirms and incorporates the Tribes' sovereign authority to regulate all class III gaming there, and mandates that the Tribes are the primary beneficiaries of gaming there. *Id.* ¶¶ 12-35; 25 U.S.C. § 2710(d)(1). Also, class III gaming subject to tribal regulation under IGRA includes online sports betting where the bettor is on Indian lands. Compl. ¶¶ 18-23, 26-27; 25 C.F.R. § 502.4(c).

The Tribes all entered into the Compact, which is effective under IGRA, only authorizes the Tribes to operate gaming on their lands, recognizes that internet gaming is not authorized, and requires that the Tribes enact and enforce the Tribal Gaming Laws and regulations and prohibit gaming by those under 21 years of age. Compl. ¶ 38-40. The Tribal Gaming Laws all have been adopted by the Tribes' governing bodies and approved by the National Indian Gaming Commission ("NIGC") Chairman.[1] The Tribes have been regulating and operating all gaming on their Indian lands for decades under IGRA, the Compact and its predecessors, and their Tribal Gaming

---

[1]*See* Compl. ¶ 43 & n.1; *cf.* MTD Ex. C (Sandia Regs. & resolution). The Court should take judicial notice of and consider the Compact, the Tribal Gaming Laws, the tribally adopted gaming regulations, Kalshi's prior representations, and other case filings since they are "referred to in and central to the complaint" and no party disputes their authenticity, *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013), and they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see United States v. Pursley*, 577 F.3d 1204, 1214 n.6 (10th Cir. 2007) (noting judicial notice of court records); *United States ex rel. Mtn. Contr., Inc. CHP Solns., LLC*, 787 F. Supp. 3d 1216, 1228 n.8 (D.N.M. 2025) ("The Court may take judicial notice of government documents").

Laws. *See* Compl. ¶¶ 36-42. Those Laws prohibit underage gaming and third-party online sports betting, require net revenues be used for government purposes, impose licensing requirements, and authorize enforcement, and all but Sandia's impose civil penalties for violations. *See id.* ¶¶ 45-59.

The Commodities Exchange Act ("CEA") and the Commodities Futures Trading Commission ("CFTC") historically only regulated trading of and derivatives based on prices of physical commodities. *See id.* ¶¶ 60-63. The scandal and disruption of the 2008 financial crisis led Congress in 2010 to amend the CEA to increase regulation of commodities markets in the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. 111-203, 124 Stat. 1376 (2010). *Id.* ¶¶ 64-68. In Dodd-Frank's "Special Rule," Congress intended that derivative contracts concerning sporting events are contrary to the public interest and be prohibited because they exist solely or predominately for gambling. *Id.* ¶ 69; *see* Pub. L. 111-203, § 745, 124 Stat. 1736-37 (codified at 7 U.S.C. § 7a-2(c)(5)(C)). One year later, the CFTC implemented the Special Rule by promulgating a regulation prohibiting event contracts regarding gaming or any activity that is unlawful under any state or federal law. Compl. ¶ 72 (citing 17 C.F.R. § 40.11 ("Rule 40.11")). Dodd-Frank says nothing about tribes, gaming on Indian lands, or IGRA. *Id.* ¶ 71.

Kalshi is a privately owned business operated out of New York City. *Id.* ¶¶ 10-11. Kalshi previously represented in federal court that the Special Rule and Rule 40.11 prohibit it from offering event contracts regarding sporting events. *Id.* ¶¶ 77-80. However, Kalshi reversed its position in January 2025, has since advertised that it offers sports betting through its prediction markets, and even sought federal trademarks concerning its self-described "bookmaking services" related to sports betting and gambling. *Id.* ¶¶ 81-84, 89. Kalshi's acceptance of bets or contracts about sports events is the same service that bookmakers have conducted for centuries, and which other courts have recognized as sports betting. *Id.* ¶¶ 83-88, 90.

Kalshi operates sports betting, including for underage patrons, within the Tribes' Indian lands. *Id.* ¶ 91. Yet Kalshi could easily avoid operating on the Tribes' Indian lands by geofencing, which has been commonly used since the mid-1990s in various commercial contexts, including the gambling industry, and which Kalshi is financially capable of implementing. *Id.* ¶¶ 92-97. The Tribes have investigated Kalshi's activities and determined that Kalshi is offering and operating illegal gambling on the Tribes' Indian lands via offering and allowing use of its website and mobile app for those located there, including underage people. *Id.* ¶¶ 98-105.

## II. THE TRIBES' INVESTIGATIONS CONFIRM KALSHI'S VIOLATIONS OF THE COMPACT AND TRIBAL GAMING LAWS ON THE TRIBES' INDIAN LANDS.

The Tribes each investigated Kalshi's operations on their respective Indian lands.[2] Those investigations confirmed that Kalshi offers, accepts, and collects wagers, and pays winnings for online sports betting on the Tribes' Indian lands in violation of the Compact and their Tribal Gaming Laws. *Id.* That includes wagers which tribal investigators have placed and documented, and offering gaming to people under the age of 21, which the Compact and the Tribal Gaming Laws all prohibit, making that unlawful under IGRA. *See* Pls.' Ex. 1-3, 5, 7. That also includes thousands of times Kalshi's website has been searched for, advertised, or accessed via the Tribes' public Wi-Fi networks on their Indian lands, mostly by discrete individual. *See* Isleta Mendoza Decl., Pls.' Ex. 4 ¶ 9 (about 13,000 visits to Kalshi.com over three weeks); Pojoaque Flores Decl., Pls.' Ex. 6 ¶¶ 9-10 (about 15,000 direct clicks and about 7,000 viewed advertisements over 24

[2]*See* Decl. of Maria Ramos (July 17, 2026) ("Mescalero Ramos Decl."), attached here as Pls.' Ex. 1; Decl. of Dorothea Notah (June 24, 2026) ("Isleta Notah Decl."), attached here as Pls.' Ex. 2; Decl. of Sylvia Castillon (July 21, 2026) ("Isleta Castillon Decl.), attached here as Pls.' Ex. 3; Decl. of Erik Mendoza (July 13, 2026) ("Isleta Mendoza Decl."), attached here as Pls.' Ex. 4; Decl. of Terrence Bailey (July 17, 2026) ("Pojoaque Bailey Decl."), attached here as Pls.' Ex. 5; Decl. of Guadalupe Flores (July 14, 2026) ("Pojoaque Flores Decl."), attached here as Pls.' Ex. 6; Decl. of Trista Tafoya (July 8, 2026) ("Sandia Tafoya Decl."), attached here as Pls.' Ex. 7; Decl. of Brandon Hurtado (July 8, 2026) ("Sandia Hurtado Decl."), attached here as Pls.' Ex. 8.

days); Sandia Hurtado Decl., Pls.' Ex. 8 ¶ 9 (about 940 direct clicks over more than two months). Also, Kalshi's sportsbook on the Tribes' Indian lands functions materially the same as the Tribes' own sportsbooks, except that the latter are authorized and operate only in-person at casinos for people 21 and older whereas Kalshi's is accessible online anywhere for anyone 18 or over.[3]

In addition, Kalshi does not use geolocation or geofencing to preclude access on any of the Tribes' Indian lands. *See* Mescalero Ramos Decl., Pls.' Ex. 1 ¶ 22; Isleta Notah Decl., Pls.' Ex. 2 ¶ 18; Pojoaque Bailey Decl., Pls.' Ex. 5 ¶ 18; Sandia Tafoya Decl., Pls.' Ex. 7 ¶ 29. This is even though geolocation and geofencing have been widely used since the 1990s, including for vehicle tracking, Amber alerts, airspace protection, pesticide application, emergency public notices, law enforcement, and geographically targeted advertising and authorized internet use. *See* Sandia Hurtado Decl., Pls.' Ex. 8 ¶¶ 10-21; *Chatrie v. United States*, 609 U.S. __, 2026 WL 1855568, *4-*5 (June 29, 2026); https://radar.com/product/geofencing (last visited July 20, 2026). That includes geofencing numerous states since 2023 to avoid age-verification laws for access to online pornography. *See* Michael Grady, "Millions of People are Blocked by Pornhub Because of Age Verification Laws," Techdirt, https://www.techdirt.com/2024/01/04/millions-of-people-are-blocked-by-pornhub-because-of-age-verification-laws/ (last visited July 20, 2026).

Geofencing has been used to preclude prohibited online sports betting since before 2021 and commercially available compliance software can easily geofence around each of the Tribes' Indian lands. Sandia Hurtado Decl., Pls.' Ex. 8 ¶¶ 22-26. For example, DraftKings and FanDuel—two of the largest online sports betting operators—both use GeoComply for geofencing their

---

[3] *See* Mescalero Ramos Decl., Pls.' Ex. 1 ¶¶ 6, 10, 14-15 (tribal administration offices); Isleta Notah Decl., Pls.' Ex. 2 ¶¶ 4, 9, 11, 13-17 (bar, hotel, elder center parking, golf club, gas station, lake); Pojoaque Bailey Decl., Pls.' Ex. 5 ¶¶ 3, 6-7, 12, 14-16 (casino administration offices); Sandia Tafoya Decl., Pls.' Ex. 6 ¶¶ 4-6, 22-27 (bar, hotel, blackjack table); https://kalshi.com/faq (last visited July 20, 2026) (noting 18 as minimum age to participate).

sportsbooks. *See* https://www.geocomply.com/global-sports/ (last visited July 20, 2026). That includes geofencing around New Mexico and many other identified states where they are prohibited. https://sportsbook.draftkings.com/retailsportsbook (last visited July 20, 2026); https://sportsbook.fanduel.com (last visited July 13, 2026). Kalshi also is using GeoComply to geofence Michigan as the cost of doing business while it earned $10 million a day during the World Cup. *See* Daniel O'Boyle, "Michigan Ban on Kalshi Sports Contracts Extended, With Geofencing To Begin Aug. 12," available at: https://www.ingame.com/michigan-ban-kalshi-sports-contracts-extended-geofencing/ (last visited July 20, 2026). Likewise, Jackpocket uses geofencing for its lottery courier operation "to ensure that each order occurs within legal boundaries," https://jackpocket.com/regulators (last visited July 20, 2026), such as when it suspended that operation in New Mexico in early 2025 after the New Mexico Attorney General found that its use constitutes internet gaming, *see* New Mexico Att'y. Gen. Opinion No. 2025-07 (Feb. 26, 2025), available at: https://nmdoj.gov/wp-content/uploads/AG-Opinion-2025-07.pdf (last visited July 20, 2026); Dustin Gouker, "The Current: Jackpocket Leaves Another State After AG Opinion," https://closingline.substack.com/p/the-current-jackpocket-leaves-nm (last visited July 20, 2026); Compl. ¶ 94. Indeed, Kalshi already provides that it may not be used by people domiciled or located in 54 "Restricted Jurisdictions" from Afghanistan to Zimbabwe, where trading event contracts on its platform is prohibited. Kalshi Member Agreement § VI, available at https://kalshi.com/docs/kalshi-member-agreement.pdf (last visited July 20, 2026).

