**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

MESCALERO APACHE TRIBE,
PUEBLO OF ISLETA,
PUEBLO OF POJOAQUE,
and PUEBLO OF SANDIA,

Plaintiffs,

v. Case No. 26-cv-01517-GBW-GJF

KALSHI INC., and KALSHIEX LLC,

Defendants

**DECLARATION OF BRANDON HURTADO**

1. I, Brandon Hurtado, am over 21 years of age. I make this declaration based on my personal and professional knowledge and experience.

**Professional Background**

2. I am the Technical Services Manager for Sandia Resort & Casino ("SRC"), which is wholly owned and operated by the Pueblo of Sandia ("Sandia"), a federally recognized Indian tribe located in central New Mexico, just north of the City of Albuquerque. I have worked for SRC for ten years.

3. As a gaming employee, I maintain a gaming license issued by the Sandia Tribal Gaming Commission and am bound by all applicable federal, tribal and state laws and regulations, approved internal controls, game rules, policies and procedures, and standards and directives.

4. In my position at SRC, I manage the technical support aspect of SRC's Information Technology ("IT") department, supervise the IT Helpdesk team and support many IT systems, including networks, databases, web interface, and cybersecurity. Currently, I am also the Interim

**PLAINTIFFS' EXHIBIT 8**

IT Director for SRC, responsible for SRC's overall system security and access control, to ensure that system functions, programs, and files cannot be accessed without specific authorization.

5. I have 17 years of experience in the IT sector. My experience includes 13 years working at casinos and four years of IT support at local repair shops, including my time at New Mexico Highlands University, where I studied Mathematics and Computer Science.

**Use of the SRC Wi-Fi**

6. To facilitate public internet access within the SRC for use by patrons and other guests or visitors, Sandia operates a free, public Wi-Fi network. That Wi-Fi network is only accessible from the Pueblo's lands.

7. Anyone who uses the SRC Wi-Fi network must first consent to a standard pop-up user consent agreement for terms and conditions of service. By accepting those manadatory terms and conditions, SRC public Wi-Fi users agree that they will use the wireless access in a legal and responsible manner and that there can be no expectation of privacy.

8. To facilitate system compliance and operations, the SRC public Wi-Fi network captures or logs users' Domain Name System ("DNS") queries or searches while using the public Wi-Fi network. DNS translates human-readable domain names (e.g., Kalshi.com) into machine-readable Internet Protocol ("IP") addresses.

9. Logs from Sandia's public Wi-Fi document approximately 940 clicks on Kalshi.com while on Pueblo lands between April 12, 2026 and June 24, 2026. This means that over that period, there were that many times that people went to the Kalshi website while on the Pueblo lands via the SRC's public Wi-Fi. Also, based on the IP addresses of users which visited the Kalshi website, it appears that the significant majority of those visits were by separate individuals.

**Geolocation and Geofencing**

10. Geolocation is the process or technology used to identify the real-world location of a location-aware device with a location-based service (such as a mobile phone, smart watch, Wi-Fi-enabled laptop or tablet, vehicle navigation system, or a Global Positioning System ("GPS") tracker) or a person possessing or using such a device.

11. Geofencing is the use of GPS, radio frequency identification ("RFID"), Wi-Fi, or cellular data to define a virtual geographic boundary and trigger a targeted action when a location-aware device enters, exits, or is used within a specific boundary, known as a "geofence".

12. Geolocation is not the same as geofencing. They both use location data of the user, but solve different operational problems. Geolocation identifies the physical location of a device, providing data for personalized content delivery, while geofencing creates a virtual boundary, triggering specific actions when a user enters or exits a defined area.

13. For example, geolocation is used in emergency public notice systems to disseminate SMS text messages to mobile phones phycially located within determined relevant areas for so-called Amber, Silver, and Turquoise Alerts. Those respectively ask the public to help find missing or abducted children, at-risk adults such as developmentally disabled individuals and seniors with cognitive impairments people, and other adults who are missing under unexplained or suspicious circumstances and believed to be in danger, especially tribal members.

14. Geolocation checks are designed to verify a user's true location, detect efforts at fraudulent impersonation of trusted sources ("spoofing"), and ensure compliance with jurisdictional rules. Geolocation software runs hundreds of checks on location, device integrity, and detection of identity fraud for every transaction. The data it uses for those checks come from the user's device, network, and transaction history, not from the location.

15. A geofence can be created around a geographical location as small as a building, store, mall, or school, or as large and specific as a ZIP code, a city, an Indian reservation, or a state.

