**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| MESCALERO APACHE TRIBE, PUEBLO OF ISLETA, PUEBLO OF POJOAQUE, and PUEBLO OF SANDIA,<br><br>*Plaintiffs*,<br><br>v.<br><br>KALSHI INC. and KALSHIEX LLC,<br><br>*Defendants*. | Case No. 2:26-cv-01517-MIS-GJF |

**BRIEF OF AMICUS CURIAE BLUE LAKE RANCHERIA, CHICKEN RANCH RANCHERIA AND HO-CHUNK NATION IN SUPPORT OF PLAINTIFFSMOTION FOR A PRELIMINARY INJUNCTION**

## INTRODUCTION

The Blue Lake Rancheria, the Chicken Ranch Rancheria of Me-Wuk Indians, and the Ho-Chunk Nation ("Amici Tribes") respectfully submit this brief in support of Plaintiffs Mescalero Apache Tribe, Pueblo of Isleta, Pueblo of Pojoaque, and Pueblo of Sandia's ("Tribes") combined motion for preliminary injunction and response to Defendants Kalshi, Inc., and KalshiEX LLC's ("Kalshi") motion to dismiss. The Amici Tribes, who were the first tribes in the Nation to file suit against prediction market companies for engaging in class III gaming on their Indian lands in violation of the Indian Gaming Regulatory Act ("IGRA"), Blue Lake and Chicken Ranch's secretarial procedures, and the Ho-Chunk Nation's gaming compact with the State of Wisconsin, believe that there are specific legal issues that have nationwide significance in prediction market litigation involving both tribes and states that have not been addressed in the briefing filed with the Court in this case and that will assist the Court in its analysis.

In this brief, the Amici Tribes will demonstrate that: (1) gaming compacts must be interpreted as federal regulatory law with the same status as interstate compacts, not as contracts

entered into by private parties; (2) enforcement of gaming ordinances falls within the ambit of 25 U.S.C. § 2710(d)(7)(A)(ii); (3) the assertion that the Commodity Futures Trading Commission ("CFTC") has exclusive jurisdiction over all contracts offered on designated contract markets is incorrect, as the history and the text of 7 U.S.C. § 2 allocates regulatory jurisdiction among the CFTC, the SEC, the Federal Reserve, banking regulators, and FERC; (4) the definition of "swap" in the Commodity Exchange Act ("CEA") does not encompass sports betting, and the CFTC cannot unilaterally expand its jurisdiction to interfere with tribal gaming by impermissibly expanding that definition.

## I. IGRA ESTABLISHES THAT COMPACTS AND GAMING ORDINANCES ARE FEDERAL REGULATORY DEVICES WITH THE FORCE OF FEDERAL REGULATORY LAW.

To understand the effect of IGRA and the jurisdictional problem IGRA resolved, the statute must be analyzed against the background of the history of tribal-state relations. From the earliest years of the republic, courts have recognized the political independence and self-governing status of Indian tribes. *See Cherokee Nation v. State of Ga.*, 30 U.S. 1, 2 (1831) (holding tribes are "domestic dependent nations [whose] relations to the United States resemble that of a ward to his guardian."). In *Worcester v. State of Ga.*, 31 U.S. 515, 561 (1832), the Supreme Court held that state law had "no force" in Indian country. "Generally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States." *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998); *see United States v. Mazurie*, 419 U.S. 544, 557 (1975); *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 154 (1980); *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 170–71 (1973) ("State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply."). In 1953, Congress enacted Public Law No. 83-280, 67 Stat. 588 (1953) ("PL 280"), codified at 28 U.S.C. § 1360, 25 U.S.C. §§ 1321–26, and 18 U.S.C. § 1162, which conferred criminal and limited civil jurisdiction on specific states, including the State of California. 28 U.S.C. § 1360(a).

In the 1980s, tribes began conducting gaming on Indian lands and states sought to prohibit or regulate Indian gaming. In 1987, the Supreme Court issued its decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which held that gaming in California was regulated rather than prohibited and, as a result of the limited civil jurisdiction conferred on California in PL 280, "Pub. L. 280 [did] not authorize California to enforce Cal. Penal Code Ann. § 326.5." *Cabazon*, 480 U.S. at 209–212. Importantly, the "sole interest asserted by the State [of California] to justify the imposition of its bingo laws on the Tribes is in preventing the infiltration of the tribal games by organized crime." *Id*. at 220.

"Congress passed IGRA in response to *Cabazon*." *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1031 (9th Cir. 2022); *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014). IGRA is "an example of cooperative federalism in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the **regulatory** scheme." *Id*. at 1032 (emphasis added) (quoting *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*, 813 F.3d 1155, 1160 (9th Cir. 2015)). Congress enacted IGRA "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments [and] to provide a statutory basis for the **regulation** of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences . . . ." 25 U.S.C. § 2702(1)–(2) (emphasis added).

In IGRA, Congress federalized state gambling laws and applied state gambling laws in Indian country. 18 U.S.C. § 1166. Gambling in Indian country is, thus, a federal crime, unless conducted pursuant to IGRA. 18 U.S.C. § 1166(c). Because states have historically been the "deadliest enemies" of tribes, *United States v. Kagama*, 118 U.S. 375, 384 (1886), Congress vested criminal enforcement authority in the federal government, unless that authority is transferred to states, with the consent of tribes, through tribal-state compacts. 18 U.S.C. § 1166(d).

Congress authorized limited state civil jurisdiction over Indian gaming through tribal-state compacts and the federalization of those compacts. *See* 25 U.S.C. § 2710(d)(3)(C)(i)–(ii) (allowing

states and tribes to identify applicable state and tribal law directly related to class III gaming and allocate jurisdiction for enforcement of those laws); *id.* § 2710(d)(3)(B). At the same time, Congress preserved the inherent tribal sovereignty to regulate gaming on Indian lands confirmed in *Cabazon* and enhanced that sovereign regulatory authority by federalizing tribal-state law (compacts) and tribal regulatory law (gaming ordinances). *See* 25 U.S.C. §§ 2710(d)(3)(B), 2710(d)(2)(B); *id*. §§ 2701(4)–(5), 2702(1)–(2).

