**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

MESCALERO APACHE TRIBE,
PUEBLO OF ISLETA,
PUEBLO OF POJOAQUE,
and PUEBLO OF SANDIA,

Plaintiffs,

v.

Case No. 2:26-cv-01517-MIS-GJF

KALSHI, INC., and KALSHIEX, LLC,

Defendants,

**ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR PRELIMINARY INJUNCTION**

**THIS MATTER** is before the Court on Defendants' Motion to Dismiss ("Motion to Dismiss"), ECF No. 21, filed June 24, 2026, and Plaintiffs' Consolidated Motion for Preliminary Injunction and Response to Defendants' Motion to Dismiss ("Motion for Prelim. Inj."), ECF No. 23, filed July 22, 2026. Defendants Kalshi, Inc. and KalshiEx, LLC ("Kalshi") filed a Response ("Response") to Plaintiffs' Motion for Preliminary Injunction on August 19, 2026, ECF No. 50, to which Plaintiffs Mescalero Apache Tribe, Pueblo of Isleta, Pueblo of Pojoaque, and Pueblo of Sandia (referred to collectively as "the Tribes") filed a Reply ("Reply") on September 4, 2026, ECF No. 55. The Court also received two amicus briefs. ECF Nos. 36-1, 48-1. The Court heard Oral Argument as to both Defendants' Motion to Dismiss and Plaintiffs' Motion for Preliminary Injunction on September 23, 2026. Tr. of Hr'g of Sep. 23, 2026, ECF No. 64.

Upon review of the Parties' submissions, the record, and the relevant law, the Court will **DENY** Defendants' Motion to Dismiss and **GRANT** Plaintiffs' Motion for a Preliminary Injunction.

# I. Background

## 1. Indian Gaming Regulatory Act and the Tribes' Gaming Laws

Enacted in 1988 in an effort to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments[,]" the Indian Gaming Regulatory Act ("IGRA") provides a comprehensive system for regulating gambling activities on Indian lands. 25 U.S.C. § 2702(1); see also 25 U.S.C. §§ 2701–2721. Under the Act, gaming activities are divided into three categories: class I gaming includes "social games solely for prizes of minimal value or traditional forms of Indian gaming[,]" 25 U.S.C. § 2703(6); class II gaming includes games of chance like "bingo" and "card games that are explicitly authorized by" state law, id. § 2703(7)(A); and class III gaming—most relevant to the instant case—includes "all forms of gaming that are not class I or class II gaming[,]" id. § 2703(8). For example, "casino games, slot machines, and horse racing" have all been recognized as included under the umbrella of class III gaming activity, Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 785 (2014), and the Tenth Circuit has noted that "sports betting" is included in the definition of class III games set forth in the Code of Federal Regulations, see United States v. 162 MegaMania Gambling Devices, 231 F.3d 713, 720 n.4 (10th Cir. 2000) ("The [National Indian Gaming] Commission also clarified Congress's definition of class III games as follows: Class III gaming means all forms of gaming that are not class I gaming or class II gaming, including but not limited to . . . Any sports betting and parimutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai[.]" (quoting 25 C.F.R. § 502.4(c))).

To engage in or operate a class III gaming activity, a tribe must have a Tribal-State Compact that has been negotiated with the surrounding State or operate under procedures prescribed by the Secretary of the Interior. See 25 U.S.C. §§ 2710(d)(1)(C), (d)(7)(B)(vii). The compact typically prescribes rules for operating gaming, allocates law enforcement authority

between the tribe and State, and provides remedies for breach of the agreement's terms. See id. §§ 2710(d)(3)(C)(ii), (v). Notably, IGRA also states that class III gaming activities are "lawful on Indian lands only if such activities are" (1) "authorized by an ordinance or resolution that is adopted by the government body of the Indian tribe having jurisdiction over such lands"; (2) "located in a State that permits such gaming for any purpose by any person, organization, or entity"; and (3) "conducted in conformance with a Tribal-State compact entered into by the Indian Tribe and the State[.]" Id. § 2710(d)(1)(A)-(C). IGRA also states that the United States District Courts shall have jurisdiction over "any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact[.]" Id. § 2710(d)(7)(A)(ii).

All of the Tribes in the instant case have had gaming on their lands for several decades, with Mescalero and Sandia operating gaming activities even prior to the passage of IGRA. Compl. ¶ 36, ECF No. 1. However, pursuant to IGRA, the Tribes began entering into tribal gaming compacts with the State of New Mexico and approved by the U.S. Department of the Interior in 1995. Id. ¶ 37. Since then, the Tribes have entered into successive gaming compacts with New Mexico under IGRA, with each Tribe being a party to "the standard-form 2015 gaming compact" which is effective through 2037. Id. ¶ 38. For example, Mescalero Apache and Isleta's applicable Compacts took effect in 2015, Sandia's Compact took effect in 2016, and Pojoaque's Compact took effect in 2017. Id.

All of the Tribes have since adopted gaming laws pursuant to IGRA and their respective compacts to regulate gaming on their lands. Id. ¶ 43. Among other things, these laws "prohibit third-party operated mobile sports betting on the Tribe's Indian lands, prohibit gaming by people under the age of 21, require use of net revenues for governmental purposes, impose licensing

requirements, and authorize enforcement, and all but Sandia's impose civil penalties for violations." Id. ¶ 45.

**2. Kalshi's Operations and the Commodity Exchange Act**

KalshiEx, LLC is a financial services company that operates as a derivatives exchange with a designated contracts market licensed by the Commodities Futures Trading Commission. KalshiEx, LLC v. Flaherty, 172 F.4th 220, 224 (3d Cir. 2026). As a result, Kalshi is able to offer so-called "event contracts" in which Kalshi customers can buy positions on predictions for a wide variety of events such as election outcomes, box office returns, and even the likelihood of war or natural disaster. Id. at 225. However, in January of 2025, Kalshi added a new type of contract to its exchange: sports event contracts. Id. These contracts were based on users being paid out if they correctly predicted the outcome of sporting events, such as who would win the Super Bowl. See Mot. to Dismiss at 8; Compl. ¶ 81. Despite sports gambling not being legal in every state and these sports event contracts appearing at times materially indistinguishable from traditional sports gambling, Kalshi was soon offering these contracts in jurisdictions across the country because it had self-certified the sports event contracts pursuant to Section 7a-2(c)(1) of the Commodity Exchange Act ("CEA"). See Compl. ¶ 81.