**RESPONSE TO KALSHI'S MOTION TO DISMISS**

Kalshi devotes most of its MTD to trying to sell the Court a large can of red herrings. That includes misplaced and irrelevant arguments about inherent tribal sovereignty limits, statutes of general applicability, laws not governing Indian lands gaming, nationwide exchange transactions,

and even whether the Tribes operate sportsbooks. The Court should not buy any of that since this case concerns federally sanctioned tribal regulation of gaming on the Tribes' Indian lands in New Mexico, not derivatives trading in New York City. Kalshi overlooks the express incorporation and enforceability of the Compact and the Tribes' federally approved Tribal Gaming Laws under IGRA and that no later federal law repeals IGRA or allows on-reservation online sports betting. Because all Kalshi's arguments fail, the Court should deny the MTD.

## I. THE MTD SHOULD BE DENIED BECAUSE THE COMPLAINT ALLEGES FACTS STATING FACIALLY PLAUSIBLE CLAIMS FOR RELIEF AND THE TRIBES HAVE FEDERAL AUTHORITY TO SUE KALSHI.

In considering the MTD, the Court must "'accept as true all well-pleaded factual allegations' in the Complaint and view them 'in the light most favorable'" to the Tribes. *Pueblo of Jemez v. United States* ("*Jemez*"), 790 F.3d 1143, 1171 (10th Cir. 2015) (citation omitted). To survive the MTD, the Complaint "'must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Id.* (quoting *Ashcroft v. Iqbal* ("*Iqbal*"), 556 U.S. 662, 678 (2009) and *Bell Atlantic Corp. v. Twombly* ("*Twombly*"), 550 U.S. 544, 556 (2007)). This requires the Court "'to draw on its judicial experience and common sense[.]'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). A claim has facial plausibility when the pled facts "allow[] . . . the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). This "asks for more than a sheer possibility" but is not "a probability requirement[.]" *Id.* (citing *Twombly*, 550 U.S. at 556). All that requires denying Kalshi's MTD.

### A. The Complaint States Plausible Claims that Kalshi Operates Class III Gaming on Indian Lands that Violates IGRA, the Compact, and Tribal Gaming Laws.

The Complaint plausibly alleges that Kalshi is violating IGRA, the Compact, and the Tribal Gaming Laws. The Complaint alleges that while IGRA authorizes tribal-state gaming compacts to allow for online gaming, Compl. ¶ 27 (citing, *inter alia*, 25 C.F.R. § 293.26), the Compact does

not, *id.* ¶ 40 (citing Compact § 17). Also, IGRA, the Compact, and the Tribal Gaming Laws together prohibit operation of any class III gaming on the Tribes' Indian lands by anyone besides the Tribes, gaming in which the Tribes are not the sole or primary beneficiaries, the use of net revenues from gaming for other than governmental and charitable purposes, and gaming by anyone under the age of 21.[4] The Tribes investigated and found that Kalshi—a private non-Indian business from New York City—advertises, offers and accepts, and pays and collects on online sporting betting from even underage people on the Tribes' Indian lands, violating the Tribal Gaming Laws, the Compact, and IGRA, subjecting Kalshi to applicable fines. *See* Compl. ¶¶ 10-11, 44-59, 91.

None of Kalshi's various arguments about other matters avoid any of the above. First, the Tribes indisputably have authority to sue Kalshi for violating the Tribal Gaming Laws and the Compact under IGRA. IGRA expressly provides that "Class III gaming activities shall be lawful on Indian lands only if such activities are" "authorized by" a tribal gaming law adopted by the tribe's governing body and approved by the NIGC and "conducted in conformance with" a tribal-state compact that is in effect. 25 U.S.C. § 2710(d)(1). The Tribal Gaming Laws are so adopted

[4]Compl. ¶¶ 24-25, 46-47, 50-51, 54-55, 57, 108, 116, 124, 132; *see* 25 U.S.C. § 2710(b)(2)(B), (d)(1); 25 C.F.R. §§ 501.2(a), 522.11; Compact §§ 3(A), 3(C), 4(B)(1), available at https://www.gcb.nm.gov/new-mexico-gaming-control-board-office-of-the-state-gaming-representative/ (last visited July 22, 2026) (under Tribal Compacts); Mescalero Apache Tribe, Ord. 09-13 §§ 5(A)-(B), 5(D), 12(G), 13(A) (Dec. 9, 2009) ("Mescalero Ord."), available at https://www.nigc.gov/wp-content/uploads/2025/03/mescaleroapache-Mescalero-Ordinance-Approval-12172009.pdf; Pueblo of Isleta Ord.: Permitted Gaming §§ 1(C), 2, 3(A), 10(P) (eff. Nov. 26, 2024) ("Isleta Ord."), partly available at https://www.nigc.gov/wp-content/uploads/2026/05/2024.11.26-Approved-ord-Pueblo-of-Isleta.pdf (last visited July 22, 2026); Pueblo of Pojoaque, Third Am. & Restated Gaming Ord. §§ 10-8-5(A)-(B), -9(G) (eff. Mar. 16, 2012) ("Pojoaque Ord."), available at https://www.nigc.gov/wp-content/uploads/2025/03/pueblopojoaque-20120316LtrtoTribefrNIGCreAmdntapvlPojoaque.pdf (last visited July 22, 2026); Pueblo of Sandia Ord.: Permitted Gaming, Res. No. 94-37 §§ I(C), 2-3 (eff. Feb. 15. 1995) ("Sandia Ord."), available at https://www.nigc.gov/wp-content/uploads/2025/03/02151995PuebloOfSandiaAmend.pdf (last visited July 22, 2026). Since pages of the Isleta Ordinance available on the NIGC website are partly truncated, a true and complete copy of it is attached here as Exhibit 9.

and approved, the Compact is in effect, and neither those Laws nor the Compact authorize online gaming by private third parties for their own profit including for underage patrons. *See* Compl. ¶¶ 38-40, 42-43; *supra* n.3. No one besides the Tribes can enforce their Tribal Gaming Laws.

Kalshi only baldly denies that its on-reservation sports betting constitutes class III gaming on Indian lands. MTD at 24. That ignores *Michigan v. Bay Mills Indian Community* ("*Bay Mills*"), 572 U.S. 782, 792 (2014), that IGRA's broad definition of class III gaming only requires "chance, consideration, and prize or reward" and includes "[a]ny sports betting and parimutuel wagering[,]" and that the Tribal Gaming Laws use that definition and govern all gaming on the Tribes' Indian lands. *See* Compl. ¶¶ 20-24, 44 (citing 25 U.S.C. § 2703(8), 25 C.F.R. §§ 293.2(d), 502.4(c)). The Court need only view Kalshi's website, *see id.* ¶¶ 84, 87; https://kalshi.com/category/sports/all-sports (last visited July 20, 2026), and apply required common sense to see that it is gaming.

Second, the Complaint properly states claims for relief under IGRA regarding the Compact and the Tribal Gaming Laws. IGRA grants the Court jurisdiction over "any cause of action" by the Tribes to enjoin class III gaming on Indian lands conducted in violation of the Compact. 25 U.S.C. § 2710(d)(7)(A). The Complaint satisfies that since it asserts claims and seeks to enjoin Kalshi for violating the Compact by its sports betting on Indian lands. Compl. ¶¶ 1, 3, 5, 43, 91, 97, 98-101, 103-05, 110-13, 118, 118-21, 126-29, 134-37. What other federal laws may provide about Kalshi's operations elsewhere is immaterial to gaming on Indian lands since IGRA is the only federal statute governing all Indian lands gaming. *See id.* ¶¶ 17, 23-24, 31-35, 71; 25 U.S.C. § 2702(3). Viewing the allegations in the light most favorable to the Tribes and applying common sense as required by *Jemez*, the Court should reasonably infer from the alleged facts that the Tribes have stated plausible claims for relief. Kalshi's MTD should be denied on this basis alone.

### B. Congress Intended That § 2710(d)(1) Incorporates By Reference the Duly Adopted and NIGC-Approved Tribal Gaming Laws to Confirm and Enforce the Tribes' "Exclusive Right to Regulate Gaming on Indian Lands[.]"

IGRA expressly incorporates federally approved tribal gaming laws and makes them enforceable for all gaming on Indian lands. *See* 25 U.S.C. § 2710(d)(1)(A); Compl. ¶¶ 23-24, 28-30. Under the reference canon of statutory interpretation, "'when a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises.'" *Shoshone-Bannock Tribes of Ft. Hall Rsrv. v. U.S. Dep't of Interior*, 153 F.4th 748, 764 (9th Cir. 2025) (quoting *Jam v. Int'l Finance Corp.*, 586 U.S. 199, 209 (2019)). And when Congress incorporates non-federal law, "the fact that the federal law's requirements in part involve[] compliance with [non-federal law] requirements ma[k]e[s] them no less requirements of federal law." *United States v. Kebodeaux*, 570 U.S. 387, 393 (2013). Such reference gives the referenced law "'the same validity as if its provisions had been specially made by Congress[.]'" *Id.* (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 207-08 (1824)). This principle is long standing: "the contents of a document may be incorporated or adopted as well by generic as by specific reference, if only the purport of the adopting statute is clear." *Interstate Consol. St. Ry. Co. v. Commw. of Mass.* ("*Interstate*"), 207 U.S. 79, 85 (1907) (Holmes, J.). That applies to 25 U.S.C. § 2710(d)(1).