16. Geofences can be active or passive. Active geofences require an end user to opt in to geolocation services and a location-aware app to be open. Passive geofences are always on, so they are unobtrusive and work in the background even when the relevant app is closed.

17. Geofences are commonly defined by drawing a "circle" or polygonal boundary around the desired location on a map using application programming during app development. Polygonal geofences use multiple points to create a more accurate boundary around a specific area, ensuring more precision than circular geofences. An administrator or developer first establishes a virtual boundary around a certain location in GPS- or RFID-enabled software, using geofencing software to identify points on a map. Those points define the geofence boundary.

18. Many commercially available geofencing applications incorporate Google Earth, allowing administrators to define boundaries on top of a satellite view of a specific geographical area. Other applications define boundaries by longitude and latitude or through user-created and web-based maps. Latitude and longitude geofences rely on precise geographic coordinates that define square or rectangular boundaries around the targeted location.

19. Geofencing has been around since before 1995 and relies on a variety of data points to determine a user's location with a high degree of accuracy. Since then, geofencing has been used for a wide variety of purposes, including vehicle tracking, child location, airspace protection, pesticide application, and law enforcement purposes to identify people and specific internet-based activities within specified areas.

20. Geofencing also is used for geographically targeted marketing, to pull in customers to brick-and-mortar businesses, such as a store, event, or casino. For example, a business can send

in-app notices on its own app when a user with that app on their device enters a geofenced area set by the business. Several tribal casinos in the Albuquerque area use geofencing in this manner.

21. Businesses also use geofencing to target users of other apps. Thus, a restaurant, movie theater, or salon can send coupons over an app when a consumer enters a geofenced area.

22. Geofencing also is used to ensure users are physically in an area where an activity is authorized. For example, sportsbooks and other online gambling companies are mandated by regulators to verify a user's location before allowing access. If the user is not within a jurisdiction where the activity is allowed, they are blocked from use of the website or mobile application.

23. Geofencing to limit the geographic scope of use of mobile sports betting is well established. For example, Jim "Mattress Mack" McIngvale, a famous Houston, Texas furniture-store owner, placed the largest Super Bowl wager as of 2021 by leaving Texas, where online betting is prohibited. Mr. McIngvale flew to Colorado Springs, Colorado, where sports betting is legal, logged on to DraftKings' mobile betting app from the airport, placed a bet, and then left. See https://www.usatoday.com/story/sports/nfl/super-bowl/2021/02/04/super-bowl-bets-mattress-mack-buccaneers/4388138001/. In 2022, Mr. McIngvale similarly placed a $3 million bet in a Louisiana restaurant parking lot for the Houston Astros to win the World Series, using Ceasars Sportsbook's mobile app. See https://www.espn.com/chalk/story/_/id/34964211/mattress-mack-wins-historic-75m-payout-astros-title.

24. Geofencing of Indian lands can be accomplished through such commercially available geolocation compliance apps such as GeoComply, Xpoint, and Bespot. Current technology allows for account restrictions whenever a gaming entity detects a user attempting to use a Virtual Private Network ("VPN") to route data through a private server, thereby hiding the user's physical location and internet protocol address to avoid geofencing in a restricted area.

25. Many geofencing and geolocation compliance platforms can create custom virtual boundaries and can readily connect with publicly available and trusted federal Geographic Information System ("GIS") boundary data and resources associated with Indian lands, such as (1) BIA Open GIS Data, which can be obtained through the Bureau of Indian Affairs at https://biamaps.geoplatform.gov/biatracts/; or (2) TIGER/Line Shapefiles, which are available through the U.S. Census Bureau at https://www.census.gov/cgi-bin/geo/shapefiles/index.php. Geofencing Indian lands also can be done with Google Maps, which is widely available though not an official government source, at https://google.com/maps/.

26. Geolocation compliance software is not limited to the gaming industry, but can be used in almost any commercial context. With that software and relevant available data, a large business with an online retail presence should be easily able to geofence around Indian lands within the State of New Mexico, including those of Sandia, as well as the Pueblo of Pojoaque, the Pueblo of Isleta, and Mescalero Apache Tribe. See, e.g., https://biamaps.geoplatform.gov/biatracts/ (search "Sandia Indian Reservation", "Pojoaque Indian Reservation", "Isleta Indian Reservation", and "Mescalero Apache Reservation").

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 8, 2026

[signature]

Brandon Hurtado