Because states have no criminal enforcement authority over class III gaming under 18 U.S.C. § 1166, and states only have civil regulatory jurisdiction through gaming compacts, and because tribes often lack tribal court resources and only have civil jurisdiction over non-Indians under specific circumstances, Congress established a right of action to enjoin class III gaming not "conducted in conformance with a Tribal-State compact," 25 U.S.C. § 2710(d)(1)(C), in violation of 18 U.S.C. §§ 1166(a)–(c). 25 U.S.C. § 2710(d)(7)(A)(ii) allows tribes and states to bring "**any cause of action** . . . to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under paragraph (3) that is in effect."[1] (Emphasis added); s*ee* S. REP. 100-446, 18, 1988 U.S.C.C.A.N. 3071, 3088 ("S. REP. 100-446") (showing Congress intended 25 U.S.C. § 2710(d)(7)(A)(ii) to provide a means for tribes "to enjoin illegal gaming on Indian lands . . . ."). Thus, Congress provided a civil remedy allowing tribes (and states) to bring an action in United States District Court and seek an *immediate*[2] remedy through a temporary restraining order or a preliminary injunction to enjoin unlawful class III gaming on their Indian lands.

[1] The symmetry of § 2710(d)(1)(C) and § 2710(d)(7)(A)(ii) is undeniable. "Class III gaming activities [are] lawful on Indian lands only if such activities are . . . conducted in conformance with a Tribal-State compact," 25 U.S.C. § 2710(d)(1)(C), and class III gaming activities are not lawful on Indian lands if such activities *are not* conducted in conformance with a Tribal-State compact, i.e., if "class III gaming activity located on Indian lands [is] conducted in violation of any Tribal-State compact . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii).

[2] While the federal government may bring a criminal action under 18 U.S.C. §§ 1166(a)–(b), criminal investigations and prosecutions, by their nature, are lengthy, time consuming processes and 25 U.S.C. § 2710(d)(7)(A)(ii) allows tribes to obtain an immediate remedy through civil actions to enjoin unlawful class IIII gaming on Indian lands.

### A. Gaming compacts must be interpreted as federal regulatory law with the same status as interstate compacts.

Tribal-state gaming compacts are not private contracts that bind only the parties to the agreement. Compacts are federal regulatory devices that bind all parties engaging in class III gaming activity on Indian lands. "After lengthy hearings, negotiations and discussions, [Congress] concluded that the use of compacts between tribes and states is the **best mechanism** to assure that the interests of both sovereign entities are met with respect to the **regulation of complex gaming enterprises** . . . ." S. REP. 100-446, at 13 (emphasis added); *Chicken Ranch*, at 1053 n.17. 25 U.S.C. § 2710(d)(1) creates three conditions under which class III gaming may be lawful on Indian lands throughout the nation. Congress declared that class III gaming activities shall be lawful on Indian lands "only if such activities" are authorized by a gaming ordinance, permitted in the state, and conducted in conformance with a Tribal-State compact. 25 U.S.C. § 2710(d)(1). Compacts must be "approved by the Secretary of the Interior, and published in the federal register, just like agency regulations." *Ho-Chunk Nation, Plaintiff, v. Kalshi Inc., KalshiEX LLC, Robinhood Markets, Inc. & Robinhood Derivatives LLC, Defendants.*, No. 25-CV-698-WMC, 2026 WL 1284077, at *6 (W.D. Wis. May 11, 2026) ("*Ho-Chunk Nation*") (citing 25 U.S.C. §§ 2710(d)(3)(B), 2710(d)(8)(D)). 25 U.S.C. § 2710(d)(1), thus, establishes that tribal gaming ordinances and compacts are essential elements of IGRA that implement the overarching structure of IGRA at the tribal level (gaming ordinance) and the tribal-state level (compact). Subparts (A)–(C) of § 2710(d)(1) are elemental and exhaustive and, against a backdrop of 18 U.S.C. §§ 1166(a)–(c), establish the only conditions under which any person or entity may engage in lawful class III gaming on Indian lands.

Support for the claim that IGRA tribal-state compacts are federal regulatory law, binding on any party engaging in class III conduct within the territorial jurisdiction governed by the compact, is found in interstate compacts. "The nature of compacts as a form of sharing a state's individual sovereignty with the other party states and interstate compact agencies is an important concept and an important basis for understanding how **compacts are superior** relative to the

parties' individual laws and actions." Michael L. Buenger et al., *The Evolving Law and Use of Interstate Compacts* 1727–29 (2016) (emphasis added) (discussing the nature of compacts as shared sovereignty in section 2.2.1).[3] Tribal-state compacts, like interstate compacts that are "law of the Union," have the force of federal law upon publication in the Federal Register. *See Cuyler v. Adams*, 449 U.S. 433, 439 (1981). U.S. Const. art. I, § 10, cl. 3 provides: "No State shall . . . enter into any Agreement or Compact with another State, or with a foreign Power . . . without the Consent of Congress."