The origins of the CEA trace back to the Grain Futures Act of 1922, when it was originally adopted in part to supervise and police futures contracts trading and manipulation. Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465, 475 n.11 (1997). The act was renamed the CEA in 1936 and amended in 1974 to include nonagricultural commodities, see id., and create a Commodity Future Trading Commission ("CFTC") that was bestowed "exclusive jurisdiction" over certain derivatives and designated contract markets ("DCM"), see Flaherty, 172 F.4th at 226; 7 U.S.C § 2(a)(1)(A); see also 7 U.S.C. § 7(d); 17 C.F.R. pt. 38. However, "swaps" were notably not designated as part of the CFTC's exclusive jurisdiction until the CEA was amended by the

Dodd-Frank Wall Street Reform and Protection Act following the 2008 financial crisis. See Flaherty, 172 F.4th at 226; 7 U.S.C. § 2(a)(1)(A).

The Dodd-Frank Amendments, inter alia, provided a six-part definition of "swap." See 7 U.S.C. § 1a(47)(A)(i-vi). Relevant here, the Amendments defined "swap," in part, as "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence[.]" Id. § 1(a)(47)(A)(i-ii). Additionally, the Dodd-Frank amendments added a special rule to the CEA outlining the regulatory process for the review and approval of event contracts. Id. § 7a-2(c)(5)(C). One such pathway for approval can come via self-certification, as Kalshi did with its sports event contracts. Id. § 7a-2(c); 17 C.F.R. § 40.2(a) (self-certification requirements); 17 C.F.R. § 40.3 (preapproval rules). However, the CFTC still possesses the ability to prohibit event contracts that "involve . . . gaming" if they "are contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i)(V). Notably, the CFTC also adopted a rule in September of 2011 prohibiting a registered entity from listing for trade "[a]n agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law[.]" 17 C.F.R. § 40.11(a)(1) (emphasis added).

However, the CFTC allegedly has not "taken issue with the sufficiency of Kalshi's self-certifications" for its sports event contracts. Mot. to Dismiss at 8.

**3. The Instant Lawsuit**

After Kalshi began offering sports event contracts on its platform, the Tribes began investigating whether individuals were accessing Kalshi while on the respective Indian lands of the Mescalero, Isleta, Sandia, and Pojoaque. See Compl. ¶¶ 98-101. Ultimately, the Tribes found

that individuals were accessing Kalshi's online platform and placing wagers on sports event contracts, leading each Tribe to conclude that "Kalshi is illegally operating internet-based mobile sports betting" while on tribal lands, id., with the Isleta tribe issuing a letter to Kalshi on May 12, 2026, informing the business its operations were violating Isleta's laws, id. ¶ 98.

Shortly thereafter, the Tribes filed a Complaint ("Complaint") on May 12, 2026, seeking declaratory and injunctive relief and civil penalties with four causes of action alleging violation of the IGRA and the Tribes' respective Tribal compacts and Ordinances. ECF No. 1 ¶¶ 106-37. On June 24, 2026, Kalshi filed a Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 21. The Tribes filed a Consolidated Response and Motion for Preliminary Injunction on July 22, 2026, ECF No. 23. Kalshi filed a Response on August 19, 2026, ECF No. 50, to which the Tribes filed a Reply on September 4, 2026, ECF No. 55. The Court held oral argument on both motions September 23, 2026, ECF No. 64.

## II. Legal Standard

### 1. Motion to Dismiss Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move for dismissal if a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This pleading standard does not impose a probability requirement, but it demands "more than a sheer possibility that a defendant has acted unlawfully." Id. Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice. Twombly, 550 U.S. at 555. Although the court must accept the truth of all properly alleged facts and draw all reasonable inferences in the

plaintiff's favor, the plaintiff still "must nudge the claim across the line from conceivable or speculative to plausible." Brooks v. Mentor Worldwide LLC, 985 F.3d 1272, 1281 (10th Cir. 2021).

**2. Preliminary Injunction Standard**

A movant can establish a right to a preliminary injunction if they demonstrate the following four factors weigh in their favor: "(1) [the movant] is substantially likely to succeed on the merits; (2) [the movant] will suffer irreparable injury if the injunction is denied; (3) [the movant's] threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." Awad v. Ziriax, 670 F.3d 1111, 1125 (10th Cir. 2012) (quoting Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC, 562 F.3d 1067, 1070 (10th Cir. 2009)). If a court finds against the movant on one factor, the other factors need not be addressed. Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1266 n.8 (10th Cir. 2004).

Further, a preliminary injunction is an "'extraordinary remedy' that is granted only when 'the movant's right to relief [is] clear and unequivocal.'" First W. Cap. Mgmt. Co. v. Malamed, 874 F.3d 1136, 1145 (10th Cir. 2017) (alteration in original) (quoting Wilderness Workshop v. U.S. Bureau of Land Mgmt., 531 F.3d 1220, 1224 (10th Cir. 2008)); see also United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc., 883 F.2d 886, 888–89 (10th Cir. 1989) ("Because it constitutes drastic relief to be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it is clearly established.").

However, "there is one slight wrinkle to this four-factor test. If the party seeking the preliminary injunction can establish the last three factors listed above, then the first factor becomes

less strict—i.e., instead of showing a substantial likelihood of success, the party need only prove that there are 'questions going to the merits ... so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.'" Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1246-47 (10th Cir. 2001) (quoting Fed. Lands Legal Consortium ex rel. Robart Est. v. United States, 195 F.3d 1190, 1194 (10th Cir. 1999)).

## III. Analysis

### 1. The Tribes have stated a claim under IGRA; Defendants' Motion to Dismiss fails

Kalshi argues that the Tribes lack authority to sue for violations of their ordinances and gaming laws because Kalshi is a nonmember entity and under Montana v. United States, 450 U.S. 544 (1981), tribal governments "have no inherent sovereign power over nonmembers" barring two exceptions. Mot. to Dismiss at 9. Neither of those exceptions, Kalshi argues, apply in the instant case because Kalshi operates from offices outside of tribal territory and offers its services via the internet and is thus not "nonmember conduct inside the reservation that implicates the tribe's sovereign interests." Id. at 10 (quoting Plains Com. Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 332 (2008)). Additionally, Kalshi argues that its conduct does not implicate the Tribes' sovereign right to exclude nor does its conduct result in "catastrophic injury" to the Tribes. Id. at 11-13. Moreover, Kalshi argues that IGRA "simply sets out conditions for Class III gaming activities to be lawful on Indian lands" but it "does not turn tribal ordinances into federal law." Id. 13-14. Alternatively, Kalshi argues that even if Tribes had authority to enforce their ordinances or hold Kalshi liable for violating IGRA, the CEA provides exclusive jurisdiction to the CFTC for Kalshi's activities and thus "preempts" the Tribes' claims. Id. at 17. Lastly, Kalshi argues that two of the Tribes' claims fail because the Tribes' ordinances rely on preempted state law, id. at 21-22,

and the Tribes' compacts with New Mexico are unenforceable against Kalshi because it is a nonparty, id. at 23-24.