"'The goal of statutory interpretation is to ascertain the Congressional intent and give effect to the legislative will.'" *Kansas Natural Res. Coalition v. U.S. Dep't. of Interior*, 971 F.3d 1222, 1235 (10th Cir. 2020) (citation omitted). This effort starts with the statute's plain language, giving "'undefined terms their ordinary meaning, considering both the specific context in which the word is used and the broader context of the statute as a whole.'" *Id.* (citations omitted). In this, courts read statutes "as an ordinary citizen might, not to lay spring traps for the unwary." *El Encanto, Inc. v. Hatch Chile Co.* ("*El Encanto*"), 825 F.3d 1161, 1164 (10th Cir. 2016) (Gorsuch, J.). Also, under "long established . . . precedents[,]" "'statutes are to be construed liberally in favor of the

Indians[.]'" *Ysleta Del Sur Pueblo v. Texas* ("*Ysleta*"), 596 U.S. 685, 703 n.3 (2022) (citation omitted). At the same time, since tribes "possess 'inherent sovereign authority over their members and territories[,]'" *id.* at 689 (2022) (citation omitted; emphasis added), "divestiture" of tribes' retained sovereign authority "is disfavored . . . and will only be found where Congress has manifested its clear and unambiguous intent to restrict tribal sovereign authority." *N.L.R.B. v. Pueblo of San Juan* ("*San Juan*"), 276 F.3d 1186, 1194 (10th Cir. 2002) (en banc).

With all that in mind, and in view of Congress's express intent in IGRA to recognize tribes' "exclusive right to regulate gaming on Indian lands[,]" 25 U.S.C. § 2701(5), IGRA presents a straightforward application of the reference canon. Section 2710(d)(1)(A) provides that "[c]lass III gaming activities shall be lawful on Indian lands only if such activities are . . . authorized by" a duly adopted tribal law that is approved by the NIGC Chairman. That proscription for the only lawful gaming on Indian lands "can be given scope and content only by reference to the rules governing" class III gaming on each tribes' Indian lands as adopted by the respective tribe and approved by the NIGC Chairman. *See Jam*, 586 U.S. at 211. IGRA's express reference to duly adopted and approved tribal gaming laws "is an instruction to look up the applicable rules" of each tribe for authorized class III gaming, "wherever those rules may be found" and is "a general reference to an external body of (potentially evolving) law." *Id.* That requires assessing the lawful status of Kalshi's class III gaming on the Tribes' Indian lands based on the Tribal Gaming Laws.

Other cases have similarly applied the reference canon to incorporate general references to other laws. For example, parties to contested trademark proceedings may invoke FRCP 45 "to compel nonparties to produce documents without also convening a deposition" since that Rule "'shall apply'" to those proceedings under 35 U.S.C. § 24 even though "§ 24 was last amended in 1974, long before Rule 45's revision in 1991." *El Encanto*, 825 F.3d at 1164. So too, "the term 'controlled substance' in the career offender [sentencing] guideline is a reference to a general body

of law defining what the substance is that can change over time." *United States v. Fulcar*, __ F.4th __, __, 2026 WL 1948536, *12 (1st Cir. July 6, 2026) (following *United States v. Minor*, 121 F.4th 1085, 1090-92 (5th Cir. 2024)). Also, a federal law proscribing "the crime of piracy as defined by the law of nations," 18 U.S.C. § 1651, incorporates that "evolving definition" over time. *United States v. Dire*, 680 F.3d 446, 466-68 (4th Cir. 2012). In all those cases, as in IGRA, one law incorporates by reference another law to provide "the scope and content" for the provision at issue.

### C. Kalshi's Unfounded Arguments Cannot Avoid IGRA's Express Incorporation of the Tribal Gaming Laws.

To try to avoid all the above, Kalshi disputes the Tribes' authority to enforce the Tribal Gaming Laws as IGRA provides. MTD at 13-17. But those arguments hold no water. First, the common sense, plain meaning of § 2710(d)(1)—that gaming "shall be lawful on Indian lands only" as "authorized by" qualifying tribal law—does more than "simply set[] out the conditions for" such lawful gaming as Kalshi asserts. MTD at 14. IGRA's express proscription materially differs from the mere description in another law that "'provisions of this subsection are enacted in accordance with the tribe's request[,]'" which did "not purport to incorporate that [tribal] resolution into federal law." *Ysleta*, 596 U.S. at 703-04 (concerning 101 Stat. 666, 668-69 (1987)).

Second, *Haaland v. Brackeen*, 599 U.S. 255 (2023), cites an incorporation by reference in the Indian Child Welfare Act ("ICWA") but does not narrow the reference canon. *Brackeen* notes that if a tribe adopts a resolution altering the child placement preference order, "'the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child.'" *Brackeen*, 599 U.S. at 268 (quoting 25 U.S.C. § 1915(c)). ICWA's incorporation by reference of tribal law there does not materially differ from IGRA's incorporation by reference of tribal law in § 2710(d)(1).

Third, *Estate of William Eugene Holsapple* ("*Holsapple*"), 69 IBIA 31, 2023 WL 4216420 (2023), applied a federal Indian probate incorporation by reference that "'laws of the Indian tribe with jurisdiction . . . may otherwise define the inheritance rights[,]'" which gives tribes the authority to replace "default rules" so long as their laws include certain terms and are federally approved. *Id.* at *2-*3 (quoting 25 U.S.C. § 2206(j)(2)(B)(iii)(II) and citing *id.* § 2205(a)(1), (a)(3), (b)). That permissive provision does not use the magic "shall apply" words Kalshi posits and is analogous to and not more restrictive than IGRA's proscription. Indeed, IGRA's express intent and the additional canons for statutory interpretation here reinforce that IGRA legally incorporates by reference of all duly enacted and federally approved tribal gaming laws.

Fourth, other IGRA references do not negate incorporation by reference in § 2710(d)(1). *Contra* MTD at 14-15. While other IGRA provisions reference that state and federal tax laws "shall apply" for other matters, 18 U.S.C. § 1166; 25 U.S.C. § 2719(d)(1), the reference canon does not mandate those words for incorporation by reference, as *Brackeen* and *Holsapple* confirm. Nor is there "omitted" required text in § 2710(d)(1) which was "expressly" used in surrounding sections, MTD at 15, because the reference canon requires only that "the purport of the adopting statute is clear." *Interstate*, 207 U.S. at 85. IGRA properly variously references other laws in different ways for different purposes. *See, e.g.,* 25 U.S.C. §§ 2703(7)(A)(ii), (C), (E) (defining class II games), 2707(a) (prescribing NIGC general counsel pay rate), 2710(b)(1) (permitting class II gaming), 2710(d)(6) (exempting compacted gaming from the Johnson Act, 15 U.S.C. § 1175). Nothing else in IGRA undermines its expressly proscriptive mandate in § 2710(d)(1) that class III gaming on Indian lands "shall be lawful . . . only if . . . authorized" by qualifying tribal laws.

Fifth, Kalshi fails to distinguish *Jam* and *Kebodeaux*. MTD at 15. *Jam* held that a statute has "a general rather than specific reference . . . to an external body of potentially evolving law" so the statute "should therefore be understood to link" to the other law "so that the one develops

in tandem with the other." *Jam*, 586 U.S. at 210. *Jam* equated that incorporation with the law in *El Encanto* and the crime of piracy noted above. *See id.* The same logic applies here with the express terms in, plain meaning of, and context and congressional intent for § 2710(d)(1). In turn, "the fact that the federal law's requirements in part involve[] compliance with [non-federal law] requirements ma[k]e[s] them no less requirements of federal law," *Kebodeaux*, 570 U.S. at 393, confirms rather than undermines the Tribes' position. Namely, violation of the Tribal Gaming Laws is enforceable under IGRA. The fact that the law in *Kebodeaux* "punishes violations of its requirements (instead of violations of state law)[,]" *id.* at 399, does not preclude the Tribes from enforcing their own qualified laws that are requirements of and federalized by IGRA.

Finally, even if § 2710(d)(1) delegates federal authority rather than incorporates the Tribal Gaming Laws, the Tribes still can enforce those since § 2710(d)(1) expressly requires compliance with them. Federal delegation of authority is not limited to a tribe's inherent authority since courts "need not decide whether this independent authority is itself sufficient for the tribes to impose" the federally sanctioned laws on others. *United States v. Mazurie*, 419 U.S. 544, 557 (1975). Instead, "[i]t is necessary only to state that the independent tribal authority is quite sufficient to protect Congress' decision to vest in tribal councils this portion of its own authority[.]" *Id.*

For example, Congress indisputably can delegate to tribes its own power to regulate (liquor) transactions on Indian reservations, *Rice v. Rehner*, 463 U.S. 713, 728-29 (1983), via "an ordinance duly adopted by the tribe having jurisdiction over such area . . . , certified by the Secretary of the Interior," 18 U.S.C. § 1161. So too, Congress can authorize federal approval of qualifying tribal law to "grant tribal jurisdiction over nonmember owned fee land within a reservation without the need to determine, on a case-specific basis, whether a tribe possesses 'inherent sovereign power' under *Montana*[ *v. United States*, 450 U.S. 544 (1981)]." *Arizona Public Service Co. v. EPA*, 211 F.3d 1280 (D.C. Cir. 2000). In both instances, Congress can

confirm tribal authority without either limiting it to a tribe's inherent jurisdiction or requiring an express delegation. *Id.* at 1289-91 (discussing *Rice* and *Mazurie*).

Under that authority, Congress could and alternatively did delegate its "exclusive right to regulate gaming" on all Indian lands via duly adopted and NIGC-approved tribal gaming laws. *See* 25 U.S.C. §§ 2701(5), 2710(d)(1). Regardless of whether someone offers and sells liquor or offers and accepts sports bets in Indian country in-person or online, compliance with tribal law is required. *See* Compl. ¶ 22. That applies even for large fines for non-Indian violations on non-Indian lands within an Indian reservation. *Nebraska v. Parker*, 577 U.S. 495, 486 (2016).

### D. Whether Federally Delegated or Incorporated, the Tribal Gaming Laws are Enforceable Against Kalshi's Sports Betting On Indian Lands.