Interstate compacts represent a political compromise between "constituent elements of the Union," as opposed to a "commercial transaction." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 40 (1994); *Entergy Arkansas, Inc. v. Nebraska*, 358 F.3d 528, 542 (8th Cir. 2004). Compacts are made to "address interests and problems that do not coincide nicely either with the national boundaries or with State lines—interests that may be badly served or not served at all by the ordinary channels of National or State political action." *Hess*, 513 U.S. at 40. "The compact . . . adapts to our Union of sovereign States the age-old treaty making power of independent sovereign nations." *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 104 (1938); *see also United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 197 (1876) (finding power to make treaties with Indian tribes coextensive with power to make treaties with foreign nations). "While a common law contract directly affects only the rights and obligations of the individual parties to it, an interstate compact may directly impact the population, the economy, and the physical environment in the whole of the compact area." *Entergy*, 358 F.3d at 542. Crucially, compacts are binding on third-parties operating within the combined territorial jurisdiction of party-states, within the ambit of the conduct regulated by the compact. *See, e.g., Hinderlider*, 304 U.S. at 106 (holding a compact "is binding upon the citizens of each State and all water claimants, even where the State had granted the water rights before it entered into the compact.").

[3] Page numbers reference the Kindle edition, which may differ from physical copies.

In enacting IGRA, Congress chose tribal-state compacts as the "mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to activities conducted on Indian land . . . ." S. REP. 100-446, 6. Once effective, tribal-state compacts become the law of the land, binding on any entity within the designated territorial jurisdiction and scope of activity regulated by the compacts. Thus, just as interstate compacts are agreements between a state and another sovereign entity (state or foreign sovereign) with the force of federal law, tribal-state compacts are agreements between a state and another sovereign entity (tribe) with the force of federal law.

Tribal-state compacts are federalized (1) through IGRA itself, §§ 2702(2), 2710(d)(1)(C), and (2) through the ratifying act of approval by the Secretary of the Interior, § 2710(d)(8)(A), upon publication in the Federal Register. 25 U.S.C. § 2710(d)(3)(B). Treating compacts as anything other than the law of the land, binding on all parties within the combined jurisdiction, would conflict with 25 U.S.C. §§ 2710(d)(3)(C)(i)–(ii). If compacts are private contracts, there would be no need to determine "the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the . . . regulation of such activity," or "the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations . . . ." 25 U.S.C. §§ 2710(d)(3)(C)(i)–(ii). Private contracts do not allocate jurisdiction among the parties because private parties do not have *jurisdiction to allocate or enforce*; only sovereigns have such *jurisdiction*.

### B. Enforcement of Gaming Ordinances is within the ambit of 25 U.S.C. § 2710(d)(7)(A)(ii).

Gaming ordinances fall within the ambit of "any cause of action" because gaming ordinances are inextricably intertwined with the IGRA regulatory framework. *See* 25 U.S.C. § 2710(d)(7)(A)(ii). "Treating the Tribal-State compact and incorporated Gaming Ordinance as a regulatory device is [] supported by IGRA's legislative history, as well as its text." *Ho-Chunk Nation*, 2026 WL 1284077, at *6. IGRA requires enactment of a gaming ordinance as a condition for compacted gaming. 25 U.S.C. § 2710(d)(1)(A). Section 2710(d)(2)(A) provides: "If any Indian

tribe proposes to engage in . . . a class III gaming activity . . . the governing body of the Indian tribe shall adopt and submit to the Chairman" a gaming ordinance. Similar to compacts, gaming ordinances are federalized through approval of the Chairman of the NIGC upon publication in the Federal Register. *Id.* § 2710(d)(2)(B). Once a compact is concluded, effective with the publication of a tribal ordinance in the Federal Register, "class III gaming activity on the Indian lands of the Indian tribe shall be fully subject to the terms and conditions of the Tribal-State compact . . . ." 25 U.S.C. § 2710(d)(2)(C); *Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1028 (2d Cir. 1990). Thus, class III gaming is regulated by both the gaming ordinance (tribal level) and the compact (tribal-state level). The two cannot be separated, nor can they be separated from IGRA.

For example, gaming ordinances are required to establish that the tribe "will have the sole proprietary interest and responsibility for the conduct of any gaming activity . . . ." 25 U.S.C. § 2710(b)(2)(A); *see* Section 5(B) of Mescalero Ordinance No. 03-08 (Gaming Ordinance). Sections 1(f) and 2(I) of Mescalero's Compact also require the Tribe to be the sole owner of the gaming operation and have sole responsibility for conducting class III gaming activity. Sections 4(B)(17) and 5(A) of the Compact restrict third-party operation of class III gaming to duly authorized management contractors. *See* 25 C.F.R. § 502.15; *see also* Mescalero Ordinance No. 09-13.

Class III sports betting conducted on Mescalero's Indian lands without authorization under its compact constitutes a violation of the Gaming Ordinance, the Compact, 25 U.S.C. § 2702(2) (requiring tribes to be primary beneficiaries of gaming), and 18 U.S.C. §§ 1166(a)–(c). *See* N.M. Stat. Ann. §§ 30-19-2–3.[4] Thus, gaming ordinances, compacts, and IGRA itself must be considered as a holistic criminal-prohibitory/civil-regulatory framework in evaluating whether a particular class III gaming activity is "conducted in violation of [a] Tribal-State compact," under § 2710(d)(7)(A)(ii).

---

[4] While N.M. Stat. Ann. § 30-19-1(B)(1)(b) defines "bet" to exclude "bona fide . . . contracts for the purchase or sale, at a future date, of securities or other commodities," use of the term *bona fide* illustrates that commodity futures contracts must be lawful to be excluded from the prohibition.