The Tribes argue that Kalshi's conduct violates IGRA, the tribal-state compacts, and tribal gaming laws because although IGRA authorizes tribal-state gaming compacts to allow for online gaming, these compacts do not. Mot. for Prelim. Inj. at 7-8. Moreover, the Tribes argue that IGRA, the compacts and Tribal gaming laws collectively "prohibit operation of any class III gaming on the Tribes' Indian lands by anyone besides the Tribes, gaming in which the Tribes are not the sole or primary beneficiaries, the use of net revenues from gaming for other than governmental and charitable purposes, and gaming by anyone under the age of 21." Id. at 8. Therefore, since neither the tribal compacts nor tribal laws allow/authorize online gaming by private third parties, such laws are "expressly incorporate[d]" by IGRA, which provides a cause of action for enjoining unlawful gaming activities on Indian lands. Id. The Tribes state they investigated and found that Kalshi "advertises, offers and accepts, and pays and collects on online sporting betting" from people on Tribal lands in violation of IGRA and tribal laws, and thus Kalshi can be subjected to enforcement actions. Id. at 8-10. Additionally, the Tribes argue that irrespective of how Kalshi defines its offerings, a Court need only look at its website with "common sense to see it is gaming." Id. at 9. Thus, the Tribes continue, because Kalshi is engaging in this conduct on tribal lands and the Tribes are authorized to seek relief under IGRA, it does not matter what other federal laws, such as the CEA, provide about Kalshi's operations. Id. Further, the Tribes argue that several canons of statutory interpretation–including plain language and reference canon–support the conclusion that IGRA expressly incorporates tribal gaming laws, and even if incorporation were not to apply, IGRA delegates federal authority to enforce such laws under 25 U.S.C. § 2710(d)(1). Id. at 10-13. Additionally, the Tribes argue Kalshi's reliance on Montana is misplaced as is

Kalshi's contention its operations are off-site/off-Indian land because (1) class III gaming in IGRA does not refer to off-site administration or operation of games, but rather gaming activity relates only to activities actually involved in the playing of the game, and (2) courts have found sports betting on a smartphone occurs where a bettor places a bet, so the location of the servers and the fact Kalshi users participate via the internet is irrelevant. Id. at 15-16.

**a. IGRA provides jurisdiction for the Tribes claims.**

The Court first tackles whether IGRA provides a cause of action and whether the Tribes' allegations about Kalshi's conduct, accepted as true with reasonable inferences drawn in their favor, provide sufficient factual matter such that a Court can find Kalshi's operations should be enjoined from being accessible on the respective Indian lands. For the following reasons, the Court finds the Tribes have carried their burden.

The plain language of the statute itself is the best starting point for determining whether the Tribes have authority to bring the instant suit and there are several passages in IGRA that support the conclusion the statute does far more than merely "set conditions," as Kalshi alleges. Mot. to Dismiss at 2. In the "Findings" section of the Act, Congress explicitly states "Indian Tribes have the exclusive right to regulate gaming activity on Indian Lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5). Elsewhere, IGRA states "Class III gaming activities shall be lawful on Indian lands only if such activities" are authorized by ordinance adopted by the Tribe, located in a State that permits such gaming and is conducted in conformance with a Tribal State compact. Id. § 2710(d)(1) (emphasis added). The Act also adds additional direction for when Tribes wish to have a third party conduct/operate gaming activities on its lands, stating: "If any Indian tribe proposes to engage in, or to authorize

any person or entity to engage in, a class III gaming activity on Indian lands of the Indian tribe, the governing body of the Indian tribe shall adopt and submit to the Chairman an ordinance or resolution[,]" as well as provides specific guidelines for when a Chairman can reject such a proposal. Id. § 2710(d)(2)(A) & (B). And, importantly, IGRA provides jurisdiction to United States District Courts for "any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . ." Id. § 2710(d)(7)(A)(ii).

While Section 2710(d)(7)(A)(ii) has often been used as vehicle for suits between the states and tribes, there is nothing in the language of the statute itself suggesting such a cause of action is limited to cases where the aim is to enjoin unauthorized class III gaming activity conducted only by those parties. Put more plainly, the text of the statute explicitly refers to class III gaming and does not appear to make any distinction about what specific actor is engaged in said gaming. Given that, the comprehensive nature of IGRA, and the various passages in the statute emphasizing tribal ordinances or authorization are a necessity for lawful class III gaming on tribal lands, it would seem illogical and undercut the purpose of the statute to interpret IGRA as not allowing a tribe or state to file suit to enjoin a third-party entity knowingly operating class III gaming activities on tribal lands without tribal approval or in violation of a tribal-state compact.

Moreover, though this exact scenario has not been frequently litigated, caselaw seems to favor interpreting IGRA's limitations on class III gaming as applicable and enforceable even where a tribe or state entity is not the gaming operator or a party to the relevant compact. See Coeur d'Alene Tribe v. Idaho, 842 F. Supp. 1268, 1282 (D. Idaho 1994) ("[I]n the absence of a tribal gaming ordinance and a compact, neither the Tribe nor any non-tribal entity including the State of Idaho, may conduct Class III gaming on the reservation"), aff'd, 51 F.3d 876 (9th Cir. 1995);

Cayuga Nation v. N.Y. State Gaming Comm'n, 775 F. Supp. 3d 651, 666 (N.D.N.Y. 2025) ("IGRA's restrictions on class III gaming applies to any class III gaming activity conducted on Indian lands, including gaming activity conducted by the State.") (emphasis added). In fact, the Tenth Circuit heard a case earlier this year in which a Tribe was able to seek enjoinment of a third-party's class III gaming operations where the party engaged in the violations was not the state or Tribe that was subject to the gaming compact. See Comanche Nation v. Ware, 174 F.4th 717, 728-31 (10th Cir. 2026).

Therefore, the Court first finds that IGRA does provide Tribes a cause of action to enjoin the operation of class III gaming activities on respective Tribal lands even when such activities are conducted by a third-party entity.