All the above makes Kalshi's arguments about limits on inherent tribal sovereignty the biggest red herring. The Court thus need not parse through much of Kalshi's preliminary statement, background, and argument about *Montana* and its progeny. *See* MTD at 2, 3-4, 9-13. Namely, § 2710(d)(1) unambiguously applies qualifying tribal gaming laws to all class III gaming on "Indian lands" as defined in IGRA, 25 U.S.C. § 2703(4), "and does not differentiate between who is conducting the gaming." *Cayuga Nation v. New York State Gaming Comm'n.*, 775 F. Supp. 3d 651, 666 (N.D.N.Y. 2025). "[G]iven the plain language of IGRA[,]" "IGRA's restrictions on class III gaming applies to any class III gaming activity conducted on Indian lands, including gaming activity conducted by the State." *Id.* at 666-67. Likewise, "in the absence of a tribal gaming ordinance and a compact, neither the Tribe nor any non-tribal entity, including the State . . . , may conduct Class III gaming on the reservation." *Coeur d'Alene Tribe v. State of Idaho*, 842 F. Supp. 1268, 1282 (D. Idaho 1994), *aff'd*, 51 F.3d 876 (9th Cir. 1995). This makes *Montana* moot.

Moreover, *Bay Mills* bars Kalshi's repeated, boldfaced backup argument that its sports betting is not physically inside the reservation. MTD at 10-13. Kalshi fails to confront the Tribes'

specific reliance on *Bay Mills* and its progeny for this point. *Compare id.* at 4, 13 n.5, 25 *with* Compl. ¶ 22. Yet *Bay Mills* holds that "class III gaming" in IGRA only means "each roll of the dice, and spin of the wheel" and not "off-site" administration or operation of the games. *Bay Mills*, 572 U.S. at 792. That "leads us to the clear conclusion that Class III gaming activity relates only to activities actually involved in the playing of the game[.]" *Navajo Nation v. Dalley* ("*Dalley*"), 896 F.3d 1196, 1207 (10th Cir. 2018). "This conclusion is ineluctable when the plain statutory text is viewed through the prism of *Bay Mills*." *Id.* at 1208. That applies equally to sports betting on a smartphone where the bettor is located, so the location elsewhere of servers where bets are accepted and processed is irrelevant. *California v. Iipay Nation of Santa Ysabel* ("*Iipay*"), 898 F.3d 960, 965, 967 (9th Cir. 2018); *S. Ute Indian Tribe v. Polis*, 810 F. Supp. 3d 1203, 1205-06 (D. Colo. 2025), *appeal filed*, No. 25-1440 (10th Cir. Nov. 24, 2025). Kalshi oddly tries to distinguish those cases as concerning IGRA, MTD at 13 n.5, when this case does too.

Kalshi cannot avoid *Bay Mills* by asserting that its conduct is "entirely conducted over the Internet." MTD at 10. In *Lexington Insurance Company v. Smith*, 117 F.4th 1106 (9th Cir. 2024), a non-Indian insurance company with offices outside the reservation was subject to tribal regulation because it insured on-reservation tribal property, even though its representatives never physically entered the reservation. *Id.* at 1107-08. The Ninth Circuit en banc held that the tribe had jurisdiction because (1) "'the cause of action brought by the[ ] parties bears some direct connection to tribal lands[,]'" (2) "tribal sovereignty over territory is implicated when nonmember behavior regarding that territory 'sufficiently affect[s] the tribe as to justify tribal oversight[,]'" and (3) "no tribal jurisdiction case from the Supreme Court or this court has ever held that nonmember conduct on tribal land equates to physical presence on that land." *Id.* at 1108, 1110, 1112 (citations omitted). All that supports subjecting Kalshi to the Tribal Gaming Laws under IGRA.

In turn, Kalshi's assertions that its activities remain off reservation cannot distinguish the tribal regulation of tribally licensed non-Indian gaming in *Crosby Lodge, Inc. v. NIGC*, 2011 WL 13262030 (D. Nev. Aug. 16, 2011). MTD at 21 n.11. Kalshi ignores that gaming occurs where the bettor is located, per *Bay Mills*, and not where "back-office admin" or support functions (such as Kalshi's servers) are located. Kalshi cannot avoid its gaming on the Tribes' Indian lands violating the Tribal Gaming Laws under IGRA simply by not being licensed under those Laws.

Several internet commerce cases Kalshi cites do not avoid enforcement here either due to the online nature of its sports betting, since "[d]ifferent results should not be reached simply because business is conducted over the Internet." *Zippo Mfg. Co. v. Zippo Dot Com, Inc.* ("*Zippo*"), 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). For example, *Hornell Brewing Co. v. Rosebud Sioux Tribal Court*, 133 F.3d 1087, 1093 (8th Cir. 1998), found no tribal jurisdiction based on national internet advertising. But like *Dish Network Service, LLC v. Laducer*, 725 F.3d 877 (8th Cir. 2013), this case is significantly different from *Hornell* since this case arises out of providing services on the reservation. *Id.* at 885. Also, Kalshi's app is highly interactive, soliciting wagers, collecting bets and paying winnings, and is a paradigmatic example of internet commerce subject to the law of the place where it is accessed. *Zippo*'s choice-of-law analysis applies in this Circuit, *see Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1312 (10th Cir. 2008), and supports tribal authority here.

The remaining internet payday lending cases Kalshi cites, MTD at 10, 13, also support the Tribes' position under *Bay Mills*, *Iipay*, and *Dalley* that online sports betting where the bettor is on tribal lands is subject to tribal jurisdiction. Each case applies the law of the place where borrowers are located when they applied for payday loans, not the law of where the lender was incorporated or had offices or servers. For example, *Jackson v. Payday Financial, LLC*, 764 F.3d 765, 782 (7th Cir. 2014), applied Illinois law because that is where users accessed the website to apply for loans with a tribal-member business even though the lender's office and servers were

elsewhere. Similarly, *Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, 769 F.3d 105 (2d. Cir. 2014), and *Colorado v. Western Sky Financial*, 845 F.Supp.2d 1178 (D. Colo. 2011), support the Tribes' position in this case, on the same type of facts and reasoning. So too here, Kalshi's should be subject to the Tribes' jurisdiction because its sports bets are solicited and placed on the Tribes' Indian lands.

All this refutes Kalshi's arguments that tribes cannot regulate on-reservation gaming by a nationwide exchange. Congress made that decision in IGRA within its authority. Kalshi's attempt to avoid the IGRA-enforced Tribal Gaming Laws since it operates on the internet flatly fails.

## II. DODD-FRANK DOES NOT PREEMPT THE TRIBAL GAMING LAWS AND DID NOT IMPLIEDLY PARTLY REPEAL IGRA.

### A. The CEA and Dodd-Frank Do Not Preempt the Tribal Gaming Laws Since They Say Nothing About Tribes or Indian Lands Gaming, Much Less Clearly Preempt IGRA-Sanctioned Tribal Regulation of Indian Lands Gaming.

Kalshi's argument that the CEA vests exclusive jurisdiction in the CFTC relevant here and preempts the Tribal Gaming Laws fails on multiple fronts. *Contra* MTD at 17-19. First, the CEA before Dodd-Frank predates IGRA and provides nothing remotely authorizing private on-reservation online sports betting or precluding tribal regulation of that. *See* Compl. ¶¶ 15-17, 60-63 (citing authorities). Instead, the CEA's historic exclusive-jurisdiction provision only served to consolidate the CFTC's regulation of traditional commodity futures trading separate from the Securities and Exchange Commission. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran* ("*Merrill Lynch*"), 456 U.S. 353, 386-87 (1982). And thereafter, IGRA expressly preempted the field of Indian lands gaming regulation. *Pueblo of Pojoaque v. New Mexico* ("*Pojoaque*"), 863 F.3d 1226, 1235 (10th Cir. 2017); *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 544 (8th Cir. 1996). Given all that, Kalshi's review of the CEA's history, MTD at 3, is just another pair of red herrings.

Second, Dodd-Frank does not preempt the Tribal Gaming Laws either. As noted above, divestiture of tribes' retained sovereign authority "is disfavored . . . and will only be found where Congress has manifested its clear and unambiguous intent to restrict tribal sovereign authority." *San Juan*, 276 F.3d at 1194. And as the party asserting preemption, Kalshi has the burden to establish it. *Cherokee*, 871 F.2d at 939. Also, courts must consider "'the target at which the . . . [non-federal] law aims in determining whether that law is pre-empted.'" *In re Winter Storm Uri Natural Gas Litigation* ("*In re Winter Storm*"), __ F.4th __, 2026 WL 1944831, *6 (10th Cir. July 6, 2026) (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015)).

Considering all that, Dodd-Frank says nothing about Indian tribes or Indian lands gaming, so it has no required clear congressional intent to preempt the Tribal Gaming Laws. Dodd-Frank makes no reference to "tribe" or "Indian" (or Indian lands, Indian country, or Indian reservations), and no reference to gaming generally other the Special Rule and the irrelevant preemption of state "bucket shop" laws. 7 U.S.C. §§ 7a-2(c)(5)(C)(i), 16(e)(2), 27f(b). Such "[s]ilence is not sufficient to establish congressional intent to strip Indian tribes of their retained inherent authority to govern their own territory." *San Juan*, 276 F.3d at 1196. Instead, "[t]he correct presumption is that silence does not work a divestiture of tribal power." *Id.* Kalshi therefore cannot establish that Dodd-Frank preempts the Tribal Gaming Laws, so they are necessarily preserved under IGRA.

Third, Kalshi's argument that the CEA is a statute of general applicability, MTD at 20-21, is unfounded and immaterial. The CEA is a specialized statute governing boards of trade and "'the volatile and esoteric futures trading complex.'" *Merrill Lynch*, 456 U.S. at 356 (citation omitted). It also "often permits state regulation." *KalshiEX, LLC v. Schuler* ("*Schuler II*"), 2026 WL 1295806, at *5 (6th Cir. Apr. 24, 2026) (citing multiple anti-preemption savings clauses). For those reasons, Dodd-Frank is hardly the hallmark of a statute of general applicability. Indeed, by its own terms, nothing in Dodd-Frank "shall . . . supersede or limit the jurisdiction at any time conferred

on . . . other regulatory authorities under the laws of the United States or of any State[.]" 7 U.S.C. § 2(a)(1)(A); *see id.* §§ 5, 6(b)(1)-(2). Thus, since IGRA expressly confirms tribal regulatory authority over Indian lands gaming, one of Dodd-Frank's saving clauses preserves that power.