Interpreting the scope of 25 U.S.C. § 2710(d)(7)(A)(ii) requires consideration of IGRA's entire regulatory scheme: the criminal statute, 18 U.S.C. § 1166 (and, here, N.M. Stat. Ann. § 30-19-2), the civil statutes, 25 U.S.C. §§ 2701–2721, the Department of Interior regulations, 25 C.F.R. part 293, the NIGC regulations, 25 C.F.R. part 502, the compact, and the gaming ordinance, to ascertain whether a "class III gaming activity [is] conducted in violation of [a] Tribal-State compact . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii). Crucially, the language of § 2710(d)(7)(A)(ii) is broad, rather than narrow, in scope. "[T]o ensure that tribes could enforce the Tribal-State compact and ordinances, Congress adopted broad language in IGRA's enforcement provision, . . . stating that a tribe could bring 'any cause of action' to 'enjoin a class III gaming activity' conducted 'in violation of any Tribal-State compact.'" *Ho-Chunk Nation*, 2026 WL 1284077, at *6. Section 2710(d)(7)(A)(ii) does not limit the type of legal action seeking an injunction, nor does it limit the class of defendants. "Of course, Congress could have limited enforcement actions to 'breach of contract' claims, . . . but *chose* not to limit the type of legal action or the class of defendants that could be sued, consistent with its stated, unambiguous intent in passing IGRA: to ensure that 'Indian tribes have the **exclusive right to regulate** gaming activity on Indian lands . . .'" *Id*. at *7 (original emphasis) (citing 25 U.S.C. § 2701(5)). "IGRA's legislative history [] explains that Congress intended to grant 'United States district courts jurisdiction over actions by . . . a tribe or state to enjoin illegal gaming on Indian lands.'" *Id*. (citing S. REP. 100-446, 18). "All of these purposes would be undermined if IGRA afforded no mechanism for tribes to prevent illegal, non-tribal class III gaming operations on their lands." *Id*.

The analysis, therefore, begins with the fact that uncompacted, class III sports betting on Indian lands is a federal crime arising from state law. 18 U.S.C §§ 1166(a)–(c); N.M. Stat. Ann. § 30-19-2. 25 C.F.R. § 502.4(c) defines "[a]ny sports betting" as class III gaming and 25 C.F.R. § defines "gaming activity" as "the conduct of class III gaming involving the three required elements of chance, consideration, and prize or reward." Class III gaming is defined broadly as "all forms of gaming that are not class I gaming or class II gaming," irrespective of technology or medium used to conduct gaming. 25 U.S.C. § 2703(8). The exemption in § 1166(c)(2) for tribal gaming refers

to §§ 2710(d)(1)(A)–(C) and, generally, § 2710(d), which require both a federally-approved compact and gaming ordinance for class III gaming to be lawful. If uncompacted sports betting occurs on Indian lands, it is conducted in violation of a compact, because it necessarily violates the requirement of tribal ownership in the gaming ordinance, the compact, § 2702(2) of IGRA, and § 1166(a) of IGRA. A violation of a gaming ordinance, therefore, falls within the cause of action if it establishes that "a class III gaming activity located on Indian lands [is] conducted in violation of any Tribal-State compact," under IGRA. 25 U.S.C. § 2710(d)(7)(A)(ii); *see Ho-Chunk Nation*, 2026 WL 1284077, at *5–7.

Finally, requiring a compact to explicitly prohibit third-party class III gaming on Indian lands to establish a right of action is an unreasonably restrictive interpretation of § 2710(d)(7)(A)(ii). IGRA directly prohibits non-tribal, uncompacted class III gaming in 18 U.S.C. § 1166(a) (through, *inter alia*, N.M. Stat. Ann. § 30-19-2) and indirectly in 25 § U.S.C. § 2710(d)(1), because gaming ordinances require tribal ownership of the gaming operations, and gaming ordinances are enforced "subject to the terms and conditions of the Tribal-State compact . . . ." 25 U.S.C. § 2710(d)(2)(C). Thus, for the foregoing reasons, courts must treat tribal-state compacts and tribal gaming ordinances as instruments of federal law designed to carry out Congressionally delegated authority to regulate class III gaming on Indian lands, the violation of which may give rise to independent causes of action demonstrating that class III gaming is being conducted in violation of a compact, under 25 U.S.C. § 2710(d)(7)(A)(ii).

## II. THE JURISDICTION OF THE CFTC IS NOT CATEGORICALLY EXCLUSIVE AND THE CFTC SHARES JURISDICTION WITH THE SEC, OTHER REGULATORS, AND STATES.

In pending litigation throughout the nation, registered entities, like Kalshi, and the CFTC take the position that the CFTC's jurisdiction over swaps is absolute to the exclusion of the jurisdiction of states, other federal agencies, and courts, when assessing the legality of sports event contracts under the CEA. *Compare, KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1023 (D. Nev. 2025) (finding the Court had "authority to construe the CEA to determine what falls within that jurisdictional provision, such as what constitutes a 'swap.'"), *with Blue Lake Rancheria v.*

*Kalshi Inc.*, No. 25-CV-06162-JSC, 2025 WL 3141202, at *7 (N.D. Cal. Nov. 10, 2025) (questioning whether the Court has jurisdiction because the CFTC has exclusive jurisdiction). This argument is an ahistorical and atextual interpretation of 7 U.S.C. § 2(a)(1)(A).

The primary purpose of 7 U.S.C. § 2 is to divide jurisdiction between the SEC and the CFTC when financial products are both futures and securities. *See generally* Gary E. Kalbaugh, *Derivatives Law and Regulation* 54 (3d ed. 2024) (chapters 2(B)–(C) discussing the history of the CEA);[5] *Chicago Mercantile Exch. v. S.E.C.*, 883 F.2d 537, 542–544 (7th Cir. 1989) (discussing the dispute between the CFTC and the SEC). The history of § 2, which arose from a dispute between the CFTC and the SEC, reveals that the CFTC's jurisdiction is limited, dependent on the type of product offered, and that jurisdiction is either shared or lost if the product offered crosses into areas of law regulated by other statutory regimes. That history sheds light on the limits of CFTC regulatory authority *vis-a-vis* tribal regulators under IGRA, when futures contracts, in the form of sports event contracts or swaps, involve "gaming"[6] and are offered on Indian lands.