**b. The Complaint plausibly alleges Kalshi has engaged in violations of IGRA and Tribal Gaming Laws.**

Given that, the next question becomes whether the facts the Tribes alleged in the Complaint are sufficient to establish Kalshi has violated IGRA and the Tribal gaming laws. The Court finds the Tribes have sufficiently pleaded their claim.

The Complaint alleges, and Kalshi does not dispute, that individuals are accessing Kalshi's site or app while physically present on the Tribes' respective lands and staking money on these sports event contracts. Compl. ¶¶ 110, 118, 126, 134; see also Decl. of Maria Ramos, Gaming Agent with the Mescalero Apache Tribal Gaming Commission at ¶¶ 10-21, ECF No. 23-1 ("I accessed the Kalshi App . . . while physically located at several locations on the Reservation. At each of those times, I observed that the Kalshi App was offering wagering contracts on various sporting events and that for each such event, Kalshi allows users to wager or bet money on the outcome of the event. Those wagers or bets are materially the same as those offered via the Sportsbook at Casino Apache and the IMG Casino[.]"); see also Tr. of Hr'g of Sep. 23, 2026, at

17:18-18:3 ("[T]he tribe submitted eight declarations about Kalshi's operations. Kalshi has not disputed any of them in terms of the facts . . . . Kalshi operates on each of the four tribes' lands . . . . It is tens of thousands of direct clicks on their website even just over three-week periods.").

Thus, the more appropriate questions are whether Kalshi's offices being located outside of tribal lands and its business occurring via the internet place the business' conduct outside the purview of the Tribes and whether the conduct alleged qualifies as prohibited class III gaming in violation of IGRA and the Tribal ordinances.

Beginning with the former, a Kalshi user purchasing a sports event contract on Kalshi's site while physically located on tribal lands, by the Court's estimation, is no different than a bettor placing a wager at a casino: it occurs where the bettor is located. The Court also agrees with its sister district that betting occurs where the bettor places the bet even with respect to online gaming. See S. Ute Indian Tribe v. Polis, 810 F. Supp. 3d 1203, 1208 (D. Colo. 2025) ("Online bets placed outside of reservation boundaries are not placed on Indian lands because online betting occurs where the bettor is located. Class III gaming activity occurs where the activities actually involved in the playing of the game take place.") (internal quotation marks omitted), appeal filed, No. 25-1440 (10th Cir. Nov. 24, 2025). Moreover, this Court is guided by two prior rulings of the United States Supreme Court and the Tenth Circuit that held class III gaming activity under IGRA relates to the actual playing of the game/engagement in the gaming activity rather than off-site administration of said games. See Bay Mills, 572 U.S. at 792 ("[N]umerous provisions of IGRA show that class III gaming activity means just what it sounds like—the stuff involved in playing class III games. For example, § 2710(d)(3)(C)(i) refers to the licensing and regulation of [a class III gaming] activity and § 2710(d)(9) concerns the operation of a class III gaming activity. Those phrases make perfect sense if class III gaming activity is what goes on in a casino—each roll of

the dice and spin of the wheel. But they lose all meaning if . . . class III gaming activity refers equally to the off-site licensing or operation of the games.") (alterations in original) (internal quotation marks omitted); see also Navajo Nation v. Dalley, 896 F.3d 1196, 1207 (10th Cir. 2018) ("The Court's analysis in Bay Mills leads us to the clear conclusion that Class III gaming activity relates only to activities actually involved in the playing of the game, and not activities occurring in proximity to, but not inextricably intertwined with, the betting of chips, the folding of a hand, or suchlike.").

Logging onto Kalshi's website or app, depositing money, and then staking said money on the outcome of a sporting event are inextricably intertwined with gaming activity and all of it is conducted from wherever the user is engaging the platform. Given that and the aforementioned authority, the Court is unpersuaded by Kalshi's argument that its business being conducted over the internet with servers off site from the respective Tribes' lands somehow insulate it from the scope of IGRA and the Tribes' ordinances. Therefore, the Court finds that the Tribes' have plausibly alleged that Kalshi's conduct violates IGRA and their Tribal gaming laws absent IGRA being displaced or preempted by another federal statute.

**c. The CEA does not preempt IGRA or preclude the Tribes from exercising their power over gaming regulations on Indian lands.**

Given the Court's findings as to IGRA and the enforceability of the Tribes' gaming laws, the Court next turns to Kalshi's alternative argument that the CEA provides the CFTC exclusive jurisdiction over transactions involving "swaps," including the sports event contracts offered by Kalshi.

The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land; . . . anything in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under this provision, Congress has the power to enact

statutes that preempt state law. Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan., 489 U.S. 493, 509, (1989). Generally, there are three types of preemption: express, field, and conflict. US Airways, Inc. v. O'Donnell, 627 F.3d 1318, 1324 (10th Cir. 2010). It appears that express preemption and field preemption are most relevant to the instant case.

Field preemption exists where Congress intends for the federal government to exclusively occupy and regulate conduct in a particular field, id. at 1324-25, with one able to infer intention where the framework of a federal law or regulation is "so pervasive . . . that Congress left no room for the States to supplement it[,]" Arizona v. United States, 567 U.S. 387, 399 (2012) (alteration in original) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)); see also English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990). "Express preemption occurs when Congress has employed explicit pre-emptive language in a statute." Am. Car Rental Ass'n v. Humphreys, 182 F.4th 1254, 1259 (10th Cir. 2026) (internal quotation marks omitted).

Kalshi argues the CEA gives the CFTC "exclusive jurisdiction" over trading platforms such as Kalshi; thus Kalshi is essentially arguing Congress expressly intended to preempt the field with the CEA and preclude both state and tribal governments from regulating in the area. Mot. to Dismiss at 17-18. Kalshi further argues that this reading is bolstered by the CFTC itself suing nine states to prevent state enforcement actions in the area and by one federal Circuit holding Kalshi's Event Contracts are subject to the exclusive jurisdiction of the CFTC. Id. at 18 (citing KalshiEX, LLC v. Flaherty, 172 F.4th 220, 226 (3d Cir. 2026)). Additionally, Kalshi argues that the plain meaning and general applicability of the statute support the conclusion that a grant of exclusive jurisdiction to the CFTC "necessarily denies jurisdiction" to other entities, such as tribal governments. Id. at 18, 20.[1] Kalshi also argues that the Unlawful Internet Gaming Enforcement

[1] Kalshi also argues that Dodd-Frank "defined 'swap' to encompass, among other things, event contracts—that is, contracts 'dependent on the occurrence . . . of an event or contingency associated