Relatedly, Kalshi's assertion of Dodd-Frank's purported general applicability conflates application of laws to tribes as economic actors with divestiture of tribal governmental authority. *See* MTD at 18-19, 20-21. Cases about statutes of general applicability concern tribes as subjects of regulation, and are irrelevant regarding tribal sovereign authority to govern. *San Juan*, 276 F.3d at 1199. The general applicability of federal commodities law also is not at issue since the Tribes only seek to enforce IGRA's distinct "'framework for regulating gaming activity on Indian lands.'" *Pueblo of Pojoaque v. Wilson*, 619 F. Supp. 3d 1095, 1099 (D.N.M. 2022) (quoting *Bay Mills*, 572 U.S. at 785); *see San Juan*, 276 F.3d at 1191. Moreover, the Tribes do not need to undertake an activity in order to be able to regulate it under IGRA. Even if the Tribes prohibited and did not operate any class III gaming, Kalshi's activities would still violate the Tribal Gaming Laws incorporated under IGRA. Nor does it matter whether the Tribes operate their own sportsbooks, though they all do. *See* Mescalero Ramos Decl., Pls.' Ex. 1 ¶ 10; Isleta Notah Decl., Pls.' Ex. 2 ¶ 9; Pojoaque Bailey Decl., Pls.' Ex. 5 ¶ 12; Sandia Tafoya Decl., Pls.' Ex. 7 ¶ 17.

### B. Dodd-Frank Also Did Not Impliedly Partly Repeal IGRA's Exclusive Regulation of On-Reservation Online Sports Betting Since Dodd-Frank is Wholly Silent About That.

Tellingly, Kalshi's Motion to Dismiss does not address whether Dodd-Frank repeals IGRA regarding online sports betting on Indian lands. *Compare* MTD *with* Compl. ¶ 71. That is not surprising, since the answer is easily no. Since Dodd-Frank does not expressly repeal IGRA, Kalshi must confront the "'strong presumption that repeals by implication are "disfavored" and that "Congress will specifically address" preexisting law when it wishes to suspend its normal operations in a later statute.'" *Epic Sys. Corp. v. Lewis* ("*Epic*"), 584 U.S. 497, 510 (2018). Rather,

"[a]n implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'" *Branch v. Smith*, 538 U.S. 254, 273 (2003) (citations omitted). Put another way, courts will regard both statutes as effective unless Congress' intent to repeal is "'clear and manifest' or the two laws are 'irreconcilable.'" *Maine Health Cmty. Options v. United States*, 590 U.S. 296, 315 (2020). Furthermore, to assert that Dodd-Frank displaces IGRA, Kalshi "bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow." *Epic*, 584 U.S. at 511. Kalshi cannot meet that burden.

First, Dodd-Frank and IGRA are not "in irreconcilable conflict" because their respective subject matters are quite distinct. IGRA wholly and only governs gaming on Indian lands. *See* 25 U.S.C. § 2702; *Bay Mills*, 572 U.S. at 785. In contrast, the CEA generally serves to provide "self-regulation of trading facilities, clearing systems, market participants and market professionals . . . to deter and prevent price manipulation or any other disruptions" and other concerns regarding "boards of trade, other markets and market participants." 7 U.S.C. § 5(b). In that context, Dodd-Frank's entitled purpose is "[t]o promote the financial stability of the United States by improving accountability and transparency in the financial system, to end 'too big to fail', to protect the American taxpayer by ending bailouts, to protect consumers from abusive financial services practices, and for other purposes[.]" Pub. L. 111-203, 124 Stat. 1376. Those "other purposes" are related the CEA's foregoing general purpose. Given those very distinct statutory purposes, "[a]ny perceived conflict is thus more apparent than real" and "repeal by implication is not appropriate." *Morton v. Mancari*, 417 U.S. 535, 550 (1974).

Second, Congress did not intend for Dodd-Frank to displace or cover the entire subject matter of IGRA. Not only is there an absence of clear indications of legislative intent to do either of these things, but Dodd-Frank is silent about tribes and gaming on Indian lands. That silence

speaks volumes: Dodd-Frank does "not even hint at a wish" to repeal IGRA. *Epic*, 584 U.S. at 511. "Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence . . . is that the sovereign power . . . remains intact." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 149 (1982).

Nor is there evidence or suggestion that Dodd-Frank "covers the whole subject of" IGRA "and 'is clearly intended as a substitute.'" *Branch*, 538 U.S. at 273. Dodd-Frank is silent about tribes and Indian lands gaming. Also, when Dodd-Frank was enacted, sports betting was largely illegal under the 1992 Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3701-3704. When the Supreme Court invalidated PASPA in *Murphy v. NCAA*, 584 U.S. 453 (2018), no one asserted that that case was moot since Dodd-Frank had legalized sports betting. Congress would not have enacted Dodd-Frank in 2010 to legalize sports betting and substitute for that aspect of IGRA when sports betting was already largely illegal per PASPA. *KalshiEX, LLC v. Schuler* ("*Schuler I*"), 2026 WL 657004, at *8 (S.D. Ohio Mar. 9, 2026), *appeal filed*, No. 26-3196 (6th Cir. Mar. 11, 2026), *inj. pending appeal denied*, 2026 WL 1295806 (6th Cir. Apr. 24, 2026); *cf. Epic,* 584 U.S. at 511-12. Simply asserting that Congress can permit sports betting is not the same as saying it did so in Dodd-Frank, surreptitiously and to the exclusion of all other regulators nationwide, including under IGRA. *See Murphy*, 584 U.S. at 453.

Finally, even if IGRA and Dodd-Frank are somehow in conflict (though they are not): "when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. 'When there are two acts upon the same subject, the rule is to give effect to both if possible.'" *Mancari*, 417 U.S. at 551 (citation omitted). After all, "[o]ur rules aiming for harmony over conflict in statutory interpretation grow from an appreciation that it's the job of Congress by legislation, not this Court by supposition, both to write the laws and to repeal them." *Epic*, 584 U.S. at 511. Given all that, both IGRA and

Dodd-Frank should both be given effect without doing violence to either: gaming on Indian lands remains subject to IGRA while event contracts traded on designated contract markets ("DCMs") not involving gaming on Indian lands may remain subject to the CEA.

### C. The Major-Questions Doctrine and "No Elephants in Mouseholes" Canon Preclude Implied Repeal of IGRA or Preemption of Tribal Gaming Laws.

Even if Kalshi belatedly asserts in reply that Dodd-Frank impliedly repeals IGRA, two additional principles of statutory interpretation preclude that: the major-questions doctrine and the "no elephants in mouseholes" canon. Under the major-questions doctrine, "'extraordinary cases' . . . in which the 'history and the breadth of the authority . . . asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority.'" *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citations omitted). When faced with such questions, the Supreme Court has "long expressed 'reluctan[ce] to read into ambiguous statutory text' extraordinary delegations of Congress's powers." *Learning Resources v. Trump*, 607 U.S. 229, 146 S. Ct. 628, 638 (2026). Instead, in such cases, courts presume that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 722-23. This leads "the reasonable interpreter [to] expect Congress "'to make the big-time policy calls itself, rather than pawning them off to another branch.'" *Learning Resources*, 146 S. Ct. at 678 (2026) (Barrett, J., conc.) (citation omitted). This case contains both the elements of that doctrine.

First, the argument for implied repeal of IGRA by Dodd-Frank would be a highly consequential action of great nationwide political and economic significance. In Fiscal Year 2025, the gross gaming revenue for Indian gaming was $46.2 billion at 545 facilities operated by nearly 250 tribal governments across 29 states. NIGC, FY2025 Gross Gaming Revenue Report 3 (July 2026), available at https://www.nigc.gov/nigc-announces-46-2-billion-in-fy-2025-gross-gaming-

revenues-2/ (last visited July 21, 2026). That revenue is essential for tribal governments and their citizens. In addition, ruling that Dodd-Frank assigned "all sports bets" "onto DCMs like Kalshi" would put out of business "every sportsbook in the country" and "would have a seismic impact on Indian tribes' authority to regulate gaming on tribal land." *Schuler*, 2026 WL 657004, at *6 & n.6. "In the absence of congressional intent to effect such a sea change, that result is absurd." *Id.* at *6.

Second, neither the CFTC nor its predecessor agencies since 1922 have had any historical authority or practice of regulating sport-betting or gambling generally. *See* Compl. ¶¶ 60-63 (citing authorities). Nor is there any indication that Dodd-Frank intended to change that. *Id.* ¶¶ 64-74. And at least until it decided to start operating sports betting, Kalshi agreed that the CEA and Dodd-Frank were not intended to regulate or encompass gaming. *Id.* ¶¶ 78-80. All that provides reasons to hesitate before concluding that Congress meant to confer such authority on the CFTC in Dodd-Frank. That would be extraordinary, especially since the CEA and the CFTC allow companies like Kalshi to self-certify their own compliance. *See* Compl. ¶ 77 n.2. Strongly weighed against that, Supreme Court cases "have consistently guarded the authority of Indian governments over their reservation" so that "[i]f this power is to be taken away from them, it is for Congress to do it." *Williams v. Lee*, 358 U.S. 217, 223 (1959).

In turn, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns.*, 531 U.S. 457, 468 (2001). That canon aligns with the rule that, in deciding Kalshi' motion, the Court should "'draw on its judicial experience and common sense[.]'" *Twombly*, 550 U.S. at 556 (quoting *Iqbal*, 556 U.S. at 679). Specifically relevant here, courts "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Common sense

dictates a degree of skepticism in face of a claim that Congress implicitly repealed all or portions of a federal statute with no expressly stated intent to do so. This need is acute regarding IGRA "given the 'significant governmental interests' of competing sovereigns—including the powerful economic interests involved in the regulation of Class III gaming—that [Congress] attempted to balance in IGRA." *New Mexico v. U.S. Dep't of Interior*, 854 F.3d 1207, 1226 (10th Cir. 2017) (citation omitted). If Congress intended that Dodd-Frank supplant IGRA to govern part of gaming on Indian lands, it would have clearly stated that. Congress certainly would not have delegated to the CFTC the ability to decide that question for itself, particularly by congressional silence.

## III. KALSHI'S REMAINING ARGUMENTS ALSO ALL FAIL.

### A. The Unlawful Internet Gambling Enforcement Act ("UIGEA") is Irrelevant Here Both Substantively and Because It Disclaims Any Change to IGRA.