The dispute between the CFTC and the SEC arose in 1974,[7] when changes to the CEA expanded the definition of "commodity" to include "all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." *See* 7 U.S.C. § 1a(9). This definition was interpreted to include certain securities and, therefore, gave the CFTC jurisdiction over certain securities. Kalbaugh, *Derivatives Law and Regulation* 62. Additionally, the CFTC was granted exclusive jurisdiction over "options," *see* 7 U.S.C. § 2(a)(1)(A), but a savings clause was added, preserving SEC jurisdiction:

Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange

[5] Page numbers reference the Kindle edition, which may differ from physical copies.

[6] Significantly, the CEA, 7 U.S.C. § 7a–2(c)(5)(C)(i)–(ii), and the regulations, 17 C.F.R. § 40.11(a)(1), make it clear that the regulatory scope of the CEA and the CFTC ends before "gaming." In contrast, the regulatory scope of IGRA begins with "gaming activity" on Indian lands. *See* 25 U.S.C. §§ 2701, 2702, 2703, 2710; 25 C.F.R. §§ 293.2, 502.4.

[7] Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389 (1974).

Commission **or other regulatory authorities under the laws of the United States** or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.

7 U.S.C. § 2(a)(1)(A)(emphasis added). Thus, "to the extent that the SEC already had jurisdiction over options on securities or futures on securities, that jurisdiction would be preserved." Kalbaugh, *Derivatives Law and Regulation* 63. However, because the expanded definition of "commodity" encompassed financial instruments (securities), securities-based derivatives sat directly on the boundary between the two agencies.

In 1975, the CFTC approved a Chicago Board of Trade ("CBT") application to trade futures on the Government National Mortgage Association ("GNMA") pass-through mortgage-backed certificates.[8] In an exchange of letters, the SEC asserted that the contracts were securities within its jurisdiction, and the CFTC responded that they were futures within its exclusive jurisdiction. In 1981, "the Chicago Board of Options Exchange, an SEC-regulated securities exchange, listed options on GNMA securities, [and] the [CBT] sued the SEC [arguing] that the SEC did not have the jurisdictional authority to permit such an option to be listed by one of its registrants." Kalbaugh, *Derivatives Law and Regulation* 63. "While the case was pending, the agencies reached a pact, which the SEC calls the Shad–Johnson Agreement and the CFTC calls the Johnson–Shad Agreement." *Chicago Mercantile Exch.*, 883 F.2d at 544. The agreement is now referred to as the Shad–Johnson Accord. "This Accord . . . provided that jurisdiction over options follows jurisdiction over the things on which the options are written." *Id*. As a result, "the SEC received jurisdiction of options on securities, while the CFTC got jurisdiction of options on futures contracts." *Id*.

However, the Court "held in *GNMA Options* that the agencies could not alter their jurisdiction by mutual agreement." *Id*. (citing *Bd. of Trade of City of Chicago v. S.E.C.*, 677 F.2d

[8] U.S. Gen. Acct. Off., *CFTC and SEC: Issues Related to the Shad-Johnson Jurisdictional Accord*, GAO/GGD-00-89 at 5 (Apr. 2000), https://www.govinfo.gov/content/pkg/GAOREPORTS-GGD-00-89/pdf/GAOREPORTS-GGD-00-89.pdf.

1137, 1142 n.8 (7th Cir. 1982) ("Although Congress has provided that the CFTC 'maintain communications' with the SEC regarding CFTC activities that 'relate' to SEC responsibilities, . . . and that the CFTC 'may cooperate' with the SEC, . . . the two agencies cannot thereby enlarge or relinquish their statutory jurisdictions."). Congress, therefore, enacted the Futures Trading Act of 1982, Pub. L. No. 97-444, 96. Stat. 2294 (1983), in which Congress "enacted the Accord almost verbatim . . . ." *Chicago Mercantile*, 883 F.2d at 544. "The legislature thought that this Accord would resolve things and restore a regime in which the SEC supervises capital formation and the CFTC hedging." *Id*. "Unfortunately, the distinction between capital formation and hedging falls apart when it comes time to allocate the regulation of options." *Id*. at 543. "Unless Congress changes the allocation of jurisdiction between the agencies, the question a court must resolve is the same . . . : is the instrument a futures contract? If yes, then the CFTC's jurisdiction is exclusive, unless it is also an option on a security, in which case the SEC's jurisdiction is exclusive." *Id*. at 545. To address the jurisdictional struggle, Congress passed the Commodity Futures Modernization Act of 2000 ("CFMA"), Appendix E of Pub. L. No. 106-554, 143 Stat. 2763 (2000).[9]

### A. The text of 7 U.S.C. § 2 allocates regulatory jurisdiction among the CFTC, the SEC, the Federal Reserve, banking regulators, and FERC.

In light of the history of § 2(a)(1)(A), a textual analysis of § 2 reveals that the purpose of the statute is to allocate jurisdiction among federal agencies, not to preclude the jurisdiction of courts. Section 2(a)(1)(A) explicitly provides that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State."

[9] The CFMA "also provided a sweeping liberalization of off-exchange derivatives trading," or over-the-counter ("OTC") derivatives. Kalbaugh, *Derivatives Law and Regulation* 68; *see* Financial Crisis Inquiry Commission, *The Financial Crisis Inquiry Report*, Chapter 3, 45–51 (Jan. 2011), available at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf (discussing OTC derivatives, credit default swaps ("CDS"), as a dominant factor contributing to the sub-prime mortgage crisis of 2008). The Dodd-Frank Act, Pub. L. No. 11-203 (2010), was enacted, in part, to force OTC derivatives, including CDS, onto regulated exchanges.