Act ("UIGEA") bolsters its position because that act acknowledges IGRA while including language that carves out federal liability for transactions "taking place on DCMs like Kalshi." Id. at 190. Lastly, Kalshi argues that Isleta and Sandia's Ordinances permit gaming if and to the extent New Mexico law permits it, and it cannot be said Kalshi violated those ordinances because (1) New Mexico gaming law is preempted by the CEA as applied to event contracts traded on DCMs and (2) Kalshi's conduct constitutes bona fide business transactions under New Mexico's unlawful gambling law. Id. at 22

The Tribes counter that the CEA's historic exclusive-jurisdiction provision only consolidated the CFTC's regulation of traditional commodity futures trading separate from the SEC, and "the CEA before Dodd-Frank predates IGRA and provides nothing remotely authorizing private on reservation online sports betting or precluding tribal regulation . . . ." Mot. for Prelim. Inj. at 18. Moreover, the Tribes argue that because divesture of tribes' retained sovereign authority is disfavored under N.L.R.B. v. Pueblo of San Juan, 276 F.3d 1186, 1194 (10th Cir. 2002) (en banc), Kalshi has the burden of establishing Congress expressly intended to remove the tribes' regulatory power with respect to gaming. Id. at 19. Given that Dodd-Frank "says nothing about Indian tribes or Indian lands gaming," the Tribes continue, Kalshi has not established that there

---

with a potential financial, economic, or commercial consequence.'" Mot. to Dismiss at 6 (quoting 7 U.S.C. §§ 1a(47)(A)(ii), 1a(19)(iv)). Further, Kalshi contends that "the only authority to have squarely addressed the lawfulness of Kalshi's event contracts is the CFTC, which has repeatedly advised courts that they are swaps falling within its exclusive jurisdiction." Resp. at 21.

The Court notes two issues with this theory from the outset and thus disposes of the argument. One, the CFTC's position on event contracts has not been consistent. See KalshiEX LLC v. Commodity Futures Trading Comm'n, 119 F.4th 58, 62-63 (D.C. Cir. 2024) ("On September 22, 2023, the Commission issued a final order prohibiting Kalshi from listing the [congressional control event] contracts. The Commission grounded its decision in four findings. . . . The Commission determined the Congressional Control Contracts involved gaming, within the meaning of the Special Rule, because that term includes betting or wagering on elections[.]") (internal citations and quotation marks omitted). Two, even if deemed "swaps," that is not dispositive of whether the CEA's grant of exclusive jurisdiction completely preempts state and tribal gaming laws. See Nevada ex rel. Nevada Gaming Control Bd. v. KalshiEX, LLC, No. 2:26CV00406-MMD-MDC, 2026 WL 579364 at 4 n.5 (D. Nev. Mar. 2, 2026).

was clear congressional intent to preempt tribal Gaming laws. Id. Additionally, the Tribes assert that Kalshi's argument that the CEA is a statute of general applicability is "unfounded and immaterial" because the CEA is a "specialized statute governing boards of trade" and futures trading, id., and Dodd-Frank itself includes a saving clause that by its own terms shall not "supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State[,]" id. at 19-20 (quoting 7 U.S.C. § 2(a)(1)(A)). Lastly the Tribes assert that Kalshi's argument about the supposed inapplicability of the Sandia and Isleta ordinances is misguided because federal/state preemption differs from federal/tribal preemption under White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143 (1980), id. at 26, and "Tribal Gaming Laws take their force from IGRA, the Compact, and inherent tribal sovereign authority[,]" id. at 27. Thus, Isleta and Sandia can still seek enforcement for violations of IGRA. Id.

The Court first focuses in on CEA's jurisdictional provision, which states that the CFTC:

> shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 … with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

7 U.S.C. § 2(a)(1)(A).

Courts have been divided on what exactly this grant of "exclusive jurisdiction" means, and the results for Kalshi's preemption theory have been mixed and mostly involved enforcement actions by state entities, rather than tribal governments. For example, Kalshi's argument that a state government's enforcement authority against it is foreclosed by the CEA carried the day in the Third Circuit and a few district courts. See Flaherty, 172 F.4th at 229 (holding Kalshi's sports event contracts are swaps traded on a CFTC-licensed DCM, therefore the CEA preempts state gaming regulations and provides the CFTC exclusive jurisdiction); KalshiEX LLC v. Orgel, No. 3:26-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (same and enjoining enforcement of state gambling statute), vacated and remanded sub nom. KalshiEX LLC v. Schuler, 192 F.4th 664 (6th Cir. 2026).

Elsewhere, though, courts have rejected Kalshi's preemption theory outright. See KalshiEx LLC v. Cox, No. 2:26-CV-00151-RJS-CMR, 2026 WL 2241564, at *7-14 (D. Utah Aug. 4, 2026) (granting Utah's Motion for Summary Judgment against Kalshi and holding Utah's anti-gambling laws are not expressly preempted by the CEA, nor field or conflict preempted); United States v. Wisconsin, No. 26-C-749, 2026 WL 2474512, at *11-13 (E.D. Wis. July 29, 2026) (finding it was unlikely that the CFTC could establish CEA's definition of swaps covers event contracts and holding that even if it were a swap, it was unlikely the CEA preempted state law); Robinhood Derivatives, LLC v. Nessel, No. 1:26-CV-730, 2026 WL 2454883, at *1 (W.D. Mich. June 17, 2026) (holding even if a derivatives market's sports event contracts fit the statutory definition of a swap, "it is not clear that the statutory framework prevents states from regulating in the porous zone where derivatives and gambling meet"); KalshiEX LLC v. Martin, 793 F. Supp. 3d 667, 680-86 (D. Md. 2025) (assuming without deciding that Kalshi's sports event contracts are swaps, but finding the CEA does not preempt Maryland's gambling laws that apply to sports wagers);

KalshiEX LLC v. Williams, No. 25-cv-08846, 2026 WL 2017466, at *5-9 (S.D.N.Y. July 13, 2026) (finding the CFTC's exclusive jurisdiction over swap transactions does not preempt state gaming regulation).