The UIGEA, 31 U.S.C. §§ 5361-5367, is irrelevant to this case for two reasons. First, UIGEA prohibits payment processing for illegal online gambling and is not a substantive gambling regulation. *Id.* § 5363 ("Prohibition on acceptance of any financial instrument for unlawful Internet gambling"). UIGEA's purpose to prohibit financial transactions to further illegal internet gambling explains why Kalshi wrongly asserts that the UIGEA's exclusion of transactions on boards of trade would be surplusage. The broad "carve-out" language in the definition of "bet or wager" in UIGEA simply reinforces that Congress intended that the CEA and Dodd-Frank expressly prohibit gambling on DCMs. As such, the "carve-out" is not surplusage at all, but a part of a harmonious federal statutory scheme. After all, UIGEA was enacted in 2010, when the CFTC had never previously approved any event contracts for sports betting, both because the CEA prohibits it and because sports betting was illegal as a matter of federal law then under PASPA.

Second, UIGEA is irrelevant here because Congress intended the UIGEA to fully preserve IGRA in its entirety: "No provision of . . . [UIGEA] shall be construed as altering, limiting, or

extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b). Again, the key phrase here is "regulating gambling," not "regulating transactions on DCMs." In addition, keeping the focus where it belongs, the phrase "regulating gambling" shows that Kalshi's repeated assertion that the lack of a factual allegations in the Complaint that any of the Tribes offer or conduct sports betting themselves, MTD at 8, 21, is immaterial. The Tribes do not need to undertake an activity in order to regulate it under IGRA. Even if the Tribes conducted no gaming, Kalshi's sports betting would still violate the Tribal Gaming Laws. Regardless, keeping the proper focus confirms that "there is no direct conflict between IGRA and the UIGEA and, thus, we give effect to the provisions of both statutes." *Iipay Nation*, 898 F.3d at 968. The Court should reach the same conclusion here.

### B. The Tribal Gaming Laws are Enforceable Against Kalshi Without Regard to Preemption of or Reference to State Gambling Laws.

Kalshi seeks to avoid IGRA and the Tribal Gaming Laws by relying on recent cases addressing preemption of state law by the CEA. *See* MTD at 17-18, 22 & n.9. But whether Dodd-Frank preempts state regulation of online sports betting is wholly irrelevant to whether the CEA impliedly repeals IGRA or impliedly preempts the Tribal Gaming Laws. Repeal is not preemption. In turn, Indian Tribes "'are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other.'" *Pojoaque*, 863 F.3d at 1233 (quoting *White Mountain Apache Tribe v. Bracker* ("*Bracker*"), 448 U.S. 136, 143 (1980)). That precludes Kalshi's entirely misplaced reliance on *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3rd Cir. 2026), and other similar rulings.

In addition, Kalshi gains no alternative traction by arguing that the Isleta and Sandia Tribal Gaming Laws rely on and fail with preempted state law. *Contra* MTD at 21-23. Since federal/state preemption differs materially from federal/tribal preemption, *see Bracker*, *supra*, this Court need

not adjudicate or assume the outcome of other cases to rule on this one. *See* Compl., *United States v. New Mexico*, No. 26-cv-01912 (D.N.M. filed June 12, 2026); Notice of Removal, *New Mexico v. Kalshi, Inc.*, No. 26-cv-01857 (D.N.M. filed June 8, 2026). Regardless, the Tribal Gaming Laws do not take their force from state laws, since the Tribes and New Mexico are separate sovereigns. *See* U.S. Const. art. I, § 8, cl. 3 (Commerce Clause). Rather, all the Tribal Gaming Laws take their force from IGRA, the Compact, and inherent tribal sovereign authority, as explained above. Kalshi fundamentally misunderstands that the Tribes can enforce their own laws, as required by IGRA and the Compact. Further, Kalshi ignores that the Compact and the Tribal Gaming Laws do not permit online sports betting by anyone, much less people under the age of 21 as Kalshi allows.

Finally, Kalshi wrongly relies on decisions defining the relevant field for preemption as trading on DCMs or event contracts generally, rather than online sports betting. As noted above, courts must consider "'the target at which the state law aims in determining whether that law is pre-empted.'" *In re Winter Storm*, 2026 WL 1944831, *6 (citation omitted). The Court thus ought not rely on cases misapplying inapplicable preemption analysis.

### C. The Complaint Explains How Kalshi Violates the Compact By Violating the Tribal Gaming Laws Because the Compact Requires Enactment and Enforcement of Those Laws.

Tribal-state gaming compacts are not garden-variety contracts. "Rather, they represent agreement as to gambling regulation and enforcement between two governmental bodies—a tribe and a state—under the imprimatur of the federal government." *Ho-Chunk Nation v. KalshiEx, LLC* ("*Ho-Chunk*"), 2026 WL 1284077 at *5 (W.D. Wis. May 11, 2026). The Compact is a creature of IGRA and replete with references to IGRA. *See generally* Compact. IGRA makes class III gaming "lawful on Indian lands only if" authorized by qualified tribal gaming laws and conducted in conformance with an effective tribal-state gaming compact entered into under IGRA. 25 U.S.C. § 2710(d)(1). That encompasses Kalshi's online sports betting on the Tribes' Indian lands.

The Compact subjects all class III gaming on the Tribes' Indian lands to the Tribal Gaming Laws and provides that only the Tribes can conduct class III gaming on Indian lands. Compact §§ 3(A)-(B). The Compact also requires that the Tribes assure that all gaming under the Compact operates pursuant to tribal law (and IGRA) and ensure compliance with the Compact and their respective Tribal Gaming Laws, including regulations. *Id.* §§ 2(Q), 4(A)(1), 4(D). The Compact, then, incorporates all the Tribal Gaming Laws for class III gaming.

Kalshi does not contend that its online sports betting is conducted in conformity with the Compact, since it obviously is not. It is not operated by the Tribes, it allows gaming by those under 21, with alcohol anywhere, and it does not restrict its revenue to use for government and community purposes allowed under IGRA. *Compare id.* §§ 1(E)-(F), 3(A), 4(B)(1), 4(B)(15) *with* Compl. ¶¶ 10-11. Nor does the Compact allow online gaming, as the Department of the Interior recognized when it allowed the Compact to become effective under IGRA. *See* Compact § 17; Compl. ¶ 40. Kalshi's arguments about the Compact, MTD at 23-25, ignore that the Compact is a creature of IGRA, which applies to all gaming on Indian lands. 25 U.S.C. § 2710(a) (class I and II gaming), (d) (class III gaming); *Ho-Chunk*, 2026 WL 1284077 at *5. Indeed, Kalshi tellingly ignores *Ho-Chunk* on this point. *Ho-Chunk*, *id.* at *6.

**D. A Mere Notice of Proposed Rulemaking Does Not Shield Kalshi from Liability Under the Tribal Gaming Laws.**

Kalshi cites a notice of proposed rulemaking ("NPRM") to support its preferred outcome. MTD at 7, 18. But that effort fails for three reasons. First, Kalshi ignores the Special Rule and the currently effective regulation which directly refutes Kalshi's position. Dodd-Frank's Special Rule prohibits DCMs from offering contracts involving, as relevant here, "activity that is unlawful under any Federal or State law . . . [or] gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i). That encompasses IGRA. If that were not enough, to implement the Special Rule, the CFTC adopted Rule 40.11, which

prohibits DCMs from listing for trading contracts involving gaming. 17 C.F.R. § 40.11. The Special Rule's "prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" Provisions Common to Registered Entities, 76 Fed. Reg. 44776, 44786 (July 27, 2011). And by adopting Rule 40.11, the CFTC concluded in 2011 that all event contracts within the Special Rule's categories are not in the public interest. Thus, if a proposed "event contract" involves gaming, that should be the end of the matter.

Second, neither a regulatory notice nor a proposed rule has any force of law, so the NPRM is "not a live regulation, let alone a prohibition[.]" MTD at 25. Further, if the NPRM reflects the CFTC's new interpretation, that concerns preemption of state laws, not implied repeal of IGRA, so it is irrelevant under *Bracker* and due no deference by this Court under *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024).

Finally, even if the NPRM is finalized as proposed, a regulation cannot repeal IGRA. Kalshi's arguments on this ignore its own argument, MTD at 25, that Section 17 of the Compact is only a forward-looking trigger. The Tribes do not assert that Kalshi has violated that section of the Compact. By the same token, Kalshi cannot seek shelter in a mere regulatory proposal.

## TRIBES' MOTION FOR PRELIMINARY INJUNCTION

### I. A PRELIMINARY INJUNCTION SHOULD ISSUE SINCE THE TRIBES ARE LIKELY TO SUCCEED ON THE MERITS, THEY WILL BE IRREPARABLY HARMED WITHOUT AN INJUNCTION, THE PUBLIC INTEREST FAVORS AN INJUNCTION, AND THE BALANCE OF THE EQUITIES FAVORS THE TRIBES.

An award of a preliminary injunction requires a clear showing that the movant (1) is "likely to succeed on the merits," (2) is "likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities tips in [the movant's] favor, and (4) an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 22 (2008);

*Flood v. ClearOne Communications, Inc.*, 618 F.3d 1110 (10th Cir. 2010). Where the movant establishes that the latter three factors "tip decidedly in its favor," the likelihood of success factor "is somewhat relaxed," and "'the movant need only show questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation.'" *Nova Health Systems v. Edmonson*, 460 F.3d 1295, 1298 n.6 (10th Cir. 2006) (citations omitted). Irreparable harm consists of injuries which are not redressable by money damages. *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016). All those general standards apply here.

In addition, encroachments on tribal sovereignty constitute an irreparable injury because the harm to tribal self-government is "not easily subject to valuation." *Prairie Band of Potawatomi Indians v. Pierce* ("*Prairie Band*"), 253 F.3d 1234, 1250 (10th Cir. 2001). The Tenth Circuit has "repeatedly stated that such an invasion of tribal sovereignty [as by precluding a tribe from enforcing its laws on its Indian lands] can constitute irreparable injury." *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah* ("*Ute Indian Tribe*"), 790 F.3d 1000, 1005 (10th Cir. 2015). Consistent with that, the Tribes are enforcing their Tribal Gaming Laws through this motion for a preliminary injunction: "Without the preliminary injunction, the Tribes would face the prospect of significant interference with their self-government." *Seneca-Cayuga Tribe of Oklahoma v. State of Oklahoma ex rel Thompson* ("*Seneca-Cayuga*"), 874 F.2d 709, 716 (10th Cir. 1989). A preliminary injunction is particularly appropriate here: "The harm to the Tribes' sovereignty cannot be remedied by any other relief other than an injunction" against Kalshi's unlawful activities. *Tohono O'Odham Tribes v. Schwartz*, 837 F.Supp. 1024, 1034 (D. Ariz. 1993).