The late addition of a saving clause in § 2(a)(1) provides direct evidence of legislative intent to preserve the implied private remedy federal courts had recognized under the CEA. Along with an increase in powers, the Commission was given exclusive jurisdiction over commodity futures trading. The purpose of the exclusive-jurisdiction provision in the bill passed by the House was to separate the functions of the Commission from those of the [SEC] and other regulatory agencies.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982). Section 2(a)(1)(C) defines when stock index futures fall within the purview of the CFTC and when the SEC has jurisdiction over those products. Section 2(a)(1)(D) carves up CFTC and SEC jurisdiction over security futures products. Sections 2(a)(1)(G)–(H) allocate jurisdiction between the CFTC and SEC over swaps and security-based swaps.

The whole-text of § 2 is inclusive rather than exclusive. It provides for concurrent jurisdiction (§ 2(a)(1)(C)(i)(II)), joint jurisdiction over security futures (§ 2(a)(1)(D)(i)), joint rule-making authority (§ 2(a)(1)(D)(v)(I)),[10] and joint rules for foreign security futures (§ 2(a)(1)(E)(i)). Section 2 also requires CFTC coordination with other agencies, such as the Department of the Treasury and the Board of Governors of the Federal Reserve System. 7 U.S.C. § 2(a)(9)(B). Section 2 makes clear that regulatory jurisdiction is determined by the nature of the underlying product and its relationship to other regulatory regimes. Other regulators, such as FERC, have exercised jurisdiction over transactions involving OTC swaps, *Fed. Energy Regul. Comm'n v. Barclays Bank PLC*, 105 F. Supp. 3d 1121 (E.D. Cal. 2015), *as amended* (May 22, 2015) (holding CFTC did not have, to the exclusion of FERC, jurisdiction to assess penalties against electricity traders who allegedly manipulated electricity markets using financial swap contracts). Thus, the CFTC does not possess exclusive jurisdiction over swaps.

---

[10] Section 2(a)(1)(D) includes, *inter alia*, coordinated examinations, coordinated examination reports, CFTC reliance on SEC examination reports, coordinated audit trails and surveillance, and coordinated trading halts.

States also exercise enforcement authority under the CEA, 7 U.S.C. § 13a-2, notwithstanding the CFTC's "exclusive jurisdiction" under § 2(a)(1)(A). States have the authority to enjoin violations of the CEA, enforce compliance, recover damages on behalf of residents, and obtain other equitable relief. *Id*. Thus, "exclusive jurisdiction" in § 2 cannot reasonably be read to mean exclusive authority over every aspect of commodity futures regulation, to the exclusion of all others. The CFTC's jurisdiction is (1) limited, (2) dependent on the type of product offered, and (3) shared or lost if the product offered crosses into areas of law regulated by different statutory regimes. This is true of the SEC and FERC and, following this logic, when the product offered involves "gaming" on Indian lands, CFTC jurisdiction must give way to duly authorized regulators under IGRA. *See* 7 U.S.C. §§ 7a–2(c)(5)(C)(i)–(ii); 17 C.F.R. § 40.11(a)(1); 25 U.S.C. § 2701(5) (establishing Indian tribes have the exclusive right to regulate gaming activity on Indian lands); 25 U.S.C. § 2702(2) (requiring tribes to be the primary beneficiary of the gaming operation).

### B. The definition of "swap" is not broad enough to encompass sports betting, and the CFTC cannot unilaterally expand its jurisdiction to interfere with tribal gaming by impermissibly expanding the definition.

The CEA defines the term "swap" broadly as: "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence . . . ." 7 U.S.C. § 1a(47)(A)(ii). While the definition of "swap" is broad, the purpose for the language was inherently restrictive, not expansive—to ensure *regulatory capture* of off-exchange financial products, not to *deregulate* those same financial products. "Context and purpose make clear that Congress intended the definition of swap to capture a set of products in the financial industry which caused the 2008 financial crisis and threatened to create other crises in the future," and force swaps, in their myriad forms and permutations, onto a federally-regulated exchange. *QCX LLC v. Nessel*, No. 1:26-CV-710, 2026 WL 1895958, at *8 (W.D. Mich. June 17, 2026) ("*Nessel*"); *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025), *cert. denied,* No. 25-1237, 2026 WL 1780066 (U.S. June 22, 2026) (explaining Congress drafted a "broad" definition of swap because swaps "were considered

a driving factor in the 2008 financial crisis"). The interpretation proposed by the CFTC and prediction markets is, therefore, antithetical to the intent of Congress in enacting Dodd-Frank.

With regard to the CEA's application to Indian gaming, there is an explicit limiting principle in the CEA and the implementing regulations: prediction markets are prohibited from listing gaming contracts. 7 U.S.C. § 7a–2(c)(5)(C)(i)(V); 17 C.F.R. § 40.11(a)(1). 7 U.S.C. § 7a–2(c)(5)(C)(i)(V), in connection with the listing of swaps, authorizes the CFTC to "determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve . . . gaming . . . ." As the District Court of Nevada emphasized, "The CFTC made that public interest determination on a blanket basis when it promulgated 17 C.F.R. § 40.11(a), which prohibits DCMs from listing a swap based on an excluded commodity" that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law. *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1186 (D. Nev. 2025) ("*Crypto.com*"); 17 C.F.R. § 40.11(a)(1).[11] "Congress did not intend for gaming to be conducted on DCMs, and it defined swaps and enacted the special rule to achieve this intent." *Id.*, 815 F. Supp. 3d at 1187; 156 Cong. Rec. S5902-01, S5906–07 (showing Congress intended to "prevent gambling through futures markets," including "sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament [because these] types of contracts would not serve any real commercial purpose.").[12]

---

[11] There is no public interest test in 17 C.F.R. § 40.11(c), rather the standard for a CFTC review is articulated in § 40.3(b): "The Commission shall approve a new product unless the terms and conditions of the product violate the Act or the Commission's regulations." Gaming contracts violate the CFTC's regulations. To date, the Amici Tribes are unaware of any § 40.11(c) review the CFTC has conducted relative to sports event contracts. Rather, the CFTC appears to be averse to reviewing and approving sports event contracts under the current regulatory framework because doing so would give rise to a claim under the Administrative Procedure Act.