Recent rulings from the Sixth and Ninth Circuits further cut against Kalshi's position. See Schuler, 192 F.4th at 675 (holding that Kalshi failed to establish that its sports-event contracts satisfy the statutory definition of a "swap" within the scope of CFTC's exclusive jurisdiction, and even if such contracts are swaps the CEA neither expressly or impliedly preempts state gambling laws); KalshiEX, LLC v. Assad, 190 F.4th 1098, 1113-22 (9th Cir. 2026) (holding the substance of the sports event contracts offered by Kalshi is sports gambling, regardless of whether Kalshi calls them swaps, and the CEA does not expressly, field, or conflict preempt Nevada gaming laws); Blue Lake Rancheria v. Kalshi, Inc., 191 F.4th 1071, 1082-90 (9th Cir. 2026) (holding IGRA provided Tribes with a cause of action against Kalshi, the sports event contracts Kalshi offered qualified as class III gaming activities under IGRA, the sports event contracts were not swaps under the CEA and even if they were, the exclusive jurisdiction provision of the CEA is limited and does not displace the requirements imposed by IGRA when operating on tribal lands).

Here, the Court finds the Ninth Circuit's analysis especially informative given its depth and the fact the Circuit reviewed the issue both in the context of the CEA preempting state gaming regulations and in the context of the CEA's relationship to IGRA and Tribal gaming laws. The Ninth Circuit's analysis of whether Kalshi's sports event contracts qualify as "swaps" in Assad, and whether the CEA displaces IGRA in Blue Lake Rancheria are particularly persuasive.

In Assad, the Ninth Circuit noted how the plain wording of § 2 of the CEA preempts state regulation of swaps that are traded or executed on a DCM, but concluded this express preemption provision only meant that state law was preempted with respect to a set of enumerated transactions

which included swaps. 190 F.4th at 1110-11. The Ninth Circuit then focused in on the terms "occurrence, event, and contingency" within the CEA's six-part definition of swaps and departed from engaging in the primarily plain-language/isolated dictionary definition interpretive approach that the Third Circuit exercised when siding with Kalshi in Flaherty. Id. at 1111. The court noted how the statutory definition of swap used both event and occurrence, and thus "these words should have independent meaning to avoid rendering one term superfluous" before highlighting how the statutory context and backdrop of the CEA included legislation involving gambling. Id. at 1112. The Ninth Circuit found this weighed against broadly interpreting the term "event" when faced with Kalshi's sports event contracts in part because they had "the hallmarks of sports betting" and the Supreme Court had instructed that the meaning of a statute may be affected by other statutes especially where "Congress has spoken subsequently and more specifically to the topic at hand." Id. (citing FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000)). Given Congress had long legislated in the field of gambling, the Ninth Circuit found it "difficult, then, to conclude that Congress intended to upend its decades of careful regulation of gambling based on broad definitions of the words used in a Wall Street Reform Bill." Id. at 1113. The Ninth Circuit ultimately held that Kalshi's sports event contracts "are likely not swaps under the CEA[,]" id. at 1120, while also making a pointed observation:

> [F]or Kalshi to deny that its sports event contracts are sports bets under a reasonable person's understanding is disingenuous. That Kalshi's sports event contracts are, in reality, sports bets is not just an "I know it when I see it" issue. … Rather, everyone, including Kalshi, knows it when they see it. The substance of the sports event contracts offered on Kalshi's DCM is sports gambling, regardless of whether Kalshi calls them swaps.

Id. at 1113 (internal citations omitted).

When faced with a similar issue in the CEA-IGRA context shortly thereafter, the Ninth Circuit took it a step further noting that even if it were to reverse and categorize Kalshi's sports

event contracts as swaps under the CEA, the court would still hold that the exclusive jurisdiction provision was limited and did not displace IGRA. Blue Lake Rancheria, 191 F.4th at 1089 ("True, Congress spoke clearly to supersede and preempt 'state regulation of swaps that are 'traded or executed' on a DCM.' But it did not say clearly that the CEA displaces other federal statutes, much less IGRA's separate regulation of gambling on Indian lands—a subject on which Congress has spoken 'repeatedly, deliberately, and specifically.' Because IGRA and the CEA are not 'irreconcilable,' we must harmonize them.") (internal citations omitted).

Here, the Court agrees with the Ninth Circuit on both fronts and will not chart a different path. The Court finds that the CEA does not provide the CFTC exclusive jurisdiction over Kalshi's sports-event contracts.[2] The Court also finds that Kalshi's sports event contracts qualify as class III gaming activity under IGRA, and thus the Tribes are not precluded from seeking to enforce their gaming laws.

Therefore, because of these findings and the fact the Tribes have put forward sufficient factual allegations that Kalshi is engaging in class III gaming activity on their lands in violation of IGRA and Tribal gaming laws, the Court concludes the tribes have stated a claim upon which relief can be granted. Therefore, Defendants' Motion to Dismiss is hereby **DENIED.**

---

[2] The Court also summarily rejects Kalshi's UIGEA argument. The only on point case Kalshi cites in support of its position regarding the UIEGA's relationship with IGRA is Blue Lake Rancheria v. Kalshi Inc., Case No. 25-cv-06162-JSC, 2025 WL 3141202, at *6 (N.D. Cal. Nov. 10, 2025 (UIGEA "contemplates this delineation" with IGRA). However, when the case proceeded to the Ninth Circuit, the Circuit rejected the argument. See Blue Lake Rancheria v. Kalshi, Inc., 191 F.4th 1071, 1088 (9th Cir. 2026) ("If Kalshi's sports event contracts are not 'bets or wagers' for UIGEA purposes because they are on-DCM (as opposed to online) transactions, then the UIGEA may not apply to them. But that conclusion says nothing about whether the same contracts are 'class III gaming activity' under IGRA when offered to users on Indian lands. IGRA applies to gaming that occurs at least partially on Indian lands, and UIGEA takes great pains to preserve IGRA's reach. The best reading of these two interrelated statutes is that IGRA provides a cause of action to enjoin class III gaming activities conducted improperly and at least in part on Indian lands, while UIGEA governs payments connected to unlawful internet gambling."). The Court agrees with the Ninth Circuit.

**2. All four preliminary injunction factors weigh in favor of the Tribes.**

**a. Likelihood of Success on the Merits.**

The Tribes argue that they are likely to succeed on the merits of their claims because each of the Tribes' respective gaming laws require that only the Tribes may conduct class III gaming on tribal lands as well as prohibit the operation of internet sports betting, and Kalshi is plainly violating those laws[3] by offering/operating a mobile sports betting platform to users located on tribal lands. Mot. for Prelim. Inj. at 31.