## II. THE TRIBES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS THAT KALSHI OPERATES SPORTS BETTING ON THE TRIBES' INDIAN LANDS IN VIOLATION OF IGRA, THE COMPACT, AND THE TRIBAL GAMING LAWS SINCE THE FACTS AND LAW SUPPORT THOSE CLAIMS.

The Tribes are likely to succeed on the merits of their claims because Kalshi is plainly violating the Tribal Gaming Laws by offering mobile sports betting, including to people under the age of 21, on the Tribes' Indian lands. Each of the Tribal Gaming Laws prohibit operation of internet sports betting on the Tribes' Indian lands and require that only the Tribes may conduct class III gaming on their Indian lands. *See* Mescalero Gaming Ord. §§ 5(A)-(B); Isleta Gaming Ord. §§ 1(C), 2; Isleta Gaming Regs. § 9(HH); Pojoaque Gaming Ord. §§ 10-8-5(A)-(B); Sandia Gaming Ord. §§ 1(C), 2; Mescalero Ramos Decl., Pls.' Ex. 1 ¶ 6; Isleta Notah Decl., Pls.' Ex. 2 ¶ 4; Pojoaque Bailey Decl., Pls.' Ex. 5 ¶ 3; Sandia Tafoya Decl., Pls.' Ex. 7 ¶ 5. Kalshi violates those laws by operating mobile sports betting on the Tribes' Indian lands via a website and mobile app, through which patrons physically located on the Tribes' Indian lands can place sports betting wagers, deposit funds, and receive payouts. Mescalero Ramos Decl., Pls.' Ex. 1 ¶¶ 11-20; Isleta Notah Decl., Pls.' Ex. 2 ¶¶ 10-22; Pojoaque Bailey Decl., Pls.' Ex. 5 ¶¶ 14-19; Sandia Tafoya Decl., Pls.' Ex. 7 ¶¶ 21-28. In fact, Kalshi has advertised to the public that it offers sports betting, self-certified sports betting contracts in filings with the CFTC, and sought trademark protection for its bookmaking services. *See* Compl. ¶¶ 81-91.

Regardless of what Kalshi may call its operations, "[t]hese are sports wagers and everyone who sees them knows it." *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1029 (D. Nev. 2025); *cf., Garland v. Cargill*, 602 U.S. 406, 430 (2024) (Sotomayor, J., diss.) ("When I see a bird that walks like a duck, swims like a duck, and quacks like a duck, I call that bird a duck."). Other courts already have determined that Kalshi's "event contracts" are sports betting, including a recent decision referring to "Kalshi's sports betting operation masquerading as an investment

opportunity." *See* Order Granting Temporary Restraining Order, *Nessel v. KalshiEx, LLC*, No. 26-1087-CZ (Mich. 30th Dist. June 29, 2026). So too, this Court must apply common sense under *Iqbal* to determine the nature of Kalshi's online sports betting.

We know the sports betting using Kalshi's app is happening on the Tribes' Indian lands because gambling occurs where the bettor is located and places the bets, in this case, on the Tribes' Indian lands, per *Bay Mills*, 572 U.S. at 792. For that reason, gaming activity occurs where the bet is made, not where the "back-office admin" activity or "activities occurring in proximity to, but not inextricably intertwined with, the betting of chips, the folding of a hand, or suchlike." *Dalley*, 896 F.3d at 1207; *Bay Mills*, 572 U.S. at 792. That includes that Kalshi's mobile gaming occurs where the bettors are, not where the servers are that take bets. *See Iipay Nation*, 898 F.3d at 967.

While geofencing is a commonly-used and commercially available method for restricting online activity in physical locations in which it is legally prohibited, Kalshi refuses to employ it unless ordered to do so or for "Restricted Jurisdictions." *See* Sandia Hurtado Decl. ¶¶ 18-22; *supra* Background II. By contrast: "Many gaming operators 'offer online or mobile gaming in Nevada,' and to do so legally, they 'must use geolocation and geofencing technology.' Accordingly, many third-party vendors offer cost-effective, proven geofencing and geolocation technological solutions that gaming operators can integrate into their platforms." Pl.'s Application for Ex Parte Order to Show Cause Re: Contempt, *Nevada ex rel. Nevada Gaming Control Board v. KalshiEx, LLC*, No. 26 OC 00050 1B (June 4, 2026) at 8 (citations omitted); *see also Hendrick*, 817 F. Supp. 3d at 1035 (noting that compliance with state court orders by Robinhood and Crypto.com to cease offering their online sports betting in Nevada has resulted in no adverse action by the CFTC). This is also true beyond Nevada: "Almost all U.S. gaming companies—some valued at a fraction of Kalshi's reported $5 billion worth—license geolocation technology to ensure they only offer their products where legally permitted." Dan Bernstein, Eben Novy-Williams, and Michael McCann,

"Kalshi puts geolocation providers on edge amid rapid rise," Sportico.com (Oct. 16, 2025), available at https://www.sportico.com/business/tech/2025/kalshi-geolocation-technology-prediction-markets-1234873796/ (last visited July 22, 2026).

This is also true for Indian lands in New Mexico: "state-regulated online sports betting and prediction operators like DraftKings and FanDuel, which offer prediction markets in New Mexico, have previously told *InGame* that they geofence out tribal lands." Jill R. Dorson, "Past Is Prescient: New Mexico Tribes Make Case Congress Didn't Intend Sports Contracts In Complaint Against Kalshi," available at https://www.ingame.com/new-mexico-tribes-sue-kalshi/ (last visited May 17, 2026); Compl. ¶ 94. Despite the commonplace use of geofencing in the gambling industry, Kalshi does not use geofencing to exclude the Tribes' Indian lands from the reach of its website or app. *See* Mescalero Ramos Decl., Pls.' Ex. 1 ¶ 22; Isleta Notah Decl., Pls. Ex. 2 ¶ 18; Pojoaque Bailey Decl., Pls.' Ex. 5 ¶ 18; Sandia Tafoya Decl., Pls.' Ex. 7 ¶ 29. The Tribes are likely to succeed on the merits of their claim that Kalshi is in violation of the Tribal Gaming Laws and refuses to take steps to come into compliance.

## III. THE TRIBES LIKELY WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION BECAUSE THEY OTHERWISE WILL BE UNABLE TO ENFORCE THEIR GAMING LAWS ON THEIR INDIAN LANDS, A HARM THAT IS IRREPARABLE UNDER GOVERNING LAW.

The Tribes are likely to suffer irreparable harm to their sovereignty and governmental authority in the absence of an injunction because the issuance of an injunction is how the Tribes can enforce the Tribal Gaming Laws on their Indian lands as made enforceable by IGRA. Interference with tribal self-government and implementation of a tribe's laws can be irreparable harm for purposes of a preliminary injunction motion. *See Ute Indian Tribe*, 790 F.3d at 1005; *Prairie Band*, 253 F.3d at 1250; *Seneca-Cayuga*, 874 F.2d at 716. By analogy: "Any time a State

is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012).

The absence of an injunction in this case would allow Kalshi to evade the Tribes' laws. Specifically, the Tribal Gaming Laws prohibit gaming that violates IGRA, Compl. ¶¶ 52, 57, the Tribes must have the "sole proprietary interest" for all gaming on their Indian lands, *id.* ¶¶ 46, 50, 55, 57, and no gaming is permitted on the Tribes' Indian lands unless it is approved by the relevant tribe, *id.* ¶¶ 46, 50, 54. The Tribal Gaming Laws and the Compact also prohibit gaming by those under 21 years old, which Kalshi unlawfully allows. *See* Pls.' Ex. 1-3, 5, 7. Also, the Compact recognizes that internet gaming is not authorized in New Mexico and allowing that would conflict with the promise of exclusivity which underlies the Compact's revenue-sharing provisions. *See* Compl. ¶ 40. All that would all be severely undermined unless the Tribes are able to enforce the Tribal Gaming Laws here. If, as Kalshi argues, Dodd-Frank in 2010 nationally legalized internet gaming, the Department of the Interior could not have approved the Compact to take effect in 2015 and thereafter with understanding that internet gaming was illegal. *See id*. Given all this, the Tribes would be irreparably harmed is Kalshi is allowed to continue to its online Indian lands gaming in violation of all the Tribal Gaming Laws.

## IV. THE EQUITIES FAVOR A PRELIMINARY INJUNCTION FOR THE TRIBES SINCE HARM TO THEIR ABILITY TO ENFORCE THEIR LAWS ON THEIR INDIAN LANDS STRONGLY OUTWEIGHS KALSHI'S ORDINARY, MONETARY HARMS FROM GEOFENCING.

Next, the balance of equities tips sharply in favor of the Tribes here since potential harms to Kalshi are strongly outweighed by the irreparable injury to the Tribes' authority to regulate gaming activities on their Indian lands. The Tribes' authority to regulate all class III gaming on their Indian lands is an essential attribute of tribal sovereignty, which IGRA was enacted to protect and support. 25 U.S.C. §§ 2701(4), 2702(1)-(2). The Tribes have duties and interests to protect the

gaming public, minors, problem gamblers, the Tribes' governmental revenues, and the general welfare of their citizens. *See, e.g.*, Compact § 1. All those interests together in exercising sovereignty, "enforcing duly-enacted laws, and regulating sports gambling to promote the public welfare" are weighty. *Schuler I*, 2026 WL 657004 at *10. That especially applies for people aged 18 to 20, who are "too young to participate in legal sports gambling" but "have unrestricted access to sports-event contracts on Kalshi's exchange" and are "particularly vulnerable to problem gambling" and unprotected when trading on Kalshi. *Id.* at 10 n.9.