[12] Notably, 7 U.S.C. § 7a–2(c)(5)(C) can only be interpreted to authorize the CFTC to *prohibit* "gaming" contracts, because the Professional and Amateur Sports Protection Act of 1992, 28 U.S.C. §§ 3701–3704, generally prohibited sports gambling nationwide when the Dodd–Frank amendments to the CEA were enacted in 2010. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584

Beyond this explicit limiting principle, other provisions of the CEA and the regulations clarify that swaps are financial instruments that manage risk and price discovery in *existing markets* related to rates, currencies, debt, credit, and commodities, or events affecting these markets, such as weather events, not sports events. 7 U.S.C. § 1a(47)(A)(i) demonstrates that swaps include "a put, call, cap, floor, collar, or similar option[s] . . . based on the value [of] rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind . . . ." 7 U.S.C. § 1a(47)(A)(iii) deals with contracts based on the value of "rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, . . . . or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, . . . the financial risk associated with a future change in any such value . . . ." Section 1a(47)(A)(iii)(I)–(XXII) lists twenty-two specific swaps, all of which deal with rates, currencies, debt, credit, and commodities, or events affecting these markets, such as weather events, but lists nothing related to sports events or anything that could be construed to include sports events. The terms and conditions relevant to swaps in 17 C.F.R. § 40.1(2)(i) include: "Identification of the major group, category, type or class in which the swap falls (such as an interest rate, commodity, credit or equity swap) and of any further sub-group, category, type or class that further describes the swap." Sports events do not fall into any of the categories listed in the whole-text of 7 U.S.C. § 1a(47)(A). Even the residual definition in § 1a(47)(A) has internally limiting language: "the term 'swap' means any . . . agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap . . . ." The phrase "commonly known to the trade" must mean the finance industry, that deals with *derivatives* that manage risk and price discovery in *existing markets* related to rates, currencies, debt, credit, and commodities, or events affecting these markets.

Sports betting, however, is antithetical to the primary economic, financial, and commercial purpose of derivatives: risk-mitigation. *See generally* Christopher L. Culp, *Risk Transfer:*

---

U.S. 453 (2018) (holding that PASPA violated the Tenth Amendment and the anticommandeering doctrine).

*Derivatives in Theory and Practice* (2004).[13] The "value of [a derivative] is derived from the value of an underlying asset." Kalbaugh, *Derivatives Law and Regulation* 8. Derivatives allocate future uncertainty in markets by transferring risk across market participants and facilitate price discovery in the face of future uncertainty. *See generally* Robert L. McDonald, *Derivatives Markets* (3d ed. 2013). The distinction between derivatives and gambling is that derivatives quintessentially *mitigate external risk* and the value of a derivative is proportionate to the risk mitigated, while gambling *manufactures risk internally* through a game of chance and the value reflects the probability (odds) of winning or losing. Stripping the definition of "swap" of the proper context to include sports betting is, thus, incompatible with the concept of derivatives, and leads to other untenable consequences:

> The statutory language at issue came from a bill intended to regulate the use of financial instruments by large financial institutions in the wake of the 2008 financial crisis. The term "swap," . . . emerged from a particular context and referred to a set of existing things in that context. If that context is ignored, the definition of the term "swap" becomes so broad that it sweeps in any agreement or transaction dependent on anything happening that could conceivably result in any degree of financial consequence for anyone. This would intrude not only on the province of state [and tribal] gambling law but also contract law (service contracts), property law (mortgages), and family law (prenuptial agreements), among others. It is difficult to imagine anything that would not have *any* potential financial consequence, especially if the downstream consequences could include others betting on the event. [This] reading would make many transactions across all spheres of life into "swaps," and thus unlawful unless they are "entered into on, or subject to the rules of, a board of trade designated as a contract market."

*Nessel*, 2026 WL 1895958, at *6.

Just as limiting principles for construing the scope of the term "swap" can be derived, internally, from "the structure of the statute and its other provisions," *Nessel*, 2026 WL 1895958, at *6 (quoting *Maracich v. Spears*, 570 U.S. 48, 60 (2013)), limiting principles can also be derived externally to ascertain the scope of "swap." Crucially, expansion of the definition of swaps necessarily expands the jurisdiction of the CFTC. If swaps include "mortgages" and "prenuptial agreements," or "gaming," then the CFTC has jurisdiction over those areas of law. *Nessel*, 2026 WL 1895958, at *6.

[13] Page numbers reference the Kindle edition, which may differ from physical copies.

If the CFTC has the exclusive authority to interpret the definition of "swap," the CFTC can unilaterally expand its jurisdiction and, among other things, displace tribal regulators regulating class III gaming under IGRA. That would violate the federal government's trust obligations to tribes. In enacting IGRA, Congress found that "a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and Indian tribes have the exclusive right to regulate gaming activity on Indian lands . . . ." 25 U.S.C. § 2701(4)–(5). This policy arises from the unique trust relationship between tribes and the United States government.[14]

That trust responsibility supplies an external barrier to construing the CEA to permit the CFTC, through an expansive interpretation of "swap," to include sports betting and displace the regulatory authority Congress expressly preserved for Indian tribes under IGRA. Federal agencies "owe a fiduciary responsibility to Indian tribes." *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 574 (9th Cir. 1998). Here, Congress has expressly identified the federal interests that govern Indian gaming. In enacting IGRA, Congress sought to promote tribal economic development through the exclusive right to own and regulate class III gaming. 25 U.S.C. §§ 2702(1), 2701(5).