In its briefs, Kalshi largely relies on the arguments it made in its Motion to Dismiss to argue the Tribes are not likely to succeed in their claims, Resp. at 19, arguments the Court has already rejected. However, Kalshi also argues that because of "the mixed results that states and tribes challenging Kalshi have achieved across the country, the Tribes cannot show they are likely to succeed on the merits, let alone the 'plain' violation they assert." Id. at 20. Kalshi also contends that the allegations and declarations the Tribes have put forth to establish it has violated the Tribes' gaming laws are "legal opinions offered by fact witnesses who proclaim that the trades they or other declarants placed constitute 'Class III gaming' that 'violate IGRA, the Compact, and the Ordinance.'" Id. at 19 (citations omitted).

With the amount of documented traffic to Kalshi's website from individuals physically located on the respective Tribes' land and the Court having already found the Tribes have stated a claim upon which relief can be granted, the Court is unpersuaded by Kalshi's argument. While there are certainly parts of the declarations the Tribes provided that veer into offering legal

---

[3] Specifically, the Tribes cite to the following ordinances: Mescalero Gaming Ord. §§ 5(A)-(B); Isleta Gaming Ord. §§ 1(C), 2; Isleta Gaming Regs. § 9(HH); Pojoaque Gaming Ord. §§ 10-8-5(A)-(B); and Sandia Gaming Ord. § 1(C).

conclusions, what appears undisputed is that individuals were able to freely access Kalshi's site and place stakes on a variety of sports-event contracts while physically located on the respective Tribes' lands. Further, three of the declarations provided came from Information and Technology Directors working for casinos/resorts on Isleta, Pojoaque, and Sandia land who reported a total of approximately 30,000 visits to Kalshi's website over a three-week period on their respective wifi networks. See Decl. of Erick Mendoza ¶ 9, ECF No. 23-4; Decl. of Gaudalupe Flores ¶ 10, ECF No. 23-6; Decl. of Brandon Hurtado ¶ 9, ECF No. 23-8. Additionally, the Court has already found that (1) IGRA provides authority for Tribes to regulate gaming activity on Indian lands, (2) neither Kalshi's nonmember status nor the CEA preclude the Tribes from pursuing enforcement actions; and (3) the Tribes have offered undisputed allegations that Kalshi users are placing stakes on Kalshi's sports event contracts while physically located on the respective Tribes lands.

Therefore, the Court finds the first preliminary injunction factor weighs in favor of the Tribes and they are likely to succeed in on the merits of their claims.

**b. The Tribes likely will suffer irreparable injury by Kalshi's ongoing conduct on their respective Indian lands.**

As to the second factor, the Tribes argue that encroachments on tribal sovereignty constitute an irreparable injury because the harm to tribal self-government is "not easily subject to valuation." Mot. for Prelim. Inj. at 30 (citing Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1250 (10th Cir. 2001)). Further, the absence of a preliminary injunction would allow Kalshi to continue to evade the Tribes' gaming laws and in effect undermine the ability of Tribes to enforce their own laws as well as undermine the promise of exclusivity proffered by New Mexico in the Tribal-State compacts. Id. at 34.

Kalshi argues that the Tribes will not suffer irreparable or imminent harm as result of its activities. For one, Kalshi argues, the Tribes waited more than sixteen months after Kalshi first

began offering sports event contracts before seeking preliminary relief suggesting they were not facing urgent harm. Resp. at 22. Further, Kalshi argues its operations as a private business pose no threat to the Tribes' sovereignty and governmental authority because its business is not physically located on tribal lands and the Tribes have not "offer[ed] concrete evidence . . . of imminent and irreparable harm to their revenues" as a result of their sports-contracts activities. Id. Alternatively, Kalshi argues that simple economic loss does not usually constitute irreparable harm. Id. at 22-23 (citing Heideman v. South Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003).

The Tenth Circuit has "repeatedly stated that . . . an invasion of tribal sovereignty can constitute irreparable injury." Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah, 790 F.3d 1000, 1005 (10th Cir. 2015) (alteration in original) (quoting Wyandotte Nation v. Sebelius, 443 F.3d 1247, 1255 (10th Cir. 2006)). For example, in Prairie Band the Tenth Circuit found irreparable injury to a tribe's sovereignty where state laws governing motor vehicle registration and titling infringed on the Tribe's own motor vehicle code. 253 F.3d at 1242. There, the court noted the tribes could not be adequately compensated in the form of monetary damages in part because harm to tribal self-government is not easily subject to valuation. Id. at 1250-51. The fact the Tribe was operating in an area that was a traditional government function (motor vehicle codes and registration) also seemed pertinent in the Court's reasoning. Id.

Here, the Court finds Prairie Band instructive and similar to the case at hand. Gaming and gambling regulations have historically fallen under the purview of a traditional government function and tribes have had an explicit federal grant of authority to exercise that function since the adoption of IGRA in 1988. Several of the Tribes in the instant case were also regulating gaming on their lands for decades prior to that. Therefore, Kalshi enabling its customers to engage in

gaming activities while physically located on tribal lands in violation of IGRA and the Tribal gaming laws impedes the exercise of tribal sovereignty.[4]

Thus, the Court finds that the irreparable injury factor of its preliminary injunction analysis also weighs in favor of the Tribes.

**c. The balance of equities favors the Tribes.**

The Tribes argue the balance of equities favor granting a preliminary injunction to enjoin Kalshi from making its platform available to users accessing it on tribal lands because the "authority to regulate all class III gaming on their Indian lands is an essential attribute of tribal sovereignty," and the exercise of that regulatory power helps them protect their revenues and "the welfare" of their citizens. Mot. for Prelim. Inj. at 34-35.

Kalshi, on the other hand, argues the Tribes ignore the potential compliance costs an injunction would inflict on Kalshi's business. Resp. at 23. Kalshi also argues that the Tribes request is "unworkably vague and broad." Id. at 24. More specifically, Kalshi notes that in other cases it:

> has expended significant resources to implement in certain jurisdictions geofencing that seeks to restrict the initiation of trades based upon user location at the time of initiation. But the Tribes' request is seemingly broader: By asking the Court to enjoin Kalshi from "operating" on tribal lands, the Tribes are asking the Court to prevent anyone with an open position on a Kalshi event contract from closing out that position, or possibly from even continuing to hold it, while on tribal lands.

Id. (emphasis added). Additionally, Kalshi argues the requested injunction may put it into conflict with CFTC's principles regarding impartial access because the injunction would require it to "discriminate among users and restrict access to its market on the basis of geographic location."