In stark contrast, Kalshi's interest here is simply a desire to continue making money from evading the costs and effect of compliance with IGRA, the Compact, and the Tribal Gaming Laws. But those interests are redressable by money damages obtainable in the ordinary course of litigation, and so are outside the scope of the preliminary injunction analysis. *See Curtis v. Oliver*, 479 F. Supp. 3d 1039, 1103 (D.N.M. 2020). In addition, Kalshi's compliance burden, should an injunction issue, would be a technique commonly-used in the technology and gaming industries and relatively straightforward to implement: geofence the Tribes' Indian lands. *See* Sandia Hurtado Decl., Pls.' Ex. 8 ¶¶ 13, 17-26; *see also, e.g.,* Ariz. Admin. Code § R19-4-117 (requiring event wagering operators in Arizona to institute geofencing to block patrons located outside Arizona).

Kalshi's exiting privacy policy would ameliorate compliance with a geofencing order. That policy provides that Kalshi already collects the information it would need, such as user "location data, including current and historical information concerning a user's geographic location, GPS location, transaction location, and IP addresses that they use in conjunction with [Kalshi's] Services" and user location information gleaned from "GPS, Wi-Fi, [and] wireless network triangulation[.]" Kalshi Privacy Policy, available at https://kalshi.com/privacy-policy (last visited July 21, 2026); Compl. ¶¶ 92-93. Per that policy, Kalshi "use[s] the Google Maps API to gather information about [users'] location(s)" through "various technologies to determine [their] location,

including IP address, GPS, and other sensors that may, for example, provide Google with information on nearby devices, Wi-Fi access points, and cell towers." Kalshi Privacy Policy, *supra*. With all the information Kalshi collects, a sophisticated, well-funded, and highly profitable technology company such as Kalshi will not be overly burdened by having to implement a standard and commonly-used measure such as geofencing. *See* Compl. ¶¶ 95-96; *supra* Background II. DraftKings, FanDuel, Jackpocket, and even Pornhub all geofence, so Kalshi should too.

Finally, Kalshi's claimed injuries due to an injunction would be of its own making. Kalshi moved forward with its online sports betting enterprise despite the CFTC's warnings of possible legal issues and risk of enforcement actions. *See* CFTC Advisory Letter No. 25-36, 2025 WL2817302, n.4 at 2 (Sept. 30, 2025) (warning "that State regulatory actions and pending and potential litigation, including enforcement actions, should be accounted for with appropriate contingency planning, disclosures, and risk management policies and procedures.").

## V. A PRELIMINARY INJUNCTION HERE ADVANCES THE PUBLIC INTEREST SINCE IT FURTHERS PUBLIC INTERESTS OF IGRA, THE COMPACT, THE TRIBES' GAMING LAWS, DODD-FRANK, AND THE CFTC'S REGULATIONS.

The public interest strongly supports granting an injunction to the Tribes, as it would further the public interests of IGRA, the Compact, and the Tribal Gaming Laws. First, the public interest would be served in furthering IGRA's policy goals, namely to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments," and

> to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players.

25 U.S.C. § 2702(1)-(2).

The Tribes' request for an injunction is an exercise of their regulatory authority under IGRA, both based on their inherent sovereignty and under federal law. An injunction also would

serve the public interest through the Tribes' implementation of the public policy goals to protect their citizens and the gaming public per the Compact and the Tribal Gaming Laws.

IGRA is a comprehensive federal regulatory regime for on-reservation gaming and the Compact is a creature of that structure. To implement the requirements of IGRA and the Compact, the Tribes established an array of consumer protections for the gaming public and developed over the decades successful regulation of gaming on their Indian lands, including ensuring the integrity of gaming, supporting problem gambling programs, prohibiting the cashing of public assistance checks or payments for gaming activities, providing self-exclusion for problem gamblers, limiting gaming to persons over the age of 21, requiring licenses and background checks for gaming operators, and requiring minimum liability insurance, among others. Compl. ¶¶ 36, 41-42, 45-47, 50-51, 55, 57, 59 (citations omitted). This strong public interest in protecting the gaming public also is expressed in the cooperative intergovernmental framework of tribal sovereignty, compacts, regulation, consumer protection, responsible gaming, jobs, and essential governmental revenue and services on which IGRA is built. *Id.* ¶¶ 37-43. The absence of an injunction to prevent Kalshi from continuing to violate the Tribal Gaming Laws would severely undermine this joint regulatory structure established to protect the public interest. An injunction here also would advance New Mexico's sovereign interests under the Compact since regulation of gambling is "concededly within the police powers of a state[.]" *See Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905).

The CEA does very different things than IGRA but both their goals would be served by an injunction here. IGRA was enacted in part "to provide a statutory basis for the regulation of gaming by an Indian tribe . . . [and] to ensure that the Indian tribe is the primary beneficiary of the gaming operation," 25 U.S.C. § 2702(2). In turn, Dodd-Frank serves "to protect consumers from abusive financial services practices[.]" Pub. L. 111-203, 124 Stat. 1376. Enjoining Kalshi's online on-reservation sport-betting will both full IGRA's objectives and protect consumers.

Among other things, Kalshi allows anyone 18 years of age to bet on sports, regardless of the legal limits of where the bettor is located. Compl. ¶ 91. And because Kalshi allows sports betting wherever there is a smartphone and an internet connection, Kalshi allows individuals consuming alcohol or located in places where alcohol is served and consumers to place unlimited sports bets—practices the Compact and the Tribal Gaming Laws disallow. *See* Compact § 4(B)(15); *see also* Isleta Ord. § 1(C); Isleta Regs. § 9(HH); Sandia Ord. § I(C).

Granting a preliminary injunction in favor of the Tribes here also would support the public interest on which the Special Rule and Rule 40.11 are based. When the Supreme Court struck down PASPA in 2018, it held: "Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Murphy*, 584 U.S. at 486. Of course, "Congress can regulate" is not the same thing as "Congress regulates," a point that appears to elude Kalshi. Besides, Kalshi has conceded that the CFTC has authority under the Special Rule to preclude gaming-related contracts, which Rule 40.11 prohibits. *See KalshiEx, LLC v. Martin*, 793 F. Supp. 3d 667, 680 (D. Md. 2025).

Congress adopted the Special Rule to make clear that DCMs cannot list for trading contracts that involve gaming or other subjects which are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11. This action was "consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" 76 Fed. Reg. at 44786. "The CFTC made that public interest determination [to prohibit gaming on DCMs] on a blanket basis when it promulgated 17 C.F.R. § 40.11(a)." *Crypto*, 815 F. Supp. 3d 1168, 1186 (D. Nev. 2025). Both Congress in the Special Rule and the CFTC in Rule 40.11 have codified the strong public interest in keeping gambling away from DCMs. That supports issuing a preliminary injunction to advance the public interest since Kalshi's online sports betting violates Rule 40.11. *See* 17 C.F.R. § 40.11(a)(1).

Finally, enjoining Kalshi from operating mobile sports betting on the Tribes' Indian lands would serve the public interest because it would be in harmony with the CEA's impartial access requirement which requires DCMs to have and enforce "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner . . ." 17 C.F.R. § 38.151(b). That rule has not a geographic requirement, but is instead prohibits access conditions based on net worth or price or fee discrimination on users of DCMs. *See id.* An injunction preventing Kalshi from offering mobile sports betting on the Tribes' Indian lands would, therefore, serve the impartial access rule, because an injunction would be applicable to everyone who attempts to access Kalshi's online sports betting application while located on the Tribes' Indian lands. Thus, injunctive relief would be "impartial, transparent, and applied in a nondiscriminatory manner." *Id.*

There is "no evidence . . . that the CFTC would take adverse action against Kalshi for complying with court orders" as violative of the impartial access rule. *See Hendrick*, 817 F. Supp. 3d at 1035. For example, the CFTC took no action under the impartial access rule against either Robinhood or Crytpo.com when each obeyed orders of Nevada regulators to cease offering their products in Nevada. *See id.* Another court, considering analogous state law, dismissed as "nothing but [Kalshi's] own *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial'" access in violation of the impartial access rule. *KalshiEx, LLC v. Schuler*, 2026 WL 657004 at *9 (S.D. Ohio Mar. 9, 2026). Nothing about the impartial access requirement precludes grant of a preliminary injunction here.

## CONCLUSION

For all the foregoing reasons and based on the declarations filed herewith and all filings in this case, Kalshi's motion to dismiss should be denied and the Tribes' motion for a preliminary injunction should be granted.

Submitted July 22, 2026,

/s/Daniel I.S.J. Rey-Bear
Daniel I.S.J. Rey-Bear
Tim H. McLaughlin
Brian P. McClatchey (pro hac vice)
Rey-Bear McLaughlin, LLP
421 W. Riverside Ave., Suite 1004
Spokane, WA 99201-0410
telephone: 505-238-1954
dan@rbmindianlaw.com
tim@rbmindianlaw.com
brian@rbmindianlaw.com

Nelva Cervantes
Office of General Counsel
Mescalero Apache Tribe
P.O. Box 227
Mescalero, NM 88340
telephone: 575-464-4494
ncervantes@mescaleroapachetribe.com

*additional attorney for*
*Mescalero Apache Tribe*

Lindsay Cutler
Jordan Oglesby
Legal Department
Pueblo of Isleta
P.O. Box 1270
Isleta, NM 87022
telephone: 505-869-9716
lindsay.cutler@isletapueblo.com
jordan.oglesby@isletapueblo.com

*additional attorneys for Pueblo of Isleta*

Dianna Kicking Woman
Robert A. Waldroup
Alicianna C. Martinez
Legal Department
Pueblo of Pojoaque
30 Buffalo Thunder Trail
Santa Fe, NM 87506
telephone: 505-455-4581
dwoman@pojoaque.org

rwaldroup@pojoaque.org
acmartinez@pojoaque.org

*additional attorneys for Pueblo of Pojoaque*

Steffani A. Cochran
General Counsel
Pueblo of Sandia
481 Sandia Loop
Bernalillo, NM 87501
telephone: 505-771-7967
scochran@sandiapueblo.nsn.us

*additional attorney for Pueblo of Sandia*

## CERTIFICATE OF SERVICE

I certify that I served Defendants with the foregoing Plaintiffs' Consolidated Motion for Preliminary Injunction and Response to Defendants' Motion To Dismiss through the Court's electronic filing system (CM/ECF) as required by D.N.M.LR-Civ. 5.1(b) on July 22, 2026.

/s/Daniel I.S.J. Rey-Bear
Daniel I.S.J. Rey-Bear