---

[14] *See* Consultation and Coordination With Indian Tribal Governments, 65 FR 67249 (2000):

> In formulating or implementing policies that have tribal implications, agencies shall be guided by the following fundamental principles: The United States has a unique legal relationship with Indian tribal governments as set forth in the Constitution of the United States, treaties, statutes, Executive Orders, and court decisions [and] Agencies shall respect Indian tribal self-government and sovereignty, honor tribal treaty and other rights, and strive to meet the responsibilities that arise from the unique legal relationship between the Federal Government and Indian tribal governments.

*See also* Uniform Standards for Tribal Consultation, 87 FR 74479 (2022):

> The United States has a unique, legally affirmed Nation-to-Nation relationship with American Indian and Alaska Native Tribal Nations, which is recognized under the Constitution of the United States, treaties, statutes, Executive Orders, and court decisions. The United States recognizes the right of Tribal governments to self-govern and supports Tribal sovereignty and self-determination. The United States also has a unique trust relationship with and responsibility to protect and support Tribal Nations.

The CEA should not be construed to silently undo that allocation of sovereign regulatory authority. Congress does not "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes," *Ho-Chunk Nation*, 2026 WL 1284077, at *10 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)), much less delegate to an agency the authority to accomplish that result unilaterally through an expansive interpretation of an otherwise undefined statutory boundary.[15] Moreover, where federal law affects Indian rights, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) ("[t]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." (quoting *Oneida Cnty., N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 247 (1985)). These principles militate against construing the undefined outer boundaries of "swap" to confer upon the CFTC an implicit power to transform class III gaming (sports betting) into federally-regulated derivatives and thereby displace the tribal regulatory authority Congress expressly protected under IGRA.

At a minimum, the federal trust relationship, the Indian canons of construction, and Congress's express protection of tribal regulatory authority under IGRA weigh against attributing such an extraordinary delegation to the CFTC absent a clear indication that Congress intended the CEA to intrude upon the federal regulatory structure it specifically established for Indian gaming.

[15] Notably, federal statutes of general applicability do not apply where core aspects of tribal sovereignty are involved. *See San Manuel Indian Bingo & Casino v. N.L.R.B.*, 475 F.3d 1306, 1313 (D.C. Cir. 2007) ("The determinative consideration appears to be the extent to which application of the general law will constrain the tribe with respect to its governmental functions. If such constraint will occur, then tribal sovereignty is at risk and a clear expression of Congressional intent [to override tribal sovereignty] is necessary. Conversely, if the general law relates only to the extra-governmental activities of the tribe, and in particular activities involving non-Indians, . . . then application of the law might not impinge on tribal sovereignty."); *Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1283 (10th Cir. 2010) ("respect for Indian sovereignty means that [general] federal regulatory schemes do not apply to tribal governments exercising their sovereign authority absent express congressional authorization."); *see also Muscogee (Creek) Nation v. City of Henryetta*, No. 25-CV-227-JAR, 2026 WL 1336060, at *6 (E.D. Okla. May 13, 2026) ("When a government actor invades the sovereignty of a federally recognized Tribe, that invasion itself constitutes irreparable harm and justifies injunctive relief.").

Nothing in the CEA expressly supersedes or repeals the IGRA. Nor does the CEA abrogate tribal sovereignty. "The baseline position, we have often held, is tribal immunity; and "[t]o abrogate [such] immunity, Congress must 'unequivocally' express that purpose." *Bay Mills Indian Cmty.*, 572 U.S. at 790 (quoting *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411, 418 (2001)). Therefore, courts must construe the definition of "swap," as it pertains to sports betting, consistent with 7 U.S.C. § 7a–2(c)(5)(C), 17 C.F.R. § 40.11(a)(1) (prohibiting gaming contracts), the whole text of 7 U.S.C. § 1a(47) (limiting swaps to traditional derivatives), the exclusive right of tribes to regulate or prohibit sports betting on Indian lands pursuant to IGRA, and the trust obligations and interpretive canons that follow from the trust obligations federal agencies owe to tribes. Properly construed, sports betting does not fall within the definition of swaps.

## CONCLUSION

For the foregoing reasons, the Court should consider IGRA, compacts, and gaming ordinances as part of a comprehensive regulatory scheme in construing 25 U.S.C. § 2710(d)(7)(A)(ii), should treat compacts and gaming ordinances as creatures of federal law implementing federal law, binding on all parties within Indian lands under IGRA, and find that the CFTC cannot unilaterally expand its jurisdiction to intrude upon tribal sovereignty and the exclusive right to regulate class III gaming on Indian lands by expanding the definition of "swap."

DATED: August 17, 2026

Respectfully Submitted,

LAW OFFICES OF RAPPORT & MARSTON

By: */s/ Lester J. Marston*

LESTER J. MARSTON
CALIFORNIA STATE BAR NO. 081030
LAW OFFICES OF RAPPORT AND MARSTON
AN ASSOCIATION OF SOLE PRACTITIONERS
405 WEST PERKINS STREET
UKIAH, CALIFORNIA 95482
TELEPHONE: 707-462-6846
FACSIMILE: 707-462-4235

EMAIL: LJMARSTON@RMLAWOFFICE.NET

ROTHSTEIN DONATELLI LLP

BY: /S/ *RICHARD W. HUGHES*_______
RICHARD W. HUGHES
NEW MEXICO STATE BAR NO. NM 1230
ROTHSTEIN AND DONATELLI LLP
PO BOX 8180
1215 PASEO DE PERALTA
SANTA FE, NEW MEXICO 87501
TELEPHONE: 505-988-8004
EMAIL: rwhughes@rothsteinlaw.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 17th day of August, 2026, the foregoing brief as *amici curiae* was filed electronically through the CM/ECF system, which caused CM/ECF participants to be served by electronic means.

*/s/Richard W. Hughes*
Rothstein Donatelli LLP