---

[4] Further, though economic factors are generally not considered—and have not been considered— in the irreparable injury analysis, the Court notes that American jurisprudence has recognized the tremendous economic impact gaming and IGRA have had for Tribes both in terms of revenue and job creation. See California v. Cabazon Band of Mission Indians, 480 U.S. 202, 218-219 (1987) ("The Cabazon and Morongo Reservations contain no natural resources which can be exploited. The tribal games at present provide the sole source of revenues for the operation of the tribal governments and the provision of tribal services. They are also the major sources of employment on the reservations. Self-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members.").

Id. at 25. Lastly, Kalshi raises a concern that it may not be able to recover from the Tribes if it ultimately prevails, as the Tribes can claim immunity from suits for money damages. Id. at 26.

The Court finds the harm inflicted on the Tribes through Kalshi's operations outweighs that suffered by Kalshi to geofence around the respective tribal lands. For one, based on oral argument and the record before the Court, it does not appear to be a heavy lift for Kalshi to geofence and limit access to its site for users who are physically located on the respective Indian lands. Kalshi already possesses such technology. See Tr. of Hr'g of Sep. 23, 2026, at 25:19-25 ("[B]ased on the online sports betting so far through August, [Kalshi] collected approximately $2.7 billion in fees. That is certainly enough to implement geofencing, as they are already doing, not only in three states, but … Kalshi has a list in their website of 54 restricted jurisdictions, from Afghanistan to Zimbabwe, the entire alphabet. They certainly can include some additional tribes."). Kalshi itself did not dispute its capacity to do so, even as it disputed its necessity and noted additional compliance challenges such as what to do with outstanding transactions if geofencing were to occur. See id. at 42:10-14 ("With respect to balancing of the equities, Your Honor, and potential hardship to Kalshi, Kalshi has geofenced in three states, where there have been court orders entered against it. It disputes those court orders and disputes the necessity of geofencing.").

Two, the Court believes that a well-tailored injunction that applies to future contracts but does not apply to contracts already entered into should alleviate some of Kalshi's concerns. Additionally, as it relates to concerns about potential recoverable costs, the Tribes stated their position was that "when tribes bring suit, they impliedly waive their sovereign immunity to the extent of offsets relevant to the same claim." See id. at 47:10-12. Additionally, and alternatively, Kalshi indicated at oral argument that "some sort of nominal bond could be appropriate," though

it cautioned it still had concerns about to what extent costs would be recoverable. See id. at 46:2-4.

"Because Indian tribes are sovereign powers, they possess immunity from suit to the extent that Congress has not abrogated that immunity and the tribe has not clearly waived its immunity." Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173, 1182 (10th Cir. 2010). However, "a Tribe waives its sovereign immunity as to counterclaims sounding in recoupment by filing suit[.]" Berrey v. Asarco Inc., 439 F.3d 636, 640 (10th Cir. 2006). Therefore, since part of the Tribes' suit seeks civil penalties and damages in addition to enjoinment, Compl. ¶ 138, it would seem Kalshi still has recourse if it were to prevail, so long as it asserts an appropriate counterclaim, see Berrey, 439 F.3d at 640. Thus, the Court finds the issuance of a nominal bond unnecessary in the instant case.

As such, the Court finds the balance of harms weighs in favor of the Tribes.

**d. The public interest favors enjoining Kalshi's operations on the Tribes respective lands.**

The Tribes argue that the public interest favors enjoining Kalshi's operations on their respective lands because it would "further[] IGRA's policy goals," namely to promote tribal economic development, self-sufficiency, and strong tribal governments by allowing the Tribes to exercise their regulatory authority rather than undermining their regulatory structure. Mot. for Prelim. Inj. at 36-37. Further, the Tribes argue enjoinment would further the purposes of the CEA's special rule precluding gaming-related contracts, id. at 38, as well as advance the CEA's impartial access requirement because it would help "prohibit[] access conditions based on net worth or price or fee discrimination" and "would be applicable to everyone who attempts to access Kalshi's online sports betting application while located on the Tribes' Indian lands[,]" id. at 39.

Kalshi counters that an injunction would not serve the public interest because, it argues, IGRA does not govern it as an entity. Resp. at 26. Further, Kalshi argues that the public interest implicated by an injunction is Congress's effort to create a national derivatives regime under the CEA because "[a] court order selectively prohibiting Kalshi from offering its products while in full compliance with the regulatory scheme Congress established would undermine that national framework; upset the delicate balance that Congress carefully established in IGRA, UIGEA, and the CEA; and sow confusion in the derivatives markets—beyond event contracts—that depend on uniform national rules." Id. at 26-27. Lastly, Kalshi argues that an injunction would be detrimental to the public interest because it would also harm nonparties by "[p]ausing or unwinding positions" and disrupting existing contracts. Id.

As the Court discussed in its analysis of CEA and IGRA, it does not appear the CEA was intended to preempt or displace all state gaming laws nor IGRA's regime and the ability of Tribes to enforce class III gaming regulations. Further, given the Court can tailor the injunction to not impact users' existing sports-event contracts, the Court is unpersuaded by Kalshi's argument that an injunction would sow confusion for users and the derivatives market. On the other hand, the Court finds that allowing a sovereign to enforce its regulatory powers in an area Congress expressly afforded them powers—powers courts have highlighted as impactful to the economic well-being of tribes—favors the public interest. Therefore, the Court finds the fourth preliminary injunction factor also favors the Tribes.

In summary, the Court finds that all four factors weigh in favor of entering a preliminary injunction, and the Court therefore **GRANTS** the Tribes' Motion for Preliminary Injunction.

## IV. Conclusion

Accordingly, it is **HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss, ECF No. 21, is **DENIED;**
2. Plaintiffs' Motion for Preliminary Injunction, ECF No. 23, is **GRANTED;**
3. Defendants Kalshi, Inc., KalshiEx, LLC and its affiliates, successors and assignees are hereby **ENJOINED** from offering internet-based sports betting or sports event contracts to individuals located on the Indian lands of the Mescalero Apache Tribe, Pueblo of Isleta, Pueblo of Pojoaque, and Pueblo of Sandia during the pendency of these proceedings;
    a. The injunction applies to internet-based sports event contracts, sports betting and the like, including but not limited to single-game bets, teaser bets, parlays/combos, over-under, moneyline, pools, exchange betting, in-game betting, proposition bets, and straight bets;
    b. The injunction does not unwind contracts or wagers already entered into before the effective date of this Order;
    c. Kalshi shall have 14 days from the date of this Order to come into compliance with the injunction via geofencing or some other mechanism.

Margaret Strickland

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE